**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAKOTA RESOURCE COUNCIL<br>720 Burnt Boat Dr., Suite 104<br>Bismarck, ND 58503,<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>1411 K St. NW, Suite 1300<br>Washington, D.C. 20005,<br><br>CITIZENS FOR A HEALTHY COMMUNITY<br>211 Grand Avenue, Suite 118<br>Paonia, CO 81428,<br><br>LIVING RIVERS & COLORADO RIVERKEEPER<br>120 Arbor Drive<br>Moab, UT 84532,<br><br>MONTANA ENVIRONMENTAL INFORMATION CENTER<br>107 West Lawrence St., Suite N6<br>Helena, MT 59601,<br><br>RIO GRANDE WATERKEEPER<br>301 N. Guadalupe St., Suite 201<br>Santa Fe, NM 87501,<br><br>SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612,<br><br>WATERKEEPER ALLIANCE<br>180 Maiden Lane, Suite 603<br>New York, NY 10038,<br><br>WESTERN WATERSHEDS PROJECT<br>126 South Main Street, Suite B-4<br>Hailey, ID 83333,<br><br>WILDEARTH GUARDIANS<br>301 N. Guadalupe Street, Suite 201<br>Santa Fe, NM 87501,<br><br>Plaintiffs, | ) | Case No. 1:22-cv-1853 |

v.

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street N.W.
Washington, D.C. 20240,

DEBRA HAALAND, Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240,

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street N.W.
Washington, D.C. 20240, and

TRACY STONE-MANNING, Director
U.S. BUREAU OF LAND MANAGEMENT
1849 C Street N.W.
Washington, D.C. 20240,

Defendants.

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

## INTRODUCTION

1. Plaintiffs Dakota Resource Council, Center for Biological Diversity, Citizens for a Healthy Community, Living Rivers and Colorado Riverkeeper, Montana Environmental Information Center, Rio Grande Waterkeeper, Sierra Club, Waterkeeper Alliance, Western Watersheds Project, and WildEarth Guardians (collectively, "Conservation Groups") hereby challenge Federal Defendants' decision to approve the sale of 162 oil and gas lease parcels, encompassing 128,510.24 acres of public lands in seven western states, through an analysis contained in six separate environmental assessments ("EAs") for violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and ts implementing

regulations,[1] and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*. A list of the challenged lease parcels is included as Appendix A at the end of this Complaint.

2. Global climate change is the greatest threat that humanity has ever faced. The scientific consensus is clear: as a result of greenhouse gas ("GHG") emissions, the global climate is rapidly destabilizing with increasingly catastrophic results. An ever-growing body of scientific literature, which Federal Defendants acknowledge, demonstrates that increasing GHG emissions are causing irreparable damage to virtually every ecosystem on the planet. From rising temperatures, increased drought and wildfires, more chaotic and extreme weather, ocean acidification, loss of sea and land ice, to rising sea levels, the impacts of climate change are already being experienced virtually everywhere.

3. Federal Defendants acknowledge the fundamentally incremental nature of the climate crisis and the small and shrinking window that remains to avoid the most catastrophic effects of climate change. Federal Defendants also admit that their Federal Oil and Gas Leasing Program contributes significantly to the global climate crisis, and that the Lease Sales at issue here will collectively cause billions of dollars in social and environmental harm to people and the planet. Federal Defendants nonetheless determined to hold the challenged Lease Sales and

[1] On July 16, 2020, the Council on Environmental Quality ("CEQ") published in the Federal Register its final rule to revise the NEPA implementing regulations, which went into effect on September 14, 2020 (the "2020 Rule"). The 2020 Rule is the subject of litigation, and CEQ is in the process of reviewing and updating the NEPA regulations pursuant to Executive Order 13990 (Jan. 20, 2021). On April 16, 2021, the Department of Interior directed its agencies to "not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect." Moreover, on April 20, 2022, the CEQ published its final Phase 1 NEPA Rule to amend the 2020 Rule, restoring core regulatory provisions and directing agencies to apply the same meaning as corresponding provisions in effect from 1978. 87 Fed. Reg. 23453 (April 20, 2022). The rule became effective on May 20, 2022. Therefore, in this Complaint, all citations to NEPA's implementing regulations are to the pre-2020 CEQ Regulations.

issue six separate EAs, each of which issued a finding of no significant impact ("FONSI") to the environment from the perpetuation of fossil fuel exploitation on federal public lands, a finding at odds with the voluminous body of scientific evidence discussed in each of the challenged EAs.

4. In January 2021, within days of President Biden taking office, the U.S. Department of the Interior ("Interior") suspended the authority of its bureaus and offices to take a number of actions without approval by Interior leadership, including the authority of the Bureau of Land Management ("BLM") to take action to implement the Leasing Program, including actions to issue any onshore or offshore fossil fuel authorization.

5. One week later, President Biden issued Executive Order 14008, which directed Interior to "pause" new oil and gas leases:

> pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

6. In response to litigation filed by pro-fossil fuel interests, the U.S. District Court for the Western District of Louisiana enjoined the implementation of the nationwide "pause" contemplated by Executive Order 14008. *Louisiana v. Biden*, 543 F. Supp. 3d 388, 410 (W.D. La. 2021). In response, Interior ordered BLM to proceed with the Lease Sales.

7. On November 27, 2021, Interior released its "Report on the Federal Oil and Gas Leasing Program Prepared in Response to Executive Order 14008" (the "Interior Oil and Gas Leasing Report"). Interior characterized the Report as "complet[ing] the review of the federal oil and gas programs called for in Executive Order 14008." While the Report recommended a number of fiscal reforms, it failed to provide any analysis of the Leasing Program's climate impacts.

8. On April 18, 2022, BLM posted lease sale notices for the challenged Lease Sales. On June 28, 2022, BLM posted the Decision Record and Protest Decision for the Wyoming lease sale. BLM issued Decision Records and Protest Decisions for the lease sales in Colorado, Montana/North Dakota, New Mexico/Oklahoma, and Nevada on June 29, 2022.

9. BLM's approval of the Lease Sales is driven by Interior's decision to proceed with implementation of its Leasing Program, and each of these sales is plainly part of a larger national initiative that must be collectively analyzed under NEPA.

10. Federal public lands used for fossil fuel extraction contribute 24% of the United States' GHG emissions. If federal lands were their own country, their GHG emissions would be ranked fifth globally. Moreover, future development of unleased federal minerals represents a "carbon bomb" that would likely push global climate change to catastrophic levels with incalculable consequences for the American people, the rest of humanity, and the global environment. Opening new areas to development is in no way consistent with a carbon budget aimed at restraining warming below critical thresholds, or with meeting the United States' commitments to international agreements such as the Paris Accord.

11. BLM manages the majority – nearly 700 million acres – of public minerals. About half of this federal mineral estate contains oil and/or natural gas, and over 26 million acres of federally managed lands are currently leased to private companies for oil and gas development. The BLM's Leasing Program contributes vast amounts of GHG pollution to the atmosphere. As the agency acknowledges, almost all ecosystems in the United States are unraveling as a result of climate change, including the lands administered by the BLM. These lands are found predominantly in the western half of the continental United States and Alaska. In particular, lands in the western United States are experiencing a climate change-exacerbated mega-drought, the likes of which have not been seen in at least 1,200 years, and unprecedented and severe wildfires.

12. These impacts in many cases appear to be disproportionate, with the western U.S. home to multiple climate "hot spots," areas where average warming has already exceeded 2°C. These and other climate impacts will occur more frequently and grow more severe as additional GHG pollution occurs, including the pollution directly resulting from Federal Defendants' Leasing Program and the Lease Sales challenged here.

13. NEPA codifies the common sense and fundamental idea of "look before you leap" to guide agency decision making. NEPA achieves its purpose through "action forcing procedures … requir[ing] that agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). Congress "directs that, to the fullest extent possible: [] policies, regulations, and public laws of the United States shall be administered in accordance with the policies set forth" in NEPA. 42 U.S.C. § 4332.

14. One of those public laws is FLPMA, which provides Interior with the authority and responsibility to serve as both the trustee of federal public lands for the benefit of the American people and the regulator of federal public land uses. These duties require Interior to: protect public land values, including "air and atmospheric values[;]" "account for the long-term needs of future generations[;]" prevent "permanent impairment of the productivity of the land and the quality of the environment[;]" and "take any action necessary to prevent unnecessary or undue degradation of the lands." Relative to its Leasing Program, Interior has failed to define what constitutes unnecessary or undue degradation under FLPMA and failed to take action to prevent the types of climate degradation that the agency acknowledges are already occurring and which will grow increasingly severe.

15. In violation of NEPA and FLPMA, BLM continues to recklessly lease large swaths of the western United States to oil and gas development without comprehensive

reviewing these connected actions and analyzing the severity of the resulting climate impacts from the addition of thousands of tons of GHG emissions into the atmosphere.

16. When several projects are pending concurrently "that will have cumulative or synergistic environmental impact," NEPA requires cumulative environmental impacts to be considered together. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). This Court and others have required BLM to consider the cumulative climate impacts of its leasing decisions together and in the context of local, regional, and national impacts. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C., 2019); *see also WildEarth Guardians v. BLM*, 457 F. Supp. 3d 880, 894 (D. Mont., 2020) ("if BLM ever hopes to determine the true impact of its projects on climate change, it can do so only by looking at projects in combination with each other, not simply in the context of state and nation-wide emissions.")

17. The Lease Sales challenged here are constituent parts of Interior's decision to resume leasing. Yet, by analyzing these Lease Sales in six distinct EAs – rather than together in a single, comprehensive environmental impact statement ("EIS") – BLM violated NEPA by diluting the impacts of these leases in the context of its Leasing Program while also failing to take a hard look at the cumulative climate impacts from these sales. In so doing, BLM also failed to prevent unnecessary and undue degradation of the public lands and resource values – or even define what "unnecessary or undue degradation" entails in the context of climate change – in violation of FLPMA.

18. Federal Defendants' process for resuming leasing under the Program and approving the challenged Lease Sales is a prime example of the fundamental disconnect between the ongoing climate crisis and Federal Defendants' management of public lands in a manner which prioritizes fossil fuel exploitation. Federal Defendants have made no indication that they intend to meaningfully acknowledge or address this disconnect through a

comprehensive programmatic review. Instead, with the Lease Sales, Federal Defendants continue their ongoing pattern of unlawfully authorizing and issuing oil and gas leases without taking a hard look at, or acknowledging the significance of, the accumulating impacts of rampant oil and gas development and combustion to our climate and the role played by the Program in the perpetuation of these impacts.

19. Plaintiff Conservation Groups therefore ask this Court to declare Federal Defendants' approval of the Lease Sales challenged herein to be unlawful, to vacate or set aside the approvals, to remand to BLM for further action in accordance with applicable law, and to enjoin Federal Defendants from approving or otherwise taking action to approve the challenged sales or any additional oil and gas leases under the agency's Leasing Program until Federal Defendants have fully complied with NEPA, its implementing regulations, and the substantive provisions of FLPMA.

## JURISDICTION AND VENUE

20. This action arises under NEPA, 42 U.S.C. §§ 4321-4370m-11, FLPMA, 43 U.S.C. §§ 1701-1787, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

21. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because this case arises under the laws of the United States and involves the United States as a defendant.

22. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because officers of the United States are named as Defendants in their official capacities and reside in this judicial district, Plaintiffs Center for Biological Diversity and Sierra Club also maintain offices in this judicial district, and a substantial part of the events or omissions giving rise to the claims, as well as the underlying decision making and guidance with respect to the U.S. Department of the Interior's management of federal oil and gas resources, as disseminated to the agency's field offices, have occurred in this district due to decisions made here by Federal Defendants.

Finally, this litigation challenges Interior's decision to resume the Oil and Gas Leasing Program through its approval of the challenged Lease Sales, and Interior is headquartered in this judicial district.

23. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 705 and 706, and would redress the actual and imminent, concrete injuries to Conservation Groups caused by Federal Defendants' failure to comply with duties mandated by NEPA and FLPMA and their implementing regulations. Conservation Groups' interests will be adversely affected and irreparably injured if Federal Defendants continue to violate NEPA and FLPMA as alleged herein, and if they affirmatively implement the decisions challenged herein. These injuries are concrete and particularized and fairly traceable to Federal Defendants' challenged decisions, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

24. The requested relief would redress the actual, concrete injuries to Conservation Groups caused by Federal Defendants' failure to comply with duties mandated by NEPA and FLPMA, and those statutes' implementing regulations.

25. The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

26. Conservation Groups have exhausted any and all available and requested administrative remedies.

**PARTIES**

27. Plaintiff DAKOTA RESOURCE COUNCIL ("DRC"), a member of the Western Organization of Resource Councils, is a grassroots community organizing group whose aim is to promote sustainable use of North Dakota's natural resources and family-owned and operated agriculture by building member-led local groups that empower people to influence the

decisionmaking processes that affect their lives and communities. Founded by farmers and ranchers in the 1970s. DRC brings North Dakotans together who want to protect family farms and ranches, reduce flaring and venting of natural gas, ensure safe and responsible disposal of oilfield waste, and make oil trains and oil pipelines safe. DRC's members live near federal public lands and work and recreate on those lands, including lands containing parcels included in the sales challenged herein. Fort Berthold Protectors of Water and Earth Rights (Fort Berthold POWER) is an affiliate of DRC located on the Fort Berthold Reservation, home to the Three Affiliated Tribes of the Mandan, Hidatsa, and Arikara Nations, which is one of the most oil-rich reservations in the United States. With more than 2500 active oil and gas wells, Fort Berthold Reservation has been disproportionately impacted by oil and gas development. Fort Berthold POWER's mission is to conserve and protect the land, water, and air on which all life depends. Badlands Area Resource Council is an affiliate of DRC with members from the Belfield, Dickenson, and Medora area in Western North Dakota. Agriculture, coal mines, and oil and gas development are all areas of concern for members working to promote DRC's mission and preserve the health and well-being of the land and its people.

28. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization headquartered in Tucson, Arizona, with offices in Washington, D.C., a number of states, and Mexico. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to advocate actively for increased protections for species and their habitats across the United States. The Center has over 81,000 members and 1.7 million online members and activists. The Center's board, staff, and members observe wildlife for recreation, scientific research, aesthetic pursuits, and spiritual renewal, including climate- imperiled species harmed by GHG emissions caused by

oil and gas development on BLM lands, and recreate on public lands across the United States as well as public lands in the states that will be affected by the Lease Sales challenged herein. The Center brings this action on its own behalf and on behalf of its adversely affected members.

29. Plaintiff CITIZENS FOR A HEALTHY COMMUNITY ("CHC") is a 500-member nonprofit organization located in Paonia, Colorado. CHC was founded in 2010 for the purpose of protecting the Delta County region's air, water, and foodsheds from the impact of oil and gas development. CHC's members and supporters include farmers, ranchers, vineyard and winery owners, and other concerned citizens impacted by oil and gas development, who currently live in, and plan to continue to live in, use, and enjoy the communities and landscapes affected by the challenged BLM action. CHC members live and work in the middle of the nation's climate hotspot, which has already warmed an average of 2.1°C. The headwaters upon which CHC members depend originate on federal lands that have already warmed 1.9°C, and CHC members are experiencing the extreme drought, low soil moisture, higher and extreme temperatures, wildfire risk, and wildlife habitat loss associated with this level of local warming. CHC brings this action on its own behalf and on behalf of its adversely affected members.

30. Plaintiff LIVING RIVERS AND COLORADO RIVERKEEPER ("Living Rivers") is a 501(c)(3) nonprofit organization that empowers a movement to instill a new ethic of achieving ecological restoration, balanced with meeting human needs. Living Rivers works to restore inundated river canyons, wetlands and the delta, repeal antiquated laws which represent the river's death sentence, reduce water and energy use and their impacts on the river, and recruit constituents to aid in reviving the Colorado River. Living Rivers has an interest in protecting the Colorado River from impacts due to development of federal fossil fuels. Living Rivers' members use and enjoy federal public lands, including lands on which

the sales challenged herein are to occur, on a regular basis and would suffer harm as a result of the sales challenged herein.

31. Plaintiff MONTANA ENVIRONMENTAL INFORMATION CENTER ("MEIC") is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, spiritual, scientific, and professional interests in the responsible production and use of energy; the reduction of GHG pollution as a means to ameliorate the climate crisis; and the land, air, water, and communities impacted by fossil fuel development. MEIC members live, work, and recreate in areas that will be adversely impacted by approval of the Lease Sales. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

32. Plaintiff RIO GRANDE WATERKEEPER is an independent organization operating under the fiscal sponsorship of Plaintiff WildEarth Guardians, that works to safeguard clean water and healthy flows in the Rio Grande from its headwaters in the San Juan Mountains of Colorado through Southern New Mexico. The program was formed out of a partnership between Guardians and Waterkeeper Alliance, a global movement united with more than 300 Waterkeeper Organizations and Affiliates around the world, and shares the Alliance's interest in protecting lands and waters that could be impacted as a result of the challenged lease sales. Rio

Grande Waterkeeper's members regularly use and enjoy federal public lands, including some lands included within the Lease Sales challenged herein and would suffer harm as a result of the development of those lands for oil and gas, particularly in the absence of appropriate environmental review by BLM.

33. Plaintiff SIERRA CLUB is one of the country's largest and oldest environmental organizations. Sierra Club was founded in 1892 and now has over 800,000 members. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and encouraging humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club and its members advocate for management of public lands that promotes conservation and continued enjoyment of outdoor spaces. Sierra Club has state chapters in all of the states containing lease sales challenged herein and is one of the largest grassroots environmental organizations in the state. Sierra Club's members use and plan to continue to live in, use, and enjoy the communities and landscapes, including public lands, affected by the Lease Sales. Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

34. Plaintiff WATERKEEPER ALLIANCE ("Waterkeeper") is a global not-for-profit environmental organization dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable, and swimmable. Waterkeeper comprises more than 350 Waterkeeper Member Organizations and Affiliates working in 48 countries on 6 continents. In the United States, Waterkeeper represents the interests of more than 160 U.S. Waterkeeper Member Organizations and Affiliates, including in six of the seven states containing the sales challenged herein, as well as the collective interests of approximately 15,000 individual supporting members that live, work, and recreate in and near waterways

across the country. Waterkeeper, through its Clean and Safe Energy campaign, engages in public advocacy, administrative proceedings and litigation aimed at reducing the water quality, water quantity, and climate change impacts of fossil fuel extraction, transport and combustion, including from BLM-controlled lands, throughout the United States. Waterkeeper has members, supporters and staff who visit public lands in many states in which the sales challenged herein will occur, including lands and waters that would be affected by the challenged lease sales, for recreational, scientific, educational, and other pursuits, and who would be injured if these lands are developed for oil and gas, particularly in the absence of an appropriate environmental review by BLM. Waterkeeper brings this action on its own behalf and on behalf of its adversely affected Members, Organizations and Affiliates and all of its individual members and supporters.

35. Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a is a nonprofit conservation organization founded in 1993, with more than 12,000 members and supporters, and has staff and field offices in Idaho, Montana, Wyoming, Arizona, Utah, Nevada, Oregon, and California. WWP works throughout the West, including in many of the states containing the lease sales challenged herein, to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness. WWP'S individual members regularly uses public lands in for recreational, aesthetic purposes and other purposes including areas on or adjacent to parcels included in the Lease Sales. Those individual members would experience injury should those parcels be developed for oil and gas, particularly in the absence of an appropriate environmental review by BLM.

36. Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the West. Guardians has 168,458 members and activists, some of whom live, work, or recreate on public lands on and near the leases challenged herein. Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

37. Conservation Groups' members and supporters regularly use and enjoy the cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy ecosystems on and adjacent to the federal public lands where the challenged leases are located in Nevada, Colorado, New Mexico, Oklahoma, Montana, North Dakota, and Wyoming. Specifically, Conservation Groups' members and supporters use the lands and areas affected by Federal Defendants' lease sales for camping, fishing, hiking, hunting, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities. Conservation Groups' members derive recreational, inspirational, scientific, educational, and aesthetic benefit from their activities on lands within the Lease Sales challenged herein, and on nearby lands that affected by the lease sales challenged herein.

38. Conservation Groups' members and supporters intend to continue to use and enjoy the lands affected by the challenged lease sales. Conservation Groups' members and supporters also intend to continue to use and enjoy lands that are around or within view of lands affected by the lease sales challenged herein, as well as federal public lands impacted by subsequent lease development. Conservation Groups' members and supporters intend to use these lands to enjoy cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis long into the future, including in 2022 and in

subsequent years.

39. Conservation Groups' members' enjoyment of public lands on and adjacent to the leases challenged herein will be adversely affected and diminished as a result of Federal Defendants' leasing actions. Conservation Groups' members have not only recreated on public lands that include the lease sale parcels that are the subject of this lawsuit, but they also enjoy public lands adjacent to these parcels. The reasonably foreseeable development of these lease parcels will industrialize these treasured landscapes, produce air pollution that is offensive and threatening to health and safety, create noise that disrupts wildlife and recreational enjoyment, and will lead to connected development that will further adversely impact nearby public lands, including road construction, truck traffic, and the construction of oil and gas pipelines and processing facilities needed to sustain the production of oil and gas on the lease parcels that are the subject of this lawsuit.

40. Conservation Groups and their members have a procedural interest in Federal Defendants' full compliance with NEPA's planning and decision-making processes when authorizing oil and gas development on public lands in the western United States and in and around the lease sale areas in particular, as well as Federal Defendants' attendant duty to substantiate their decisions in the record for these authorizations.

41. The development of the oil and gas leases challenged herein will bring not only new industrial activity, but will also bring noise, destruction of wildlife habitat, surface disturbance, air pollution, and water pollution. These impacts can be far-reaching. For example, air pollution from oil and gas development can create extensive emissions that create haze and smog in large regions, as well as impacts to human health. Further, venting and flaring of gas associated with oil and gas development creates potent emissions of methane and volatile organic compounds. Water-intensive oil and gas development also

poses a serious risk of contamination to both surface water and groundwater. Conservation Groups' members are reasonably concerned that the Lease Sales will exacerbate such impacts and the concomitant threats to their health and well-being.

42. A favorable ruling in this case would partially or wholly redress the harms that Conservation Groups' members and supporters will suffer as a result of Federal Defendants' actions. If Federal Defendants are compelled to follow NEPA's procedural and substantive requirements and properly consider the climate impacts of their decisions, they may reach a different decision and not offer some or all of the challenged leases. If Federal Defendants had defined and taken required action to avoid the unnecessary and undue degradation of public lands, as is their statutory duty, they would have rejected or otherwise conditioned the issuance of some or all of the challenged lease authorizations. This would reduce and/or eliminate the multiple reasonably foreseeable threats posed by the proposed commitment of federal lands to oil and gas development, preventing or mitigating the harm that will otherwise be experienced by Conservation Groups' members. A favorable ruling will therefore reduce or eliminate such harm. At the very least, a favorable ruling may delay development of oil and gas infrastructure on the leased parcels until Federal Defendants have taken a hard look and fully disclosed the direct, indirect, and cumulative climate impacts of its oil and gas leasing decisions, as required by law. This legally required disclosure is, by itself, of benefit to Conservation Groups' members, Federal Defendants, and the public generally.

43. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an executive department of the United States Government that is responsible for the conservation and management of the Nation's natural resources, including its public lands, resources, mineral estates, and cultural heritage.

44. Defendant DEBRA HAALAND is sued in her official capacity as the Secretary of

the United States Department of the Interior and is responsible for managing federal public lands and resources and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

45. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is responsible for managing federal public lands and resources, including federal onshore oil and gas resources and the development of those resources. In this managerial capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

46. Defendant TRACY STONE-MANNING is Director of the Bureau of Land Management and is responsible for managing the public lands, resources, and public mineral estate of the United States. In her official capacity, Director Stone-Manning is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

## LEGAL BACKGROUND

### I. National Environmental Policy Act

47. NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. It was enacted "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of [humans]," 42 U.S.C. § 4321; to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings[;]" and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b), *see also*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 52.

48. According to the White House Council on Environmental Quality ("CEQ"), the

federal agency responsible for implementing NEPA:

> . . . NEPA was a statute ahead of its time, and it remains relevant and vital today. It codifies the common-sense and fundamental idea of "look before you leap" to guide agency decision making, particularly in complex and consequential areas, because conducting sound environmental analysis before actions are taken reduces conflict and waste in the long run by avoiding unnecessary harms and uninformed decisions. It establishes a framework for agencies to ground decisions in sound science and recognizes that the public may have important ideas and information on how Federal actions can occur in a manner that reduces potential harms and enhances ecological, social, and economic well-being.

87 Fed. Reg. 23,453 (April 20, 2022).

49. NEPA regulations explain, in 40 C.F.R. §1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

50. NEPA achieves its purpose through "action forcing procedures … requir[ing] that agencies take a *hard look* at environmental consequences." *Robertson*, 490 U.S. at 350 (citations omitted) (emphasis added).

51. NEPA's purpose is "to provide for informed decision making and foster excellent action." 40 C.F.R. § 1500.1(a). NEPA regulations "are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies." *Id.* § 1500.1(b).

52. Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v).

53. To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement, known as an EIS, must, among

other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16. The scope of the analysis must include "[c]umulative actions," or actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same statement[;]" "[s]imilar actions," or actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together[;]" and "[c]onnected actions," or actions that "are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. §§ 1508.25(a)(1), (2) and (3).

54. An EIS is "sometimes required[] for broad Federal actions such as the adoption of new agency programs." 40 C.F.R. § 1502.4(b). Thus, "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." *Id.* § 1502.4(a). Accordingly, a programmatic EIS is appropriate to address a "steady flood of activity" from a federal agency that results in harmful pollution. *Nat'l Wildlife Fed'n v. Benn*, 491 F. Supp. 1234, 1249-50 (S.D.N.Y. 1980); *see also*, *Fund for Animals v. Hall*, 448 F.Supp.2d 127, 132 (2006) ("an agency may not segment actions to unreasonably restrict the scope of the environmental review process.").

55. Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions." *Id.* § 1508.7. "Effects" are synonymous with "impacts." *Id.* § 1508.8.

56. These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

57. Federal Defendants' analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson*, 490 U.S. at 352.

58. An agency may also prepare an EA to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. 40 C.F.R. § 1508.9.

59. If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment[.]" 40 C.F.R. § 1508.13. An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impact. 40 C.F.R. § 1508.27. "Context" refers to the scope of the proposed action, including the interests affected. 40 C.F.R. § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to [u]nique characteristics of the geographic area[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

60. NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS, "the

subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

61. As a general rule, tiering a site-specific EA to another NEPA document is only appropriate where "the conditions and environmental effects described in the broader NEPA document are still valid" or the site-specific EA addresses any exceptions. 43 C.F.R. § 46.140. If the programmatic EIS sufficiently analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. *Id*. § 46.140(a). However, if the impacts analysis in the programmatic EIS "is not sufficiently comprehensive or adequate to support further decisions," the agency's EA must explain this and provide additional analysis. *Id* § 46.140(b).

62. To implement NEPA's requirement to evaluate the effects of GHG emissions, the CEQ has directed federal agencies to "consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, include, as appropriate and relevant, the 2016 GHG Guidance." 86 Fed. Reg. 10,252 (Feb. 21, 2021). The "2016 GHG Guidance" refers to the "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Reviews" issued August 2, 2016. 81 Fed. Reg. 51,866 (Aug. 5, 2016).

63. The 2016 GHG Guidance recognizes:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action but is exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or not to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the

> potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

## II. The Federal Land Policy and Management Act

64. The property clause of the United States Constitution confers upon Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Constitution, Art. IV., Sec. 3, Cl. 2. Congress has exercised its power over federal public lands through the passage of FLPMA. "[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the U.S. Supreme Court] ha[s] repeatedly observed that '(t)he power over the public land thus entrusted to Congress is without limitations.'" *Kleppe*, 426 U.S. at 539 (citations omitted).

65. In this constitutional context, FLPMA directs that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use" 43 U.S.C. § 1701(a)(8). The act requires the Secretary to account for "the long-term needs of future generations." *Id.* at § 1702(c). This substantive mandate requires that the Secretary not elevate the development of oil and gas resources above other critical resource values in a planning area. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, conservation of these resources should be the preeminent goal.

66. FLPMA also provides that public lands be managed "on the basis of multiple use

and sustained yield." 43 U.S.C. § 1701(a)(7).

67. The term "multiple use" means:

> a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources *without permanent impairment of the productivity of the land and the quality of the environment* with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

*Id.* § 1702(c) (emphasis added).

68. The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands *consistent with multiple use*. *Id*. § 1702(h) (emphasis added).

69. In applying the principles of multiple use and sustained yield mandated by FLPMA, "the Secretary shall, by regulation or otherwise, take any action necessary *to prevent unnecessary or undue degradation of the lands*." 43 U.S.C. § 1732(b) (emphasis added). This duty is "the heart of FLPMA." *Mineral Policy Center v. Norton*, 292 F. Supp.2d 30, 42. (D.D.C. 2003).

70. FLPMA expressly obliges Interior to "issue regulations necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands …" 43 U.S.C. § 1733(a).

## III. Administrative Procedure Act

71. The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id*.

72. Under the APA, a reviewing court shall, inter alia, "hold unlawful and set aside

agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)-(F).

73. An agency decision is arbitrary or capricious,

> . . . if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicles Mfrs. Assoc. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983).

## IV. Legal Framework for Federal Oil and Gas Lease Authorizations

74. Under the Mineral Leasing Act of 1920, as amended by the Federal Onshore Oil and Gas Leasing Reform Act Amendments of 1987 (collectively, "MLA"), 30 U.S.C. §§ 181, *et seq*., the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[]…the public welfare." 30 U.S.C. § 187.[2]

75. The Secretary has certain discretion, constrained by the laws at issue in this case, to determine where, when, and under what terms and conditions mineral development should

---

[2] On August 16, 2022, President Biden signed the Inflation Reduction Act of 2022 ("IRA") into law. H.R. 5376, *An act to provide for reconciliation pursuant to title II of S. Con. Res. 14*. The IRA amends the MLA by tying critical renewable energy development on federal public lands to the continuation of the federal fossil fuel leasing program. For the next decade, Section 50265 of the IRA prohibits the Secretary from issuing rights-of-way for wind or solar development unless onshore oil and gas lease sales encompassing the lesser of two million acres or 50 percent of the acreage for which expressions of interest have been submitted are held, and from issuing wind or solar development leases unless offshore oil and gas lease sales encompassing 60 million acres are held. The IRA therefore locks in federal fossil fuel development at a time when there is no room in the carbon budget for additional development. The federal government's treatment of federal oil and gas development as a comprehensive "program" is acknowledged and carried on in the IRA, *and*, by locking in ongoing oil and gas development at a time when the United States should be phasing out of its reliance on fossil fuels, passage of the IRA further underscores the need for a programmatic NEPA review of the federal fossil fuel program.

occur. 43 C.F.R. § 3101.1-2. The grant of rights in a federal mineral lease is subject to a number of reservations of authority to the federal government, including reasonable measures concerning the timing, pace, and scale of development. *Id*.

76. The MLA authorizes the Secretary of the Interior to "alter or modify from time to time the rate of prospecting and development and the quantity and rate of production under such a plan." 30 U.S.C. § 226(m).

77. BLM's MLA regulations also state that "[t]he authorized officer may suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." 43 C.F.R. § 3120.1-3.

78. BLM manages onshore oil and gas development through a three-phase process. Each phase is distinct, serves distinct purposes, and is subject to distinct rules, policies, and procedures.

79. In the first phase, BLM prepares a Resource Management Plan ("RMP") in accordance with 43 C.F.R. §§ 1600 *et seq*., along with additional guidance found in BLM's Land Use Planning Handbook (H-1601-1) (hereafter, "BLM Handbook"). An RMP projects present and future use of public lands and their resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management.

80. With respect to fluid minerals leasing decisions, the RMP determines which lands containing federal minerals will be open to leasing and under what conditions. BLM's determinations are to be based on a hard look analysis of the direct, indirect, and cumulative impacts to the human environment of predicted implementation-stage development in the RMP's corresponding EIS.

81. Along with the RMP, BLM generally develops a reasonably foreseeable development scenario ("RFDS") outlining the projected pace and scope of oil and gas

development within the RMP planning area. An RFDS does not include any analysis of environmental impacts and is not a NEPA document.

82. In the second phase, oil and gas companies typically nominate leaseholds for sale through the submission of an "Expression of Interest." *See* 43 C.F.R. § 3120.1-1. BLM then assesses whether these lands are available, identifies the boundaries for lands to be offered for lease, and proceeds to offer up those lands through a lease sale. Leases are sold in accordance with 43 C.F.R. Subpart 3120, and agency guidance outlined in BLM Instruction Memoranda.

83. BLM regulations allow for the public to protest the sale of specific parcels. 43 C.F.R. § 3120.1-3. Although BLM may proceed with a lease sale after a protest has been filed, BLM must resolve any and all protests received prior to issuing a lease parcel to a successful bidder. BLM Competitive Leases Handbook H-3120-1, Section II.G. ("Every effort must be made to decide the protest prior to the sale."); IM 2021-027 ("the state office cannot issue a lease for a protested parcel until the protest is resolved.").

84. Prior to sale, BLM may refuse to lease public lands, even if public lands were made available for leasing pursuant to the RMP. *Udall v. Tallman*, 380 U.S. 1, 4 (1965).

85. Prior to a lease sale, BLM also has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Once BLM issues leases, it may only impose conditions of approval ("COAs") that are delimited by the terms of the lease. *Id*. § 3101.1-2.

86. Once the lease is sold, the lease purchaser has the right to use as much of the leased land as is necessary to explore and drill oil and gas within the lease boundaries, subject to stipulations attached to the lease. 43 C.F.R. § 3101.1-2. Because the sale of an oil and gas lease represents an "irreversible and irretrievable commitment of resources," BLM must comply with NEPA prior to selling a lease. *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir.

1988), citing 42 U.S.C. § 4332(2)(C)(v).

87. The Secretary of the Interior has the authority to cancel leases that have been "improperly issued." 43 C.F.R. § 3108.3(d). A lease may be canceled where BLM has not complied with NEPA prior to lease issuance. *Clayton W. Williams, Jr*., 103 IBLA 192 (1988).

88. The third phase occurs once BLM issues a lease. In order to develop the minerals, the lessee is required to submit an application for a permit to drill ("APD") to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c). At this stage, BLM may condition the approval of the APD on the lessees' adoption of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use rights. 43 C.F.R. § 3101.1-2.

89. Oil and gas operations pursuant to an approved APD must be conducted in accordance with BLM regulations at 43 C.F.R. Part 3160.

## FACTUAL BACKGROUND

### I. Executive Order 14008, the Resumption of the Oil and Gas Leasing Program, and Approval of the Lease Sales

90. On January 20, 2021, Interior's acting Secretary issued Secretarial Order 3395 which temporarily suspended the delegated authority of its bureaus and offices to:

> issue any onshore or offshore fossil fuel authorization, including but not limited to a lease, amendment to a lease, affirmative extension of a lease, contract, or other agreement, or permit to drill. This does not limit existing operations under valid leases. It also does not apply to authorizations necessary to: (1) avoid conditions that might pose a threat to human health, welfare, or safety; or (2) to avoid adverse impacts to public land or mineral resources.

91. On January 27, 2021, President Biden issued Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, acknowledging that "the United States and the world face a profound climate crisis" and recognizing "a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."

92. Regarding the Oil and Gas Leasing Program, section 208 of Executive Order 14008 directed the Secretary of the Interior to:

> pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

93. The first lawsuit challenging the leasing "pause" called for in section 208 of Executive Order 14008 was filed on the same day as the Order, January 27, 2021.[3]

94. On February 4, 2021, BLM state offices in Utah, Colorado, and Montana/Dakotas sought approval from Interior leadership for posting oil and gas lease sale notices.

95. On February 12, 2021, Interior's acting Solicitor issued an opinion on BLM's first quarter lease sales in Colorado, Montana/Dakotas, Utah, and Wyoming, recommending that the sales be postponed because "[e]ach sale raises serious questions as to NEPA compliance." While environmental analyses had not been conducted for the Utah and Wyoming sales, the acting Solicitor found that the EAs for Colorado and Montana/Dakotas "may be problematic in their evaluation of greenhouse gases."

96. On February 12, 2021, BLM published in the National NEPA Register a notice of postponement of the lease sales in Colorado, Utah, Wyoming, and Montana/Dakotas to "confirm the adequacy of underlying environmental analysis."

97. On April 21, 2021, BLM announced that it was "exercising its discretion to not

---

[3] *Western Energy Alliance* (*WEA*) *v. Biden*, 0:21-cv-00013-SWS (D. Wyo., filed Jan. 27, 2021). Four subsequent suits were eventually filed, and there are currently five cases pending before federal courts in three circuits. Those cases are, in order of filing, *State of Wyoming v. U.S. Department of Interior*, 0:21-cv-00056-SWS (D. Wyo., filed March 24, 2021) (now consolidated with *WEA v. Biden*); *Louisiana v. Biden*, 2:21-cv-00778 (W. D. La., filed March 24, 2021); *State of North Dakota v. U.S. Department of Interior*, 1:21-cv-00148-DMT-CRH (D. ND, filed July 7, 2021); and *American Petroleum Institute (API) v. U.S. Department of Interior*, 2:21-cv-02506-TAD-KK (W. D. La., filed Aug. 16, 2021).

hold lease sales in the 2nd quarter of Calendar Year 2021" due to Interior's "ongoing review of the federal oil and gas program in assessing compliance with applicable laws and, as directed by Executive Order 14008, reviewing whether the current leasing process provides taxpayers with a fair return."[4]

98. On June 15, 2021, the *Louisiana* court issued a nationwide preliminary injunction forestalling implementation of the lease pause contemplated by Executive Order 14008. 543 F. Supp. 3d at 410. The *Louisiana* court, however, did not preclude the possibility of lease sale postponements due to NEPA or other environmental concerns with a particular sale. *Id.*

99. On August 24, 2021, Interior reported to the *Louisiana* court that it was actively complying with the court's preliminary injunction by directing BLM offices across the country "to finalize parcel lists for upcoming sales, in order to publicly post those parcel lists for NEPA scoping by August 31, 2021." ECF No. 155 at 5, *Louisiana v. Biden*.[5] As directed by Interior, BLM posted said notices on August 31, 2021, which included the Lease Sale parcels.

100. In October 2021, BLM released the 2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends ("Specialist Report") associated with coal, oil, and gas exploration and development on federal public lands. Designed to be updated annually, the report provides both short- and long-term emissions estimates based on projected development, and "serves as a tool to track the evolution of climate science and policy in order to provide decision makers with the best available data to implement management strategies consistent with regulatory requirements." The report is explicitly intended to be used as a supplement to NEPA analysis at the project or decision level. The Lease Sales EAs incorporate the report by reference.

101. On November 26, 2021, Interior released its Oil and Gas Leasing Report, which

[4] *See https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales*
[5] See, https://thehill.com/policy/energy-environment/569256-interior-to-move-forward-with-%20lease-sales-after-pause%20/

"focuses primarily on necessary reforms to the fiscal terms, leasing process, and remediation requirements related to deficiencies with the federal oil and gas program." The leasing report does not address climate impacts of the Oil and Gas Leasing Program, even though Interior was directed to do so by Executive Order 14008. The Lease Sale EAs incorporated fiscal recommendations from this report.

102. On April 15, 2022, Interior announced its decision to "tak[e] action" called for in the Interior Oil and Gas Program Report and "in compliance with the injunction from the Western District of Louisiana" to resume oil and gas leasing under its Oil and Gas Leasing Program.[6]

103. On April 18, 2022, BLM posted final EAs, unsigned FONSIs, and sale notices for the Lease Sales, which incorporated by reference the Specialist Report, and announced on its website that, "[c]omplying with the injunction issued by the Western District of Louisiana, the BLM assessed lease sales in seven state offices: Montana/Dakotas, Wyoming, Colorado, Utah, New Mexico, Nevada, and Eastern States." BLM also stated on its website that the decision to hold the Lease Sales was made "based on its analysis and review of the record, and they are consistent with the recommendations in the [Interior Oil and Gas Leasing Program Report]."

104. On May 18, 2022, Conservation Groups timely submitted protests for each of the lease sales for which BLM chose to offer parcels for sale.

105. The leasing decisions challenged herein were issued out of five different field offices – Nevada, Colorado, Wyoming, New Mexico, and Montana-Dakotas – through six separate administrative processes.[7] In general, the NEPA process for each sale included: a

---

[6] *See*, https://www.doi.gov/pressreleases/interior-department-announces-significantly-reformed-onshore-oil-and-gas-lease-sales.

[7] BLM also proposed a lease sale in Alabama, but chose not to offer the parcel for lease at the June 2022 lease sale. https://eplanning.blm.gov/eplanning-ui/project/2015577/510 . On June 29, 2022, BLM's Utah State Office granted the protest filed by Southern Utah Wilderness

scoping period, a comment period on the draft EA, and a protest period before the actual lease sale. Conservation Groups participated in each stage of the administrative process for all six of these leasing decisions.

106. Conservation Groups specifically challenge each of BLM's authorizations associated with the challenged Lease Sales, including the associated EAs, FONSIs, and decision records.

## II. Greenhouse Gas Pollution and the Climate Crisis

107. The scientific consensus is clear: as a result of GHG emissions, our climate is rapidly destabilizing with potentially catastrophic results, including rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other destructive changes. It is now conclusively established that GHG emissions from the production and combustion of fossil fuels are the predominant drivers of climate change, a scientific fact which BLM acknowledges.

108. Carbon dioxide ("CO2") is the leading cause of climate change and represents the majority of U.S. GHG emissions. According to a 2022 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2020*, CO2 comprised 78.8% of total U.S. greenhouse gas emissions, or 4.7 billion metric tons. EPA's data indicates that fossil fuel combustion accounted for 92.1% of U.S. carbon dioxide emissions, or 4.3 billion metric tons. Although emissions declined at the beginning of the COVID-19 pandemic due primarily to decreased travel and transportation, they have since rebounded to their highest level in history.

109. Methane ("$CH_4$") is an extremely potent GHG, with a global warming potential 87 times that of $CO_2$ over a 20-year period. Over a 100-year period, methane has a climate impact 36 times greater than that of $CO_2$ on a ton-for-ton basis. Large amounts of methane

---

Alliance and others and withdrew the parcel proposed to be offered for lease in Utah. No Utah parcels were offered as part of the June 2022 lease sales.

are released during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts.

110. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. As part of its 2022 Sixth Assessment Report, *Impacts, Adaptation and Vulnerability*, the IPCC confirmed that climate change is not simply a future threat, but that "[w]idespread, pervasive impacts to ecosystems, people, settlements, and infrastructure" are already being seen globally, and "[t]he rise in weather and climate extremes has led to some irreversible impacts as natural and human systems are pushed beyond their ability to adapt."

111. The western U.S. is particularly susceptible to the effects of climate change. The West is already experiencing increasing temperatures and prolonged droughts, including the most severe drought in 1,200 years, with widespread impacts across our forests, wildlife, and human communities which compromise the ability of these ecosystems and communities to adapt to continued warming. Local economies, which are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses, have also seen significant impacts and these impacts are expected to worsen with increased GHG concentrations.

112. According to the Third and Fourth National Climate Assessments, published by the U.S. Global Change Research Program, increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have exacerbated wildfires and impacts to people and ecosystems in the Southwest.

113. The Fourth National Climate Assessment, released in 2018, notes that temperatures have already "increased across almost all of the Southwest [Colorado, New

Mexico, and Utah] region from 1901 to 2016," magnifying the impacts of drought and wildfire. For example, hotter temperatures have already contributed to reductions in snowpack, amplifying drought conditions in the Colorado River Basin, the Rio Grande, and other critical watersheds. It is also estimated that the area burned by wildfire across the western United States between 1984 and 2015 was twice what would have burned in the absence of anthropogenic climate change.

114. Future projections for the West are even more alarming. In the Southwest, climate change threatens to lead to "to aridification (a potentially permanent change to a drier environment) … through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to regional food security.

115. For the Northern Great Plains, which includes Wyoming, Montana, and North Dakota, the Fourth National Climate Assessment found "[t]he highly variable climate of the Northern Great Plains poses challenges for the sustainable use of water, land, and energy resources by competing urban, suburban, rural, and tribal populations." Climate change is expected "to exacerbate those challenges, which include 1) effectively managing both overabundant and scarce water resources, 2) supporting adaptation of sustainable agricultural systems, 3) fostering conservation of ecosystems and cultural and recreational amenities, 4) minimizing risk to energy infrastructure that is vulnerable to climate change and extreme weather events, and 5) mitigating climate impacts to vulnerable populations."

116. In October 2018, the IPCC issued its *Special Report, Global Warming 1.5°C* that examined, in more depth, the impacts of global warming of 1.5°C above pre-industrial levels as

compared to 2.0°C. The IPCC's findings included:

- Human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, with a likely range of 0.8°C to 1.2°C. Global warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.

- Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts but these emissions alone are unlikely to cause global warming of 1.5°C.

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C. Limiting warming to 1.5°C could reduce the number of people both exposed to climate-related risks and susceptible to poverty by up to several hundred million by 2050 (medium confidence).

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).

117. IPCC has also recognized climate justice as an essential component of climate analysis and discussion in parts of its Sixth Assessment Report. The report outlines three main components of climate justice, stating:

> The term climate justice, while used in different ways in different contexts by different communities, generally includes three principles: distributive justice which refers to the allocation of burdens and benefits among individuals, nations and generations; procedural justice which refers to who decides and participates in decision-making; and recognition which entails basic respect and robust engagement with and fair consideration of diverse cultures and perspectives.

118. In April 2022, the IPCC published its final report in the "scientific trilogy" of working group reports making up the Sixth Assessment Report, *Mitigation of Climate Change*. In recognition of the scientific consensus of the urgency at hand, IPCC chair, Hoesung Lee, remarked:

> We are at a crossroads. This is the time for action. We have the tools and know-how required to limit warming and secure a liveable future … [H]uman-induced climate change is widespread, rapid, and intensifying. It is a threat to our well-being and all other species. It is a threat to the health of our entire planet. Any further delay in concerted global climate action will miss a rapidly closing window.

## III. Greenhouse Gas Pollution from Federal Defendants' Oil and Gas Leasing Program

119. BLM is responsible for the management of over 700 million acres of federal onshore subsurface minerals. As of October 2020, BLM-managed lands contained 37,496 individual oil and gas lease parcels, covering over 26.6 million acres of public lands, on which 96,110 active producible wells are drilled. Based on 2012 figures, the ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders accounts for approximately 21% of total U.S. GHG emissions and 24% of all energy-related GHG emissions.

120. NEPA's implementing regulations define a "program" as "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18. BLM's oil and gas leasing activities fall within this definition of a program because they are "connected agency decisions allocating agency resources to implement" the MLA for the purpose of exploration or development of oil and natural gas resources. *Id*.

121. Federal Defendants expressly refer to BLM's oil and gas leasing activities as a program. All of the leasing authorizations challenged herein are part of the Federal Defendants' Oil and Gas Leasing Program implemented pursuant to the MLA and FLPMA.

122. Federal Defendants' Oil and Gas Leasing Program emits vast amounts of GHGs into the atmosphere, threatening the climate, the natural environment, public lands and public health.

123. In 2018, the U.S. Geological Survey released its first ever inventory of GHG emissions associated with federal coal and oil and gas production. The report revealed that from 2005 to 2014, average fossil fuel production on federal public lands contributed 23.7% of all U.S. $CO_2$ emissions or 1,279 million metric tons. This is the equivalent of annual GHG emissions from over 329 coal-fired power plants. Taking into account releases of methane and other GHGs, federal fossil fuel production generated nearly 25% of all U.S. GHG emissions over that same time period. Emissions in 2014 from petroleum products and natural gas were estimated at 498.93 million metric tons of carbon dioxide equivalent ($CO_2e$), equaling the annual emissions from 128 coal-fired power plants.

124. In the Specialist Report, BLM admits, in reliance on IPCC and the National Climate Assessment, that "[c]urrent ongoing global climate change is caused, in large part, by the atmospheric buildup of GHGs," which include $CO_2$, $CH_4$, $N_2O$, and fluorinated gases." Quoting the IPCC's climate assessment report, BLM acknowledges: "[w]arming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentration of greenhouse gases have increased."

125. BLM also recognizes that the National Climate Assessment provides region-specific impact assessments for climate change, that each region has experienced increasing temperatures, and that the largest changes were in the western United States. For example, in New Mexico, since 1980 the mean annual temperature increased by approximately 2.5°F, and the current drought is more severe than any in recent historical record. In Wyoming there has been net warming of 1.4°F since the beginning of the 20th century and three of the four hottest years on record have occurred since 2012. These effects are already occurring.

126. BLM also predicts future climate impacts at a state-level based on various emission scenarios. For example, in New Mexico temperatures could increase by as much as 12°F above current levels by the end of the century. Precipitation is projected to decrease, with negative impacts on snowpack. There would be decreases in overall water availability by one-quarter to one-third, with increased frequency and intensity of both droughts and floods. Wyoming would experience unprecedented warming, with mean temperatures projected to increase by about 10°F, with increases in heat wave and drought intensity. This will increase the risk of wildfires, which are projected to become more frequent and severe.

127. Also in the Specialist Report, BLM notes that "[g]lobal fossil $CO_2$ emissions were estimated at 38,000 Mt for 2019" with increases in $CO_2$ emissions being attributable to fossil fuel use in industrial processes and combustion. The agency further acknowledges the "general consensus among climate scientists that to limit global temperature rise to 1.5°C and avoid serious climate changes, global emissions must drop to 25,000 Mt by 2030."

128. BLM also knows that global energy related $CO_2$ emissions are projected to increase through 2050 from about 35 billion metric tons of $CO_2$ to about 43 billion metric tons, and that 82% of total U.S. emissions are due to energy production and use from fossil fuels.

129. Despite the agency's acceptance of the scientific consensus regarding the significance of continued fossil fuel development, BLM offers the same statement in each of the FONSIs approving the Lease Sales:

> There are no established thresholds for NEPA analysis to contextualize the quantifiable greenhouse gas emissions or social cost of an action in terms of the action's effect on the climate, incrementally or otherwise. The BLM acknowledges that all GHGs contribute incrementally to climate change and has displayed the greenhouse gas emissions and social cost of greenhouse gas in the EA in comparison to a variety of emissions sources and metrics. As of the publication of this FONSI, there is no scientific data in the record, including scientific data submitted during the comment period for these lease sales, that would allow the BLM, in the absence of an agency carbon budget or similar standard, to evaluate the significance of the greenhouse gas emissions from this

proposed lease sale.

130. Thus, while accepting the scientific consensus that increasing GHG emissions are causing irreparable damage to virtually every ecosystem on the planet, and the significant contributions of its Leasing Program to GHG pollution, Federal Defendants continue to authorize the sale and issuance of hundreds of federal oil and gas leases on public lands across the western United States without meaningfully acknowledging or fully evaluating the climate change implications of their actions, without any acknowledgment of the inconsistency of these authorizations with U.S. commitments to reduce GHG emissions, or with the agency's duty to take action to avoid the type of unnecessary and undue degradation already occurring and which will worsen through exploitation of the challenged leases.

## IV. Federal Climate Policy and Initiatives

131. In 2001, at the start of the George W. Bush Administration, the Secretary of the Interior established Interior policy in Secretarial Order 3226, stating: "There is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Secretarial Order 3226 established the responsibility of Interior agencies, such as BLM, to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

132. In a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* the U.S. Governmental Accountability Office ("GAO"), concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of

Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

133. In 2009, Secretarial Order 3289, "Addressing the Impacts of Climate Change on America's Water, Land and Other Natural and Cultural Resources" recognized that "the realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that Interior is "responsible for helping protect the nation from the impacts of climate change."

134. In Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their GHG emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009) (revoked by Executive Order No. 13693, revoked by Executive Order No. 13834). This directive was followed up by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

135. In 2009, the Environmental Protection Agency ("EPA") issued a formal finding under the Clean Air Act, 42 U.S.C. § 7521(a), that the changes in our climate caused by elevated concentrations of GHGs in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA concluded that "the body of scientific evidence compellingly supports" the finding and recognized the potential for human-induced climate change to have "far-reaching and multidimensional" impacts. *Id*. at 66,497. In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64,661 (Oct. 23, 2015).

136. In 2015, the United States entered into the United Nations' Paris Agreement, which seeks to keep global temperatures within 2°C of the pre-industrial levels, and preferably

within 1.5°C. Among other pledges and commitments, the United States pledged to reduce its emissions by filing an intended national determined contribution ("NDC") with the United Nations Framework Convention on Climate Change to reduce net GHG emissions by 17 percent below 2005 levels by 2020, and by 26-28 percent by 2025. While President Trump withdrew the United States from the Paris Agreement in 2016, the Biden Administration rejoined the agreement in 2021.

137. CEQ has also recognized the unique nature of climate change and the challenges it imposes on NEPA compliance. CEQ's 2016 GHG Guidance recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. *Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA.* Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. (Emphasis added).

138. The 2016 GHG Guidance also stated that "[i]n the context of long-range energy, transportation, and resource management strategies … it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews." In particular, CEQ identified "issuing leases for oil and gas drilling" as a "site-specific action[] that may benefit from being able to tier to a programmatic NEPA review."

139. In early 2021, the Biden Administration directed all federal agencies to "consider all available tools and resources in assessing GHG emissions and climate change effects of their

proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance." 86 Fed. Reg. 10252 (February 19, 2021).

140. In Executive Order 14008, President Biden acknowledged:

> The scientific community has made clear that the scale and speed of necessary action [to address climate change] is greater than previously believed. There is little time left to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. Responding to the climate crisis will require both significant short-term global reduction in greenhouse gas emissions and net-zero emission by mid-century or before.

141. President Biden also issued Executive Order 13990 on January 20, 2021, which acknowledged that "[i]t is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues."

142. On April 16, 2021, the Secretary of the Interior issued Secretarial Order 3399, which established the Departmental Climate Task Force. The Climate Task Force is tasked with developing a strategy "to reduce climate pollution; improve and increase adaptation and resilience to the impacts of climate change; address current and historic environmental injustice; protect public health; and conserve Department-managed lands." Moreover, the Climate Task Force is responsible for facilitating "the development and use of the best available science to evaluate the greenhouse gas emissions and associated climate change impacts of Federal Land Uses" and for "implementing the review and reconsideration of Federal oil and gas leasing and permitting practices" called for in Executive Order 14008.

143. Secretarial Order 3399 also instructs "all Bureaus/Offices to utilize science and enhance opportunities for Tribal and environmental justice community engagement in the NEPA and decision-making process." Specifically, it orders agencies to "consider impacts on both the natural or physical environment as well as social, cultural, and economic impacts," and

it emphasizes the importance of Tribal consultation.

144. BLM's Specialist Report and associated interactive tool on federal GHG emissions was released in October 2021, and describes for the first time both the direct and indirect GHG emissions resulting from the management and development of the federal mineral estate. BLM characterizes its Specialist Report as "an important tool for evaluating the cumulative impacts of GHG emissions from fossil fuel leasing and development authorizations on the federal onshore mineral estate."

145. BLM's Specialist Report was incorporated by reference into each of the EAs for the Lease Sales. While the Specialist Report provides, for the first time, a comprehensive tabulation of GHG emissions from federal fossil-fuel development, it stops far short of containing the analysis that would be included in a programmatic NEPA analysis for the Interior's Oil and Gas Leasing Program or an analysis which would consider collectively the cumulative climate impacts of the Lease Sales in the context of the Leasing Program.

## V. Available Tools for Understanding the Significance and Severity of Cumulative Greenhouse Gas Impacts

146. BLM's analysis must do more than merely identify impacts, including cumulative and potentially disproportionate impacts; it must also "evaluate the severity" of effects. *Robertson,* 490 U.S. at 352. BLM must use readily-available tools to evaluate the severity and significance of effects.

147. In the case of the challenged Lease Sales, to analyze the severity of the predicted impacts, BLM used EPA's GHG equivalencies calculator to correlate the predicted annual GHG emissions to the GHG emissions from gas-fueled passenger vehicles, estimated billions of dollars social cost from the proposed sales, and acknowledged the tremendous amount of the global carbon budget its Program consumes. Yet, in reaching its conclusion that the predicted GHG emissions and resultant climate impacts from the Lease Sales are

individually insignificant, BLM failed to collectively analyze the cumulative impacts of the Lease Sales, and importantly failed to do so in the context of any meaningful analysis of the climate impacts of the federal Oil and Gas Leasing Program as a whole.

**A. The Social Cost of Greenhouse Gases**

148. In recognition of the consequences of human-caused climate change, federal agencies have developed a protocol for assessing the "social cost of carbon," ("SCC") "social cost of nitrous oxide," and "social cost of methane" – together, the "social cost of greenhouse gases" ("SC-GHG"). According to Executive Order 13990, the SC-GHG provides an estimate "of the monetized damages associated with incremental increases in greenhouse gas emissions in a given year." Further, "[a]n accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions."

149. Conversely, according to the EPA in its December 2016 "Fact Sheet: The Social Cost of Carbon," the SC-GHG can represent "the value of damages avoided for a small emission reduction (i.e., the benefit of a CO2 reduction)" and

> The [SCC] is meant to be a comprehensive estimate of climate change damages and includes changes in net agricultural productivity, human health, property damages from increased flood risk, and changes in energy system costs, such as reduced costs for heating and increased costs for air conditioning. However, given current modeling and data limitations, it does not include all important damages.

150. A federal Interagency Working Group ("Working Group")—consisting of the EPA, CEQ, Department of Energy, National Economic Council, Office of Management and Budget, Department of Agriculture, Department of Commerce, Department of Transportation, and other agencies—has prepared estimates of the cost that carbon pollution has on society. The Working Group prepared its first Social Cost of Carbon estimates in 2010, which was subsequently updated in 2013, 2015, and 2016.

151. The Working Group's Social Cost of Carbon estimates vary according to assumed discount rates and presumptions regarding the longevity and damages caused by carbon pollution in the atmosphere, which for 2015 produced a range of between $11 and $105 per metric ton of CO2. Accepted practice typically applies the median value to determine the social costs of a given project, although the range of values provided by the Working Group is also useful for comparing alternatives and evaluating the significance of climate impacts from a program or project.

152. In 2021, Executive Order 13990 re-established the Working Group after it was disbanded by the Trump Administration in 2017. In February 2021, the Working Group issued a technical support document with interim estimates of the social cost of carbon, methane, and nitrous oxide for use by federal agencies, in advance of the Working Group publishing a final update to the SC-GHG that reflects the best available science. According to the interim estimates, for 2020 the median Social Cost of Carbon is $51 per metric ton, which increases over time as additional carbon emissions become more costly to society.

153. BLM's Specialist Report on GHG Emissions did not use the SC-GHG tool to assess the impacts of the cumulative cost of global damages from the Oil and Gas Leasing Program. For the Lease Sales challenged here, BLM provided SC-GHG estimates for each lease sale, individually, but failed to disclose or analyze the cumulative total of the estimated SC- GHG collectively for these sales, or for the Leasing Program. Doing the simple arithmetic that BLM failed to do, collectively, the total social costs of GHG pollution for all proposed Lease Sales equals (in 2020 dollars) between $410,780,000 and $4,685,620,000, depending on the discount rate applied. BLM failed to disclose, let alone analyze, the immense social costs of the climate impacts associated with the Lease Sales.

### B. Carbon Budgeting

154. Carbon budgeting is another well-established method for estimating the significance of impacts from GHG emissions. A "carbon budget" offers a cap on the remaining amount of GHG emissions that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds.

155. The 2018 IPCC special report on *Global Warming of 1.5°C* provided a global carbon budget for a 66 percent probability of limiting warming to 1.5°C – a scientifically determined threshold above which potentially-irreversible tipping points may be reached with catastrophic results. This carbon budget was estimated at 420 gigatons ("Gt") $CO_2$ and 570 $GtCO_2$ depending on the temperature dataset used, from January 2018 onwards. At the current emissions rate of 42 Gt $CO_2$ per year, this carbon budget would be expended in just 10 to 14 years, underscoring the urgent need for transformative national and global action to transition from fossil fuel use to clean energy.

156. Using the IPCC's revised carbon budget, a 2019 Oil Change International Report found that "oil, gas, and coal in existing fields and mines would push the world far beyond 1.5°C while exhausting a 2°C budget as well." Thus, there is no room for new fossil fuel development if we are to keep warming below 1.5°C, or even 2°C.

157. According to a 2016 report from EcoShift Consulting, U.S federal fossil fuel resources (both leased and unleased) on public lands contain enough recoverable coal, oil and gas that, if all of it were extracted and burned, would result in as much as 492 Gt $CO_2$, surpassing the entire *global* carbon budget for a 1.5°C target and nearly eclipsing the 2°C target. Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 Gt $CO_2$, using up the most if not all of the remaining U.S. carbon budget. In short, any new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate

change (or, incidentally, be compatible with the United States' commitment under the Paris Accord).

158. Instead of ratcheting down emissions, the United States is gearing up for a carbon burst fueled by expanding oil and gas production. The 2019 Oil Change International Report found:

- Between now and 2030, the United States is on track to account for 60 percent of world growth in oil and gas production, expanding extraction at least four times more than any other country. This is the time period over which climate scientists say global carbon dioxide ($CO_2$) emissions should be roughly halved to stay in line with the 1.5°C target in the Paris Agreement.

- Between 2018 and 2050, the United States is set to unleash the world's largest burst of $CO_2$ emissions from new oil and gas development . . . U.S. drilling into new oil and gas reserves – primarily shale – could unlock 120 billion metric tons of $CO_2$ emissions, which is equivalent to the lifetime $CO_2$ emissions of nearly 1,000 coal-fired power plants.

- If not curtailed, U.S. oil and gas expansion will impede the rest of the world's ability to manage a climate-safe, equitable decline of oil and gas production. We find that, under an illustrative 1.5°C pathway for oil and gas taken from the [IPCC], U.S. production would exhaust nearly 50 percent of the world's total allowance for oil and gas by 2030 and exhaust more than 90 percent by 2050.

159. To put these global carbon budgets in the specific context of domestic U.S. emissions and the United States' obligation to reduce emissions, the United States is the world's largest historic emitter of GHG pollution, responsible for 26 percent of cumulative global $CO_2$ emissions since 1870, and is currently the world's second highest emitter on both an annual and per capita basis. Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel GHG emissions were attributable to federal minerals leased and developed by Interior.

160. According to a 2016 report from the Stockholm Institute, if BLM ceased new leasing and renewal of existing non-producing leases, total projected oil production would be reduced by 12% in 2025 and 65% by 2040, while natural gas production could be reduced by

6% in 2025 and 59% by 2040.

161. This avoided production would significantly reduce future U.S. emissions, and is desperately needed to avoid catastrophic climate change. Cessation of new and renewed leases for federal fossil fuel extraction could reduce annual $CO_2$ emissions by about 100 Mt by2030.

162. BLM's Specialist Report also includes a discussion on carbon budgets. Specifically, the report listed estimates of the amount of additional GHGs that can be emitted into the atmosphere while limiting global temperature rise to 1.5°C or 2°C above pre-industrial levels consistent with international commitments such as the Paris Agreement. The Specialist Report discloses that GHG emissions from the Oil and Gas Leasing Program alone consume a tremendous amount of the global budget – 1.47% of the budget consistent with a 66% chance of limiting warming to 1.5°C.

163. BLM asserts, however that "the global budgets that limit warming to 1.5°C or 2°C are not useful to BLM decision making as it is unclear what portion of the budget applies to emissions occurring in the United States." Further, BLM declined to evaluate whether predicted GHG emissions from the Lease Sales are significant because it found "no scientific data in the record . . . that would allow the BLM, in the absence of an agency carbon budget or similar standard, to evaluate the significance of the greenhouse gas emissions from this proposed lease sale."

**CLAIMS FOR RELIEF**

**<u>FIRST CLAIM FOR RELIEF</u>**

**Failure to Prepare an EIS**
**(Violation of NEPA)**

164. Conservation Groups incorporate by reference all preceding paragraphs and Appendix A below.

165. NEPA requires federal agencies to prepare an EIS for "major federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

166. The requirement to prepare an EIS for major federal actions, "serves NEPA's 'action-forcing' purpose in two important respects . . . It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts [and] it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

167. BLM's approvals of the challenged Lease Sales constitute a major federal action under NEPA.

168. Despite being part of a coordinated federal action to resume oil and gas leasing under the Leasing Program, all of the EAs for the Lease Sales were developed individually, resulting in an improperly segmented consideration of the 162 lease parcels and approximately 128,510.24 acres of federal mineral estate sold for oil and gas development. BLM attempted to avoid a finding of significance by breaking the sale down into component parts, which failed to accurately analyze the predicted cumulative GHG emissions and associated social costs from the Lease Sales collectively, and their associated impacts on the climate.

169. BLM's Specialist Report, incorporated by reference into each of the EAs, provides no meaningful analysis of GHG emissions in light of the remaining national and global carbon budgets and the quickly closing window to avoid the catastrophic effects of climate change. Nor did the Specialist Report consider the site-specific effects of the leases challenged here, together with the impacts of BLM's Leasing Program as a whole.

170. The conclusion reached in each of the challenged leasing FONSIs is also unsupported and inconsistent with the agency's acknowledgements of the climate crisis. For example, each of the FONSIs discloses the predicted amount of GHG emissions and the

millions of dollars in potential social costs of the GHG pollution associated with the individual lease sale analyzed, while also acknowledging that "all GHGs contribute incrementally to climate change." Nevertheless, BLM asserts that it cannot determine whether the predicted GHGs or social costs are significant because "[t]here are no established thresholds for NEPA analysis to contextualize the quantifiable greenhouse gas emissions or social cost of an action in terms of the action's effect on the climate, incrementally or otherwise." Despite such ambiguity, for each of the Lease Sales, BLM is still able to find that its decision to perpetuate fossil fuel exploitation on federal public lands will not significantly affect the environment.

171. BLM violated NEPA by failing to prepare an EIS before approving the Lease Sales challenged herein. BLM failed to articulate a satisfactory explanation for its actions, including a rational connection between the facts found and choices made, and its failure to prepare an EIS was arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law. 5 U.S.C. §§ 706(2)(A), (C), (D).

## SECOND CLAIM FOR RELIEF

### Failure to Take a Hard Look at Cumulative Impacts of Greenhouse Gas Pollution (Violation of NEPA)

172. Conservation Groups incorporate by reference all preceding paragraphs and Appendix A below.

173. NEPA requires BLM to take a "hard look" at all reasonably foreseeable environmental impacts and adverse effects of the proposed lease sales. 42 U.S.C. § 4332(2)(C).

174. NEPA documentation must do more than merely identify impacts, it must also enable the agency and other interested parties to "evaluate the severity" of the effects.

*Robertson*, 490 U.S. at 352.

175. Where information relevant to foreseeable adverse impacts is unavailable, agencies must nonetheless bear in mind NEPA's mandate to "develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." 42. U.S.C. § 4332(2)(B).

176. BLM is required to provide a hard look analysis of these impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v).

177. When several projects are pending concurrently "that will have cumulative or synergistic environmental impact," NEPA requires cumulative environmental impacts to be considered together. *Kleppe,* 427 U.S. at 410.

178. For all of the Lease Sales, BLM failed to analyze and evaluate the severity of the climate impacts of the Lease Sales collectively, and in the context of the total impacts from the Oil and Gas Program. In particular, BLM failed to take a hard look at the cumulative impacts of the Lease Sales because it failed to evaluate the severity of their collective impacts in the context of the climate crisis and GHG emissions from the Leasing Program.

179. BLM used available tools to contextualize GHG emissions from the Lease Sales and acknowledged the scientific consensus that fossil fuel production exacerbates the climate crisis. Yet, in each of the six challenged FONSIs, BLM asserts that "[t]here are no established thresholds" for it to apply the information it gleaned from using the available tools to make a significance determination. Instead, BLM found the cumulative GHG emissions from the individual sales and associated climate impacts to be insignificant, without explaining its rationale for reaching these conclusions.

180. Despite acknowledging that the United States is a signatory to the Paris

Agreement, the EAs, FONSIs, and Specialist Report failed to analyze the compatibility of the increased emissions from the challenged lease sales or the Leasing Program with the United States' goal and commitment to of avoid 1.5°C of warming.

181. In approving the lease sales, BLM failed to take a hard look at the cumulative impacts to the climate from GHG emissions, and failed to discuss the severity of these impacts, when authorizing the challenge Lease Sales. BLM's leasing approvals and failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C. § 4332(C)(ii), its implementing regulations, and the APA at 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF

### Failure to Prevent Unnecessary or Undue Degradation in the Context of Climate Impacts (Violation of FLPMA)

182. Conservation Groups incorporate by reference all preceding paragraphs and Appendix A below.

183. Federal Defendants have a substantive, non-discretionary duty under FLPMA to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This duty is "the heart of FLPMA." *Mineral Policy Center*, 292 F. Supp.2d at 42.

184. Federal Defendants' duty to comply with FLPMA extends to every BLM action.

185. Federal Defendants have never meaningfully defined how these FLPMA mandates apply to the Oil and Gas Leasing Program generally, or specifically to individual lease sales challenged herein.

186. BLM's duties to comply with FLPMA coexist with the MLA and NEPA's action-forcing procedures. Section 102 of NEPA provides that, "to the fullest extent possible," FLPMA (and other "policies, regulations, and public laws of the United States")

"shall be interpreted and administered in accordance with [section 101 of NEPA]." 42 U.S.C. § 4332(1).

187. In its Specialist Report, BLM acknowledges that FLMPA provides "the majority of BLM's legislative authority, policy direction, and basic management guidance" and FLPMA requires that it manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."

188. The agency also acknowledges—through extensive discussion—current climate science and the scientific consensus that BLM-authorized GHG emissions contribute to anthropogenic climate change, that climate induced impacts are already occurring, and that these impacts will increase and become more severe over time without dramatic emissions reductions and the implementation of aggressive mitigation pathways.

189. In approving the Lease Sales, BLM unlawfully failed to define or to take any action necessary to prevent the further unnecessary or undue degradation of public lands from acknowledged climate impacts and despite its acknowledged contribution to those impacts. This substantive failure is arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, in violation of FLPMA, 43 U.S.C. § 1732(b), and the APA, 5 U.S.C. § 706(2).

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Conservation Groups respectfully request that this Court:

A. Declare that Federal Defendants' decision to authorize the Lease Sales violated NEPA and its implementing regulations;

B. Declare that Federal Defendants' approval of the Lease Sales violated FLPMA;

C. Vacate Federal Defendants' leasing authorizations and accompanying EAs and FONSIs

challenged herein;

D. Enjoin Federal Defendants from approving or otherwise taking action on any applications for permits to drill on the oil and gas leases challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations, and the substantive provisions of FLPMA;

E. Order Federal Defendants to prepare an EIS analyzing the direct, indirect, and cumulative effects of the leasing authorizations challenged herein, including the incremental impact of the challenged leases, together with the other past, present, and foreseeable cumulative impacts from BLM's Oil and Gas Leasing Program;

F. Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure Federal Defendants take a meaningful hard look at the direct, indirect, and cumulative impacts of GHG emissions from BLM's Oil and Gas Leasing Program to climate;

G. Award the Conservation Groups their fees, costs, and other expenses as provided by applicable law; and

H. Issue such relief as Conservation Groups subsequently request or that this Court may deem just, proper, and equitable.

RESPECTFULLY SUBMITTED on the 22nd day of September, 2022.

*/s/ Barbara Chillcott*
Barbara L. Chillcott
D.D.C. Bar No. MT0007
WESTERN ENVIRONMENTAL LAW CENTER
103 Reeder's Alley
Helena, MT 59601
(406) 430-3023
chillcott@westernlaw.org

*/s/ Melissa Hornbein*
Melissa A. Hornbein
D.D.C. Bar No. MT0004

WESTERN ENVIRONMENTAL LAW CENTER
103 Reeder's Alley
Helena, MT 59601
(406) 471-3173
hornbein@westernlaw.org

*/s/ Kyle Tisdel*
Kyle J. Tisdel
D.D.C. Bar No. NM006
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602 Taos,
New Mexico 87571
(575) 613-8050
tisdel@westernlaw.org

*Attorneys for Plaintiffs*

# APPENDIX A

## PARCEL LIST: JUNE 2022 LEASE SALE

### COLORADO (6 lease parcels)
### DOI-BLM-CO-0000-2022 0001-EA

CO-2022-06-0130 Split Estate
COCO105294898
CO, Royal Gorge Field Office

CO-2022-06-5985 Split Estate
COCO105294902
CO, Kremmling Field Office

CO-2022-06-0034
COCO105294904
CO, Little Snake Field Office

CO-2022-06-5994 Split Estate
COCO105294900
CO, Little Snake Field Office

CO-2022-06-0005
COCO105294912
CO, Little Snake Field Office

CO-2022-06-6196
COCO105294914
CO, White River Field Office

### MONTANA/DAKOTAS (23 lease parcels)
### BLM-MT-0000-2021-0006-EA

MT-2022-06-0246 Split Estate
MTMT105295014
MT, Miles City Field Office

MT-2022-06-0245 Split Estate
MTMT105295015
MT, Miles City Field Office

MT-2022-06-0243 Split Estate
MTMT105295016
MT, Miles City Field Office

MT-2022-06-0242 Split Estate
MTMT105295017
MT, Miles City Field Office

MT-2022-06-0244 Split Estate
MTMT105295018
MT, Miles City Field Office

MT-2022-06-0234 Split Estate
MTMT105295019
MT, Miles City Field Office

MT-2022-06-0235
MTMT105295021
MT, Miles City Field Office

MT-2022-06-0241
MTMT105295023
MT, Miles City Field Office

ND-2022-06-0238
NDMT105295025
ND, North Dakota Field Office

ND-2022-06-0543
NDMT105295028
ND, North Dakota Field Office

ND-2022-06-1848
NDMT105295031
ND, North Dakota Field Office

ND-2022-06-0248
NDMT105295032
ND, North Dakota Field Office

ND-2022-06-0700
NDMT105295033
ND, North Dakota Field Office

ND-2022-06-2312
NDMT105295034
ND, North Dakota Field Office

ND-2022-06-0545
NDMT105295038
ND, North Dakota Field Office

ND-2022-06-0242
NDMT105295039
ND, North Dakota Field Office

ND-2022-06-0074 Split Estate
NDMT105295040
ND, North Dakota Field Office

ND-2022-06-0075 Split Estate
NDMT105295041
ND, North Dakota Field Office

ND-2022-06-0230 Split Estate
NDMT105295042
ND, North Dakota Field Office

ND-2022-06-0544
NDMT105295030
ND, North Dakota Field Office

ND-2022-06-0243
NDMT105295035
ND, North Dakota Field Office

ND-2022-06-0240
NDMT105295036
ND, North Dakota Field Office

ND-2022-06-0241
NDMT105295037
ND, North Dakota Field Office

**NEVADA (5 lease parcels)**
**DOI-BLM-NV-B000-2021-0007-Other**

NV-2022-06-1508
NVNV105294467
NV, Battle Mountain District Office

NV-2022-06-6910
NVNV105294469
NV, Battle Mountain District Office

NV-2022-06-6912
NVNV105294471
NV, Battle Mountain District Office

NV-2022-06-1513
NVNV105294472
NV, Battle Mountain District Office

NV-2022-06-1510
NVNV105294474
NV, Battle Mountain District Office

**NEW MEXICO/OKLAHOMA (6 lease parcels)**
**DOI-BLM-NM-P000-2021-0001-EA (New Mexico)**
**DOI-BLM- NM-0040-2021-0033-EA (Oklahoma)**

NM-2022-06-0408
NMNM105294478
NM, Roswell Field Office

NM-2022-06-0407 Split Estate
NMNM105294479
NM, Carlsbad Field Office

NM-2022-06-0409 Split Estate
NMNM105294480
NM, Carlsbad Field Office

NM-2022-06-0410 Split Estate
NMNM105294481
NM, Carlsbad Field Office

NM-2022-06-0396
NMNM105294482
NM, Carlsbad Field Office

OK-2022-06-0039
OKNM105294483
OK, Oklahoma Field Office

**WYOMING (122 lease parcels)**
**DOI-BLM-WY-0000-2021-0003-EA**

WY-2022-06-1612 Split Estate
WYWY105294510
WY, Rawlins Field Office

WY-2022-06-1107 Split Estate
WYWY105294524
WY, Newcastle Field Office

WY-2022-06-1033 Split Estate
WYWY105294485
WY, Casper Field Office

WY-2022-06-6979 Split Estate
WYWY105294541
WY, Newcastle Field Office

WY-2022-06-6977
WYWY105294547
WY, Newcastle Field Office

WY-2022-06-7021 Split
Estate WYWY105294487
WY, Casper Field Office

WY-2022-06-7193 Split
Estate WYWY105294489
WY, Casper Field Office

WY-2022-06-7126 Split
Estate WYWY105294491
WY, Casper Field Office

WY-2022-06-1083 Split
Estate WYWY105294553
WY, Buffalo Field Office

WY-2022-06-7152 Split
Estate WYWY105294493
WY, Casper Field Office

WY-2022-06-7123 Split Estate
WYWY105294557
WY, Buffalo Field Office

WY-2022-06-0942 Split Estate
WYWY105294558
WY, Buffalo Field Office

WY-2022-06-7012 Split Estate
WYWY105294560
WY, Buffalo Field Office

WY-2022-06-7215 Split Estate
WYWY105294495
WY, Casper Field Office

WY-2022-06-1131
WYWY105294497
WY, Casper Field Office

WY-2022-06-0943
WYWY105294566
WY, Buffalo Field Office

WY-2022-06-1210 Split Estate
WYWY105294567
WY, Buffalo Field Office

WY-2022-06-1277
WYWY105294569
WY, Buffalo Field Office

WY-2022-06-1234 Split Estate
WYWY105294574
WY, Buffalo Field Office

WY-2022-06-1032 Split Estate
WYWY105294581
WY, Buffalo Field Office

WY-2022-06-1036 Split Estate
WYWY105294583
WY, Buffalo Field Office

WY-2022-06-7074 Split Estate
WYWY105294588 29
WY, Buffalo Field Office

WY-2022-06-7031 Split Estate
WYWY105294589
WY, Buffalo Field Office

WY-2022-06-7030 Split Estate
WYWY105294594
WY, Buffalo Field Office

WY-2022-06-0967 Split Estate
WYWY105294595
WY, Buffalo Field Office

WY-2022-06-0953 Split Estate
WYWY105294601
WY, Buffalo Field Office

WY-2022-06-7025 Split Estate
WYWY105294603
WY, Buffalo Field Office

WY-2022-06-0968 Split Estate
WYWY105294605 34
WY, Buffalo Field Office

WY-2022-06-0966 Split Estate
WYWY105294608
WY, Buffalo Field Office

WY-2022-06-1054 Split Estate
WYWY105294611
WY, Buffalo Field Office

WY-2022-06-7026 Split Estate
WYWY105294613
WY, Buffalo Field Office

WY-2022-06-1110 Split Estate
WYWY105294499
WY, Casper Field Office

WY-2022-06-1043 Split Estate
WYWY105294585
WY, Buffalo Field Office

WY-2022-06-7122 Split Estate
WYWY105294616
WY, Buffalo Field Office

WY-2022-06-7174 Split Estate
WYWY105294619
WY, Buffalo Field Office

WY-2022-06-7033 Split Estate
WYWY105294621
WY, Buffalo Field Office

WY-2022-06-7173 Split Estate
WYWY105294623
WY, Buffalo Field Office

WY-2022-06-7177 Split Estate
WYWY105294624
WY, Buffalo Field Office

WY-2022-06-7032 Split Estate
WYWY105294625
WY, Buffalo Field Office

WY-2022-06-7135 Split Estate
WYWY105294626
WY, Buffalo Field Office

WY-2022-06-0960 Split Estate
WYWY105294633
WY, Buffalo Field Office

WY-2022-06-7027 Split Estate
WYWY105294634
WY, Buffalo Field Office

WY-2022-06-0958 Split Estate
WYWY105294635
WY, Buffalo Field Office

WY-2022-06-7134 Split Estate
WYWY105294638
WY, Buffalo Field Office

WY-2022-06-7195
WYWY105294501
WY, Casper Field Office

WY-2022-06-0973 Split Estate
WYWY105294641
WY, Buffalo Field Office

WY-2022-06-0947 Split Estate
WYWY105294644
WY, Buffalo Field Office

WY-2022-06-7022 Split Estate
WYWY105294648
WY, Buffalo Field Office

WY-2022-06-0950 Split Estate
WYWY105294649
WY, Buffalo Field Office

WY-2022-06-0875
WYWY105294503
WY, Casper Field Office

WY-2022-06-1132
WYWY105294651
WY, Buffalo Field Office

WY-2022-06-7182 Split Estate
WYWY105294505
WY, Casper Field Office

WY-2022-06-7190 Split Estate
WYWY105294509
WY, Casper Field Office

WY-2022-06-7188 Split Estate
WYWY105294511
WY, Casper Field Office

WY-2022-06-1183
WYWY105294515
WY, Casper Field Office

WY-2022-06-7035
WYWY105294655
WY, Buffalo Field Office

WY-2022-06-0945 Split Estate
WYWY105294640
WY, Buffalo Field Office

WY-2022-06-7160 Split Estate
WYWY105294517
WY, Casper Field Office

WY-2022-06-1230 Split Estate
WYWY105294657
WY, Buffalo Field Office

WY-2022-06-0977
WYWY105294521
WY, Casper Field Office

WY-2022-06-6978
WYWY105294658
WY, Rawlins Field Office

WY-2022-06-1226 Split Estate
WYWY105294659
WY, Buffalo Field Office

WY-2022-06-1224 Split Estate
WYWY105294660
WY, Buffalo Field Office

WY-2022-06-1223 Split Estate
WYWY105294661
WY, Buffalo Field Office

WY-2022-06-1225 Split Estate
WYWY105294662
WY, Buffalo Field Office

WY-2022-06-7204
WYWY105294666
WY, Lander Field Office

WY-2022-06-1197 Split Estate
WYWY105294667
WY, Lander Field Office

WY-2022-06-7036 Split Estate
WYWY105294656
WY, Buffalo Field Office

WY-2022-06-1156
WYWY105294670
WY, Lander Field Office

WY-2022-06-7013
WYWY105294671
WY, Rawlins Field Office

WY-2022-06-7200 73
WYWY105294672
WY, Lander Field Office

WY-2022-06-1154
WYWY105294673
WY, Lander Field Office

WY-2022-06-7203
WYWY105294674
WY, Lander Field Office

WY-2022-06-1152
WYWY105294675
WY, Lander Field Office

WY-2022-06-1151
WYWY105294676
WY, Lander Field Office

WY-2022-06-7205
WYWY105294677
WY, Lander Field Office

WY-2022-06-1157
WYWY105294678
WY, Lander Field Office

WY-2022-06-1158
WYWY105294679
WY, Lander Field Office

WY-2022-06-1242
WYWY105294668
WY, Lander Field Office

WY-2022-06-1247
WYWY105294669
WY, Lander Field Office

WY-2022-06-1201 Split Estate
WYWY105294682
WY, Lander Field Office

WY-2022-06-1208
WYWY105294683
WY, Lander Field Office

WY-2022-06-1212
WYWY105294684
WY, Lander Field Office

WY-2022-06-7053 Split Estate
WYWY105294686
WY, Rawlins Field Office

WY-2022-06-1018
WYWY105294689
WY, Worland Field Office

WY-2022-06-1188
WYWY105294690
WY, Worland Field Office

WY-2022-06-1203
WYWY105294691
WY, Worland Field Office

WY-2022-06-0974
WYWY105294692
WY, Worland Field Office

WY-2022-06-7153
WYWY105294694
WY, Worland Field Office

WY-2022-06-1159
WYWY105294680
WY, Lander Field Office

WY-2022-06-1160
WYWY105294681
WY, Lander Field Office

WY-2022-06-1097 Split Estate
WYWY105294698
WY, Worland Field Office

WY-2022-06-7170 Split Estate
WYWY105294699
WY, Worland Field Office

WY-2022-06-7155 Split Estate
WYWY105294700
WY, Worland Field Office

WY-2022-06-7039
WYWY105294701
WY, Worland Field Office

WY-2022-06-7060
WYWY105294702
WY, Rock Springs Field Office

WY-2022-06-7100
WYWY105294703
WY, Rock Springs Field Office

WY-2022-06-7107
WYWY105294704
WY, Rock Springs Field Office

WY-2022-06-7110
WYWY105294705
WY, Rock Springs Field Office

WY-2022-06-7061
WYWY105294706
WY, Rock Springs Field Office

WY-2022-06-7158 Split Estate
WYWY105294695
WY, Cody Field Office

WY-2022-06-7159 Split Estate
WYWY105294696
WY, Worland Field Office

WY-2022-06-1096 Split Estate
WYWY105294697
WY, Worland Field Office

WY-2022-06-7003
WYWY105294718
WY, Rock Springs Field Office

WY-2022-06-7192 Split Estate
WYWY105294751
WY, Pinedale Field Office

WY-2022-06-1219 Split Estate
WYWY105294752
WY, Rock Springs Field Office

WY-2022-06-1221
WYWY105294754

WY-2022-06-7214 Split Estate
WYWY105294757
WY, Rock Springs Field Office

WY-2022-06-1262 Split Estate
WYWY105294749
WY, Pinedale Field Office

WY-2022-06-1261
WYWY105294750
WY, Pinedale Field Office

WY-2022-06-7216
WYWY105294748
WY, Pinedale Field Office

WY-2022-06-1267 Split Estate
WYWY105294745
WY, Pinedale Field Office

WY-2022-06-7069
WYWY105294708
WY, Rock Springs Field Office

WY-2022-06-1227 Split Estate
WYWY105294710
WY, Cody Field Office

WY-2022-06-0911
WYWY105294715
WY, Rock Springs Field Office

WY-2022-06-1023
WYWY105294734
WY, Rock Springs Field Office

WY-2022-06-7103 105
WYWY105294736
WY, Rock Springs Field Office

WY-2022-06-1025
WYWY105294738
WY, Rock Springs Field Office

WY-2022-06-0904
WYWY105294741
WY, Rock Springs Field Office

WY-2022-06-0918
WYWY105294719
WY, Rock Springs Field Office

WY-2022-06-7008
WYWY105294723
WY, Rock Springs Field Office

WY-2022-06-0886 Split Estate
WYWY105294727
WY, Pinedale Field Office