**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DAKOTA RESOURCE COUNCIL, *et al.* ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> U.S. DEPARTMENT OF THE INTERIOR, ) *et al.* ) <br><br> Defendants, ) <br><br> and ) <br><br> STATE OF NORTH DAKOTA, *et al.* ) <br><br> Defendant-Intervenors. ) | Case No. 1:22-cv-01853-CRC |

**FEDERAL DEFENDANTS' COMBINED CROSS MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

LEGAL BACKGROUND .................................................................................................. 2

FACTUAL BACKGROUND ............................................................................................. 5

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT ...................................................................................................................... 9

 I. Plaintiffs Lack Standing to Challenge the Oklahoma Lease Sale ........................ 10

 II. BLM Complied with NEPA ................................................................................... 12

  A. BLM Properly Applied the CEQ Regulations in Effect at the Time of Its Decisions ................................................................................ 13

  B. BLM Took a Hard Look at the Cumulative Impacts of GHG Emissions ....................................................................................... 14

   1. Measuring the Cumulative Effects of GHG Emissions ................ 15

   2. BLM Sufficiently Analyzed the Cumulative Impacts of the Challenged Lease Sales ................................................................ 18

   3. Plaintiffs' Attacks on BLM's Cumulative Impacts Analysis Are Not Supported by the Law ..................................................... 22

  C. BLM's Decision Not to Prepare an EIS Was Reasonable ........................ 29

   1. The Applicable Regulations ......................................................... 29

   2. BLM Was Not Required to Prepare an EIS for the Lease Sales ............................................................................................. 30

   3. BLM Explained Why It Could Not Use the SC-GHG or Carbon Budget to Evaluate the Significance of GHG Emissions ..................................................................................... 34

   4. BLM Had No Obligation to Consider the Lease Sales Collectively in a Single EIS ........................................................ 38

 III. BLM Complied with FLPMA ................................................................................ 41

CONCLUSION .................................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Alaska Airlines, Inc. v. Transp. Sec. Admin.*,
    588 F.3d 1116 (D. C. Cir. 2009) ........................................................................ 26

*Am. Chemistry Council v. Dep't of Transp.*,
    468 F.3d 810 (D.C. Cir. 2006) ........................................................................... 11

*Appalachian Voices v. FERC*,
    No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) .............................. 38

*Balt. Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) .............................................................................................. 13

*Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. BLM*
    18-CV-01643-JLK, 2022 WL 472992 (D. Colo. Feb. 9, 2022) ................. 43, 45

*Blue Mountains Biodiversity Proj. v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ........................................................................... 30

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) ......................................................................... 28

*Citizens Against Ruining Our Env't v. Haaland*,
    (*Diné CARE*), 59 F.4th 1016 (10th Cir. 2023) .......................................... 17, 23, 38

*City of Olmsted Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002) ........................................................................... 11

*Coal. on Sensible Transp., Inc. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) ............................................................................. 13

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ........................................................................... 23

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ............................................................................................ 13

*EarthReports, Inc. v. FERC*,
    828 F.3d 949 (D.C. Cir. 2016) ..................................................................... 36, 38

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) ........................................................................... 38

*Friends of Animals v. Bernhardt*,
    961 F.3d 1197 (D.C. Cir. 2020) .................................................................... 10, 18

*Friends of The Earth, Bluewater Network Div. v. U.S. Dep't of Interior*,
    478 F. Supp. 2d 11 (D.D.C. 2007) .................................................................... 12

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................................ 11

*Hisp. Affs. Proj. v. Acosta*,
    263 F. Supp. 3d 160 (D.D.C. 2017) ............................................................. 10

*Keating v. FERC*,
    569 F.3d 427 (D.C. Cir. 2009) ..................................................................... 9

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*,
    476 F.3d 946 (D.C. Cir. 2007) ..................................................................... 23

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig*,
    818 F. Supp. 2d 214 (D.D.C. 2011) ............................................................. 29

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021) .......................................................... 6

*Louisiana v. Biden*,
    585 F. Supp. 3d 840 (W.D. La. 2022) .......................................................... 7

*Louisiana v. Biden*,
    64 F.4th 674 (2023) ...................................................................................... 7

*Louisiana v. Biden*,
    No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022) .......................... 7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 10

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ...................................................................................... 12

*Mineral Policy Center v. Norton*,
    292 F. Supp. 2d 30 (D.D.C. 2003) ......................................................... 42, 43

*Montana v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022) ................................................................. 17, 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ............................................................................. 9, 33, 37

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015) .................................................... 22, 30, 33

*Norton v. S. Utah Wilderness,*
    *All.*, 542 U.S. 55 (2004) ............................................................................... 3

*NYC C.L.A.S.H., Inc. v. Fudge*,
    47 F.4th 757 (D.C. Cir. 2022) ...................................................................... 37

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022) ...................................................................... 34

*Powder River Basin Res. Council v. BLM*,
    37 F. Supp. 3d 59 (D.D.C. 2014) ................................................................. 26

*Riverkeeper Network v. FERC*,
   45 F.4th 104 (D.C. Cir. 2022) ................................................................ 30, 32

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ........................................................................................ 12

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ...................................................................... 8

*Sierra Club v. U.S. Army Corps of Engineers*,
   803 F.3d 31 (D.C. Cir. 2015) ........................................................................ 12

*Sierra Club v. U.S. Dep't of Energy*,
   867 F.3d 189 (D.C. Cir. 2017) ...................................................................... 12

*Sierra Club v. Van Antwerp*,
   661 F.3d 1147 (D.C. Cir. 2011) .................................................................... 30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   301 F. Supp. 3d 50 (D.D.C. 2018) ................................................................ 40

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 12

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ...................................................................... 10

*\*Theodore Roosevelt Conservation P'ship v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011) .................................................... 41, 42, 43, 44

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
   433 F.3d 852 (D.C. Cir. 2006) ...................................................................... 15

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) .................................................................................... 10

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ........................................................................ 9

*Utah v. Andrus*,
   486 F. Supp. 995 (D. Utah 1979) ............................................................ 42, 44

*W. Energy All. v. Salazar*,
   709 F.3d 1040 (10th Cir. 2013) ...................................................................... 4

*W. Org. of Res. Councils v. Zinke*,
   892 F.3d 1234 (D.C. Cir. 2018) .................................................................... 13

*WildEarth Guardians v. Bernhardt*,
   502 F. Supp. 3d 237 (D.D.C. 2020) ......................................................... 5, 22

*WildEarth Guardians v. BLM*,
   8 F. Supp. 3d 17 (D.D.C. 2014) ........................................ 13, 16, 24, 25, 28

*WildEarth Guardians v. BLM,*
    457 F. Supp. 3d 880 (D. Mont. 2020)....................................................... 28

\*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013)........................... 15, 17, 22, 23, 25, 28

\*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019)........................ 5, 11, 17, 22, 23, 33

**Statutes**

5 U.S.C. § 702 ...................................................................................... 9

5 U.S.C. § 706 ...................................................................................... 9

30 U.S.C. § 181 .................................................................................... 2

30 U.S.C. § 226(b)(1)(A) .................................................................. 2, 4

42 U.S.C. § 4332(C) ............................................................................ 4

43 U.S.C. § 1702(c) ........................................................................... 44

43 U.S.C. § 1712(a) ............................................................................. 3

43 U.S.C. § 1712(e) ............................................................................. 3

43 U.S.C. § 1732(a) ............................................................................. 2

43 U.S.C. § 1732(b) ........................................................................... 41

43 U.S.C. § 3006(b)(1) ........................................................................ 3

**Regulations**

40 C.F.R. § 1500.1(a) ........................................................................ 33

40 C.F.R. § 1500.3(d) ........................................................................ 34

40 C.F.R. § 1501.3(a)(3) .................................................................... 29

40 C.F.R. § 1501.3(b) ........................................................................ 33

40 C.F.R. § 1501.3(b)(2) .................................................................... 29

40 C.F.R. § 1502.21(c) ....................................................................... 32

40 C.F.R. § 1508.1(g)(3) ............................................................... 15, 41

40 C.F.R. § 1508.25(a)(1) (2019) ...................................................... 39

40 C.F.R. § 1508.27 (2019) ............................................................... 29

40 C.F.R. § 1508.27(b) (2019) .......................................................... 29

40 C.F.R. § 1508.27(b)(5) (2019) ..................................................... 33

40 C.F.R. § 1509.1(e)(1) .................................................................... 39

40 C.F.R. § 1501.3(a)(2) ........................................................................................ 4

43 C.F.R. § 1601.0-5(n) ......................................................................................... 3

43 C.F.R. § 3100.0-3 .............................................................................................. 2

43 C.F.R. § 3101.1-3 .............................................................................................. 3

43 C.F.R. § 3120.1-2 .............................................................................................. 2

43 C.F.R. § 3120.1-1 ........................................................................................... 3, 4

43 C.F.R. § 3120.4-2 .............................................................................................. 5

43 C.F.R. § 3162.3-1(c) .............................................................................. 4, 39, 40

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) .................................................................... 13

51 Fed. Reg. 15,618 (Apr. 25, 1986) .................................................................... 13

81 Fed. Reg. 51,866 (Aug. 5, 2016) ...................................................................... 16

82 Fed. Reg. 16,093 (Mar. 31, 2017) .................................................................... 16

82 Fed. Reg. 16,576 (Apr. 5, 2017) ...................................................................... 16

85 Fed. Reg. 43,304 (July 16, 2020) ..................................................................... 14

86 Fed. Reg. 7,037 (Jan. 20, 2021) ...................................................... 6, 7, 16, 17

86 Fed. Reg. 7,619 (Jan. 27, 2021) ......................................................................... 6

86 Fed. Reg. 10,252 (Feb. 19, 2021) ..................................................................... 16

88 Fed. Reg. 1,196 (Jan. 9, 2023) ........................................... 17,18, 19, 21, 28, 34, 36

## INTRODUCTION

This case challenges the Bureau of Land Management's ("BLM") consideration of greenhouse gas ("GHG") emissions and climate change in its decisions authorizing six lease sales for oil and gas development on federal lands in June 2022.  After a series of recent cases, both within and without this Circuit, found fault with BLM's and other agencies' National Environmental Policy Act ("NEPA") analysis of GHG emissions, BLM took a step back and substantially restructured its approach to analyzing climate change in NEPA documents.  The agency postponed certain lease sales in 2021 to allow for this process and took the time to prepare a thorough report addressing the foreseeable GHG emissions of all federal fossil fuel development nationwide.  These June 2022 lease sales reflect the culmination of BLM's efforts. They satisfy the Mineral Leasing Act of 1920 ("MLA") provision relating to holding quarterly lease sales of eligible and available lands, while also satisfying BLM's obligations under NEPA and the Federal Land Policy and Management Act of 1976 ("FLPMA") to take a hard look at the potential impacts of GHG emissions and prevent unnecessary or undue degradation to public lands.

In its analysis for the challenged lease sales, BLM has compared the lease sales' emissions to state and national emissions as well as the emissions of all foreseeable federal fossil fuel development, monetized the projected emissions of each of the six lease sales using the social cost of GHGs ("SC-GHG"), estimated the impact of foreseeable federal fossil fuel development on a global carbon budget, provided equivalencies to more easily understood metrics like vehicle emissions, and considered the impacts of climate change using the best available science.  Having for years asked BLM to utilize these additional tools, Plaintiffs now seek more.  But their requests are not grounded in applicable law.  A rule of reason governs

NEPA reviews and BLM satisfied its obligation to analyze GHG emissions under any standard, including the current and applicable NEPA regulations and guidance on GHG analysis that was issued after the decisions.  Plaintiffs do not grapple with the challenges inherent in applying NEPA to GHG emissions and climate change or engage with BLM's explanations as to why certain approaches are not useful in that context.  Plaintiffs' novel theory that BLM's lease sale authorizations violated FLPMA's unnecessary or undue degradation standard simply because eventual oil and gas development produces GHG emissions also has no basis in the law because Congress specifically provided for the development of oil and gas on federal lands despite their corresponding GHG emissions.

Far from arbitrary, BLM's decisions complied with the regulations in effect during the decisionmaking processes and meet the standards set by the D.C. Circuit.  Although not in effect at the time, the decisions also satisfy the Council on Environmental Quality's ("CEQ") GHG guidance issued just this January.  Because BLM's decisions to authorize the lease sales comply with the law, the Court should grant summary judgment in favor of Federal Defendants.

## LEGAL BACKGROUND

BLM manages oil and gas development on federal land consistent with the MLA and FLPMA.[1]  The MLA specifically provides for the leasing of public lands for oil and gas development, 30 U.S.C. § 181, and states that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly."  *Id.* § 226(b)(1)(A); *see also* 43 C.F.R. § 3120.1-2.  FLPMA directs BLM to "manage the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), and identifies "mineral exploration and production" as a "principal or major use."  *Id.* § 1702(*l*).  Certain other uses, moreover, are now linked to oil and gas

---

[1] This brief refers only to the MLA and FLPMA for brevity.  For a full list of statutory authorities relevant to BLM's management of oil and gas, see 43 C.F.R. § 3100.0-3.

leasing—under the recently enacted Inflation Reduction Act of 2022, the Department of the Interior may not issue a right-of-way for wind or solar energy development on federal land unless BLM has held an oil or gas lease sale during the prior 120-day period and the quantity of acreage offered in lease sales during the prior one-year period is not less than the lesser of 2 million acres or 50% of the acreage for which expressions of interest have been submitted during that same one-year period.  43 U.S.C. § 3006(b)(1).

BLM manages oil and gas development on federal lands via a three-stage process.  At each stage, BLM conducts the appropriate NEPA review.  No development may occur until all three stages are complete.  At the first stage, the land use planning stage, a BLM district or field office prepares a resource management plan ("RMP") for its assigned geographic region.  43 U.S.C. § 1712(a).  An RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) (citation omitted).  Such uses could include, for example, recreation, wildlife habitat, timber, hard rock mining, and livestock grazing.  In the oil and gas context, the RMP identifies which lands, if any, within the region will be open to oil and gas development and what conditions will be placed on that development.  *See* 43 C.F.R. § 1601.0-5(n).

At the second stage, the leasing stage, BLM may issue leases for the development of oil and gas on specific parcels within an area designated as open to leasing by the RMP and subject to the conditions of the RMP.  43 U.S.C. § 1712(e); 43 C.F.R. § 3120.1-1.  Leases may be subject to stipulations intended to protect the environment.  43 C.F.R. § 3101.1-3.  A lease does not authorize development or surface disturbance.  *See id.* § 3162.3-1(c).

Finally, at the third stage, the permitting stage, a lessee that wishes to develop federal minerals on an issued lease must seek permission by filing an Application for Permit to Drill

("APD").  43 C.F.R. § 3162.3-1(c).  APDs are subject to BLM review and approval, and BLM

may condition approval on the lessee's adoption of "reasonable measures" to mitigate impacts.

*Id.* § 3101.1-2.

This case involves the second stage, leasing.  The leases at issue here were offered via

competitive lease sales, where the highest bidders secure the right to develop, subject to

constraints, the federal minerals within the bounds of any lease awarded to them.  30 U.S.C. §

226(b)(1)(A).  In determining which lands to offer for lease, BLM considers public expressions

of interest and conducts its own internal review process.  43 C.F.R. §§ 3120.1-1, 3120.3-1; *see*

*also* CO_119443.[2]  Before holding a lease sale, BLM reviews potential parcels to ensure

conformance with the relevant RMP.  *Id.*; *see also W. Energy All. v. Salazar*, 709 F.3d 1040,

1043 (10th Cir. 2013).  BLM also posts a list of parcels under consideration for leasing online for

public scoping and solicits comments on the proposed parcels.  *See, e.g.*, CO_1391.  Often BLM

reaches out to parties that it knows may have an interest in a specific parcel, such as local Indian

tribes or local and state government agencies, to solicit feedback.  *See, e.g.*, NM_P_32401,

32501.

After receiving comments during the scoping period, BLM begins its NEPA analysis for

the lease sales.  NEPA requires that an agency prepare an Environmental Impact Statement

("EIS") for "major Federal actions significantly affecting the quality of the human environment."

42 U.S.C. § 4332(C).  However, an agency may prepare an environmental assessment ("EA") to

determine whether an EIS is warranted.  40 C.F.R. §§ 1501.3(a)(2), 1501.5(a).  BLM often

prepares EAs for lease sales to analyze and disclose the environmental impacts of the proposed

---

[2] Citations beginning with CO, WY, NV, NM_O, NM_P, MT, and HQ are to the administrative
records for the challenged lease sales.  *See* ECF No. 52.

leasing decision and any alternatives.  Generally, BLM first prepares a draft EA for public comment.  *See id.* § 1501.5(e).  BLM then considers the comments received and prepares a final EA.  If, based on the EA, BLM determines that the lease sale will not significantly affect the environment, it issues a finding of no significant impact ("FONSI"), *id.* § 1501.6(a), and decision record.  The decision record identifies which parcels will be offered in the upcoming lease sale and which parcels, if any, BLM has decided not to offer in the sale.  *See, e.g.*, CO_119426.

If BLM decides to proceed with the lease sale for one or more parcels, it issues a Notice of Competitive Lease Sale ("Sale Notice") listing the parcels available for bid at least 45 days before the sale.  43 C.F.R. § 3120.4-2.  The Sale Notice provides logistical information concerning the sale, and lists the location and acreage of available parcels, as well as any stipulations, which will be attached to the parcels should they be leased.  *Id.* § 3120.4-1.  A member of the public may protest the inclusion of a specific parcel in a Sale Notice, and BLM may choose not to offer protested parcels until any protests have been resolved.  *Id.* § 3120.1-3.

## FACTUAL BACKGROUND

BLM's approach to leasing and its NEPA analysis for lease sales has been substantially impacted by the significant amount of litigation in recent years regarding how agencies analyze GHG emissions from federal projects.  For example, in 2019 Judge Contreras held that BLM's consideration of GHGs in its NEPA analysis for five Wyoming lease sales was insufficient.  *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019).  BLM prepared supplemental NEPA analysis to address the court's concerns, but that analysis was immediately challenged, and the court again found it insufficient.  *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 237 (D.D.C. 2020).  At the same time, climate science and policy are rapidly evolving.

Faced with these challenges, in early 2021, BLM postponed certain lease sales planned for the first quarter of 2021 to allow for additional review of GHG emissions under NEPA.

5

HQ_4441-42.  Meanwhile, BLM had already begun work to improve its analysis by preparing an inventory of GHG emissions from all federal fossil fuel development, which ultimately became the BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends ("Specialist Report").[3]

On August 31, 2021, BLM posted preliminary parcel lists for potential lease sales within its Colorado, Montana-Dakotas, Nevada, New Mexico-Oklahoma, Wyoming, Utah, and Eastern States offices on BLM's ePlanning NEPA Register website for public scoping.  *See, e.g.*, NM_P_32477 (parcel list); NM_P_59610 (explanation in EA).  BLM accepted scoping comments through October 1, 2021.  *See, e.g.*, NM_P_59610.  The agency specifically solicited comments from interested parties, including nearby Tribes, non-federal surface owners, and state and local agencies.  *See, e.g.*, CO_119449, MT_94970, NV_70333-34.

Then, in October 2021, BLM issued the Specialist Report.  The Specialist Report discusses the current state of climate change science and estimates emissions attributable to all foreseeable fossil fuel development on federal lands nationwide.  HQ_1806.  The report is intended to be updated annually.  HQ_1812.

After reviewing scoping comments, in late October and early November 2021, BLM State Offices posted draft EAs and unsigned FONSIs for the lease sales on ePlanning.

---

[3] On January 27, 2021, President Biden issued Executive Order 14008 directing BLM to "pause new oil and natural gas leases on public lands" to the extent consistent with law, pending completion of a "comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices."  86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021).  On June 15, 2021, the District Court for the Western District of Louisiana preliminarily enjoined BLM from "implementing" the pause. *Louisiana v. Biden*, 543 F. Supp. 3d 388, 419 (W.D. La. 2021).  While Plaintiffs make much of these developments, this case is about BLM's June 2022 lease sale decisions, not an Executive Order.

HQ_4001.[4]  The draft EAs incorporated the Specialist Report by reference.  *See, e.g.*,

NV_31883.  In light of scoping comments, the State Offices withdrew a number of parcels from

consideration for these lease sales.  HQ_4001.  BLM initially provided a 30-day comment period

on the draft EAs, but extended it by 10 days in response to requests for more time.  HQ_4010.

BLM planned to hold these lease sales in the first quarter of 2022.  *See, e.g.*, MT_83194.

But on February 11, 2022, the District Court for the Western District of Louisiana preliminarily

enjoined the federal government's use of certain SC-GHG estimates.  *Louisiana v. Biden*, 585 F.

Supp. 3d 840 (W.D. La. 2022).  BLM's draft EAs had utilized those estimates under Executive

Order 13990's direction that agencies "capture the full costs of greenhouse gas emissions."  86

Fed. Reg. 7,037, 7,040 (Jan. 20, 2021); *see also, e.g.*, MT_53824-27.  BLM therefore paused its

leasing process to consider the effect of the injunction.  *See, e.g.*, CO_119463.  On March 16,

2022, the Fifth Circuit stayed the district court's injunction pending appeal, *Louisiana v. Biden*,

No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022), but petitioners in that case sought

rehearing en banc.

Immediately after the Fifth Circuit denied rehearing en banc on April 14, 2022,[5] BLM's

State Offices posted Sale Notices for lease sales within its Colorado, Montana-Dakotas, Nevada,

New Mexico-Oklahoma, Wyoming, and Utah offices.[6]  HQ_4415.[7]  At the same time, those

---

[4] *See also* WY_425332; MT_53785; NM_O_18764; NM_P_60072; CO_34885; NV_31857
(draft EAs); WY_425560; MT_53779; NM_O_18757; NM_P_60061; CO_35156; NV_31850
(draft FONSIs).

[5] Order, *Louisiana v. Biden*, No. 22-30087 (5th Cir. Apr. 14, 2022), ECF Nos. 71-1, 71-2.  On
April 5, 2023, the Fifth Circuit vacated the district court's injunction.  *Louisiana v. Biden*, 64
F.4th 674 (2023).

[6] BLM had originally considered a lease sale within its Eastern States Office, but in April 2022
decided not to offer the one potential parcel in that office.  *See* https://www.blm.gov/press-
release/bureau-land-management-eastern-states-issues-notice-oil-and-gas-lease-sale (last visited
Apr. 28, 2023).

[7] *See also* NV_55038; WY_481011; CO_115280; NM_P_5552; NM_O_3526; MT_83506.

Offices posted final EAs and FONSIs for protest.[8]

BLM's State Offices held the lease sales on June 28 and 29, 2022.  On those same days, each office issued its decisions resolving protests.  In response to protests, BLM's Utah State Office selected the "no action" alternative and decided not to lease the parcel under consideration within that office.[9]  Other State Offices also decided not to offer a number of parcels in response to protests.  *See, e.g.*, WY_486107.  At the same time that each State Office issued its protest decisions, it also posted the final EA, a signed FONSI, and a decision record for each lease sale.[10]  The final totals of parcels and acreage offered for lease are as follows:

| BLM Office | Parcels (Acreage) Scoped | Parcels Not Made Available for Sale | Parcels (Acreage) Offered Day of Sale |
|---|---|---|---|
| Wyoming | 459 (568,196) | 337 | 122 (119,564) |
| Nevada | 10 (10,496.59) | 5 | 5 (2,560) |
| Colorado | 119 (141,675.22) | 113 | 6 (2,444) |
| Montana-Dakotas | 29 (6,849.16) | 6 | 23 (3405.80) |
| Oklahoma | 1 (14.92) | 0 | 1 (14.92) |
| New Mexico | 5 (520.8) | 0 | 5 (520.8) |

*Sources: WY_485953-55, 486132; NV_70316-20, 70542; CO_119426-30, 119855; MT_95513, 95517; NM_O_1, 18633-35; NM_P_1, 59827-30.

## STANDARD OF REVIEW

Alleged violations of NEPA and FLPMA are reviewed under the Administrative Procedure Act ("APA") and its "deferential standard of review."  *Sierra Club v. FERC*, 867 F.3d

---

[8] NV_54952; WY_480733; NM_O_18642; NM_P_59849; CO_115344; MT_83374 (EAs for protest); NV_55026; WY_480751; NM_O_18750; NM_P_59837; CO_115339; MT_83494 (FONSIs for protest).

[9] *See* https://eplanning.blm.gov/public_projects/2015573/200495437/20062743/250068925/2022-06-29-2022_1st_Lease%20Sale%20Decision%20Record.pdf (last visited Apr. 28, 2023).

[10] WY_485685; NV_70321, 70393; MT_94893-95441; CO_119437; NM_P_59599; NM_O_18520 (final EAs); WY_485956; NV_70309; MT_95443; CO_119431; NM_P_59587; NM_O_18513 (final FONSIs); WY_485952; NV_70316; MT_95449; CO_119426; NM_P_59827; NM_O_18633 (Decision Records).

1357, 1367 (D.C. Cir. 2017) (citation omitted).  Under this standard, a court may set aside

agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. §§ 702, 706(2)(A).

 This standard of review is "narrow and a court is not to substitute its judgment for that of

the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

Instead, the reviewing court determines whether the agency "considered the factors relevant to its

decision and articulated a rational connection between the facts found and the choice

made."  *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009).  An agency acts arbitrarily or

capriciously if it "(1) 'has relied on factors which Congress has not intended it to consider,' (2)

'entirely failed to consider an important aspect of the problem,' (3) 'offered an explanation for its

decision that runs counter to the evidence before the agency,' or (4) 'is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.'"  *U.S. Sugar

Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43).

## ARGUMENT

 Plaintiffs' challenge to the Oklahoma lease sale fails at the threshold because Plaintiffs

lack standing to challenge that sale.  As to the remaining sales, BLM's consideration of GHG

emissions and climate change complied with NEPA and FLPMA.  BLM took a hard look at the

direct, indirect, and cumulative impacts of the GHG emissions from the lease sales consistent

with case law and CEQ's recent GHG guidance and, in so doing, ensured both informed agency

decision-making and informed public participation in the decision process.  BLM was not

required to consider the lease sales collectively in a single EIS because the sales are not

"connected actions."  Finally, BLM complied with FLPMA by requiring that any future oil and

gas development on the leases abide by federal and state laws and regulations to limit

environmental degradation and by committing to further consider potential impacts and any

necessary mitigation at the APD stage when more specific information about an operator's

development plans is available.

**I.    Plaintiffs Lack Standing to Challenge the Oklahoma Lease Sale**

A showing of standing "is an essential and unchanging" predicate to any exercise of an

Article III court's jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The party

invoking federal jurisdiction—here, Plaintiffs—bears the burden of establishing standing.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021).  As "standing is not dispensed in

gross," Plaintiffs "must demonstrate standing for each claim that they press and for each form of

relief that they seek."  *Id.* at 2208.  In this context, that means Plaintiffs must establish standing

as to each challenged lease sale because each lease sale was authorized by a separate BLM

decision.  *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (finding

district court properly considered standing as to each "discrete regulatory action").

Here, Plaintiff organizations seek to establish standing through their members.[11]  *See*

Pls.' Mem. in Supp. of Mot. Summ. J. 16-18, ECF No. 53-1 ("Pls.' Mem.").  An organization

"has standing to bring suit on behalf of its members when: (a) its members would otherwise have

standing to sue in their own right," *i.e.*, they meet the traditional three-prong test for standing;

---

[11] Some of Plaintiffs' standing declarations purport to address the merits of the case.  *See, e.g.*,
Decl. of Daniel Estrin ("Estrin Decl.") ¶¶ 15-16, ECF No. 53-2 at 33-34 (concluding that BLM
violated NEPA and FLPMA).  Because judicial review under the APA is limited to the
administrative record absent circumstances that are not present here (*e.g.*, allegations of bad
faith), *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010),
such statements constitute extra-record evidence and should be disregarded by the Court.  *Hisp.
Affs. Proj. v. Acosta*, 263 F. Supp. 3d 160, 176 (D.D.C. 2017), *rev'd in part on other
grounds*, 901 F.3d 378 (D.C. Cir. 2018) ("The plaintiffs may not smuggle in extra-
record evidence relevant to the merits of this APA action by contending that the evidence
pertains to standing[.]").

"(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006).

To establish standing to challenge a federal action, "plaintiffs must show 'concrete and particularized injury which has occurred or is imminent *due to* geographic proximity to the action challenged.'" *WildEarth*, 368 F. Supp. 3d at 61 (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002)). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks omitted).

Plaintiffs have failed to establish standing to challenge BLM's authorization of the lease sale in Oklahoma because they have not identified a single member who uses any area in or around the lease sale, or even in the entire state of Oklahoma. Only one of Plaintiffs' declarants, Daniel Estrin, even mentions Oklahoma. But Mr. Estrin does not claim that he personally visits any area in or near any of the lease sales. Instead, Mr. Estrin asserts vaguely and conclusorily that the Waterkeeper organization

> has members, supporters, and staff who have frequently visited public lands in Colorado, Montana, Nevada, New Mexico, Oklahoma, Utah and Wyoming, including lands and waters that would be directly affected by the lease sales challenged herein, for recreational, aesthetic, scientific, educational, and other pursuits, who intend to continue to do so in the future, and who are particularly interested in protecting these natural areas from industrialization, and from the water quality, water quantity, and climate change impacts inherent to fossil fuel extraction.

Estrin Decl. ¶ 10. He cites two declarations to support this statement, but neither of the cited declarants mentions residing in, visiting, or intending to visit any lands in Oklahoma. *See* Estrin

11

Decl. ¶¶ 10-12 (citing Weisheit Decl. & Timmons Decl.).  Mr. Estrin also states that

Waterkeeper has three groups based in Oklahoma.  Estrin Decl. ¶ 13.  But, again, he fails to

allege that he or any specific members of Waterkeeper spend time in the area in or around the

Oklahoma lease sale parcel.

These types of broad allegations that an organization has unspecified members

throughout the country who visit unspecified locations are insufficient to establish standing.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (requiring evidence that "at least one

identified member had suffered or would suffer harm" and refusing to assume that a large

organization necessarily has members who will be affected by a project); *Friends of The Earth,

Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 17-18 (D.D.C. 2007)

(refusing to "extrapolate" standing from an organization's membership numbers).  Because

Plaintiff organizations have not identified a member who uses the area in or near the lease parcel

in Oklahoma, they lack standing to challenge BLM's authorization of the Oklahoma lease sale.

## II.    BLM Complied with NEPA

NEPA is a procedural statute intended to inform agency decision makers of the

environmental effects of proposed actions and ensure that relevant information is made available

to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA

"does not dictate particular decisional outcomes"; it merely prohibits "uninformed" agency

action.  *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir. 2015).

In reviewing agency action for NEPA compliance, courts ensure that agencies have taken

a "hard look" at the environmental consequences of their decisions.  *Sierra Club v. U.S. Dep't of

Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017).  Judicial review of agency NEPA compliance is

deferential, particularly as to an agency's technical and scientific determinations.  *Marsh v. Or.

*Nat. Res. Council*, 490 U.S. 360, 377 (1989).  The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).

BLM satisfied NEPA here because it took a hard look at the cumulative impacts of the GHG emissions resulting from the challenged lease sales and adequately explained its decision not to prepare an EIS.  BLM acted appropriately in addressing rapidly evolving policy, regulations, and case law, providing more information and context for the GHG emissions from these lease sales than in any prior NEPA analysis.  Yet, despite long requesting that BLM do just what it did—for example, that it utilize SC-GHG and carbon budgets, and consider the emissions from all federal leasing nationwide—Plaintiffs remain unsatisfied.  But while Plaintiffs seek more—relying on regulations that are no longer in effect and out-of-circuit case law—"inherent in NEPA . . . is a 'rule of reason.'"  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).  It is "always possible to explore a subject more deeply and to discuss it more thoroughly,' but '[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts'" and not Plaintiffs.  *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 33 (D.D.C. 2014) (quoting *Coal. on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66 (D.C. Cir. 1987)).

A.     **BLM Properly Applied the CEQ Regulations in Effect at the Time of Its Decisions**

Establishing the relevant legal framework is crucial to this Court's review of BLM's NEPA compliance.  CEQ, which was established by NEPA, promulgates binding regulations to guide federal agencies in implementing NEPA.  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir. 2018).  CEQ first promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and made a minor substantive amendment in 1986, *see* 51

13

Fed. Reg. 15,618 (Apr. 25, 1986).  In 2020, CEQ substantially revised the regulations.  85 Fed. Reg. 43,304 (July 16, 2020).  The 2020 Regulations became effective on September 14, 2020, *id.*, and therefore were in effect during BLM's decisionmaking process for the challenged lease sales.  CEQ amended the regulations again in early 2022 to restore a few discrete provisions from the 1978 Regulations, including clarifying that "effects" under NEPA include direct, indirect, and cumulative impacts.  87 Fed. Reg. 23,453 (April 20, 2022).  Those amendments became effective on May 20, 2022, shortly before BLM issued its final decisions for the challenged lease sales in late June 2022.[12]

Each BLM State Office properly applied the 2020 Regulations, as amended in 2022, to its analysis of the challenged lease sales, WY_485689; *see also, e.g.*, NM_P_59588 (citing significance factors in the 2020 Regulations); WY_485725 (discussing "cumulative emissions"), because those were the regulations in effect at the time of the June 2022 lease sales.  Despite that, Plaintiffs' arguments rely exclusively on the 1978 Regulations.[13]

### B.    BLM Took a Hard Look at the Cumulative Impacts of GHG Emissions

Climate change is inherently cumulative because the impact of a given subset of GHG emissions arises from that subset's contribution to global GHG emissions and existing concentrations.  BLM took a hard look at the cumulative impacts of the lease sales' GHG

---

[12] Federal Defendants refer to CEQ's current NEPA regulations as the "2020 Regulations" and the regulations that existed prior to CEQ's 2020 revision as the "1978 Regulations." Federal Defendants cite to the current regulations in this brief.  Where necessary, Federal Defendants distinguish between the 1978 and 2020 Regulations by adding the date (2019) that the old regulations were last in effect to citations to the 1978 Regulations. An accessible version of the 1978 regulations is available here: https://www.energy.gov/nepa/articles/40-cfr-1500-1508-ceq-regulations-implementing-procedural-provisions-nepa-ceq-1978 (last visited Apr. 28, 2023).

[13] Even if Secretarial Order 3399 required application of the 1978 Regulations as a matter of policy, as Plaintiffs suggest, by its own terms, the Order does not create any right or benefit enforceable by any party against the United States and so cannot be enforced by Plaintiffs against BLM.  HQ_54.

emissions in line with current regulations and guidance.

## 1.    Measuring the Cumulative Effects of GHG Emissions

Cumulative effects are those effects that "result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.1(g)(3). In the D.C. Circuit, a "'meaningful cumulative impact analysis must identify' five things":

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006).

As the D.C. Circuit has recognized, not all of the *TOMAC* factors can be applied directly to GHG emissions and climate impacts because the potentially affected area and the number of other sources of emissions are too large. These factors encompass the GHG emissions from vast swaths of human activity that contribute to climate change, which, in turn, impacts the entire globe. Thus, in 2013, in upholding a BLM coal leasing decision, the D.C. Circuit held that BLM properly analyzed GHG emissions from a coal mine when it quantified the mine's emissions as well as total state and national GHG emissions and determined both the individual mine and the region's percentage contribution to state and national emissions. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 309-10 (D.C. Cir. 2013). The court deferred to BLM's determination that it was not able "to associate specific actions with specific global impacts such as potential climate effects." *Id.* at 309.

Here, the BLM satisfied the requirements of *WildEarth Guardians* and also relied on the

SC-GHG to provide information about the approximate climate impact of the lease sales

globally.  Relying on the SC-GHG for this purpose is consistent with both CEQ's GHG guidance

and case law.  It is a reasonable means of providing the public and decisionmakers with

information about climate effects because current science "does not allow for specific linkage

between particular GHG emissions and particular climate impacts," *WildEarth*, 8 F. Supp. 3d at

35, let alone "forecast[ing] local or regional effects on resources."  CO_119475.  Similarly,

NEPA's rule of reason does not require an agency to catalog all "past, present, and proposed, and

reasonably foreseeable" federal and non-federal projects worldwide that could contribute to

GHG emissions, which would literally require identification of thousands, if not millions, of

projects worldwide.

In 2016, CEQ issued guidance for federal agencies on the consideration of GHG

emissions and climate change in NEPA reviews.  81 Fed. Reg. 51,866 (Aug. 5, 2016) ("2016

Guidance").[14]  Consistent with the approach upheld by the D.C. Circuit, the 2016 Guidance

recommended that agencies quantify the GHG emissions of a proposed action and any

alternatives, and use those projected emissions "as a proxy" for assessing the action's "potential

effects on climate change."  2016 Guidance at 10.  CEQ recognized that "the analysis of the

effects of GHG emissions is essentially a cumulative effects analysis that is subsumed within the

general analysis and discussion of climate change impacts."  *Id.* at 17.  "[F]or most Federal

agency actions," CEQ did "not expect an EIS would be required based *solely* on the global

---

[14] While the prior administration withdrew the 2016 Guidance, *see* 82 Fed. Reg. 16,093, 16,094 (Mar. 31, 2017); 82 Fed. Reg. 16,576 (Apr. 5, 2017), in January 2021, the current administration reinstated it.  *See* 86 Fed. Reg. at 7,042; 86 Fed. Reg. 10,252 (Feb. 19, 2021) (explaining that until CEQ revises the 2016 Guidance, agencies should continue to consider it, along with all other "available tools and resources [for] assessing GHG emissions and climate change effects"). The 2016 Guidance is available here: https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html (last visited Apr. 28, 2023).

significance of cumulative impacts of GHG emissions, as it would not be consistent with the rule of reason to require the preparation of an EIS for every Federal action that may cause GHG emissions . . . ." *Id.* at 17.

More recent judicial decisions have reached conflicting conclusions.  Within the D.C. Circuit, courts have continued to apply the binding precedent in *WildEarth Guardians v. Jewell*, 738 F.3d 298, explaining that BLM may satisfy NEPA by "compar[ing]" the emissions from its lease sales "to regional and national emissions." *WildEarth*, 368 F. Supp. 3d at 77.  Meanwhile, the Ninth and Tenth Circuits have recently held that a comparison of a project's GHG emissions to total state, national, and global emissions is insufficient to satisfy NEPA if other tools exist by which an agency could evaluate the cumulative impact of emissions.  *350 Montana v. Haaland*, 50 F.4th 1254, 1271-72 (9th Cir. 2022); *Diné Citizens Against Ruining Our Env't v. Haaland* (*Diné CARE*), 59 F.4th 1016, 1042 (10th Cir. 2023).  While both courts declined to require agencies to use a particular methodology, the Ninth Circuit suggested that agencies could use the SC-GHG and the Tenth Circuit pointed to a carbon budget.  In both instances, the courts held that agencies should explain their reasoning if they opted to reject those methodologies.  Notably, neither court purported to apply the multifactor test from *TOMAC*, and neither articulated a clear substitute.

Against this backdrop, on January 9, 2023, CEQ published updated interim guidance.  88 Fed. Reg. 1,196 (Jan. 9, 2023) ("2023 Guidance").  The 2023 Guidance recommends a specific framework for assessing GHG emissions in NEPA reviews.  First, agencies "should quantify the reasonably foreseeable direct and indirect GHG emissions of their proposed actions[.]"  *Id.* at 1,201.  Then, agencies should "provide context" for those emissions.  *Id.* at 1,202.  CEQ recommends four specific means of providing context: (1) monetize the impacts of emissions

using the SC-GHG; (2) "where helpful," "explain how the proposed action and alternatives would help meet or detract from achieving relevant climate action goals and commitments"; (3) "summarize and cite to available scientific literature to help explain the real-world effects" of climate change; and (4) "provide accessible comparisons or equivalents to help the public and decision makers understand GHG emissions in more familiar terms." *Id.* at 1,202-03.  Relevant here, the 2023 Guidance explains that NEPA's cumulative impact analysis requirement is satisfied where an agency quantifies a project's emissions and provides context for understanding their effects.  *Id.* at 1,206.

### 2.      BLM Sufficiently Analyzed the Cumulative Impacts of the Challenged Lease Sales

Faced with evolving (and sometimes conflicting) case law, policy direction, and CEQ guidance, BLM expanded its cumulative impacts analysis of GHG emissions and climate change in the EAs for the challenged lease sales, incorporating a number of new tools and methodologies.  This new analysis responds to recent judicial decisions in this Circuit, is consistent with CEQ's 2023 Guidance, and satisfies NEPA.  Because this approach reasonably analyzes and discloses the effect of GHG emissions, BLM's analysis is not arbitrary and capricious and should be upheld.

Consistent with the 2023 Guidance, in each EA, BLM began its analysis by quantifying[15] the "reasonably foreseeable direct and indirect GHG emissions" of the proposed leases.  *See* 88 Fed. Reg. at 1,201; CO_119477-78.[16]  BLM did this by determining foreseeable emissions from

---

[15] Plaintiffs suggest BLM's use of both "metric tonne" and "megatonne" to quantify emissions was confusing.  Those units are approved by the Intergovernmental Panel on Climate Change. *See* https://www.ipcc.ch/site/assets/uploads/2018/02/ipcc_wg3_ar5_annex-ii.pdf (last visited Apr. 28, 2023).  Moreover, BLM indicated, often in the text of the EA, which unit it was using for a given calculation.  *See, e.g.*, CO_119475, 119477; WY_485714, 485717.

[16] *See also* NM_P_59080-81; MT_94930-31; NV_70353; NM_O_18554; WY_485717.

each stage of oil and gas development: well construction, production operations, and end-use combustion of oil and gas produced on the parcels. WY_485717.[17] While BLM acknowledged that it "cannot develop a precise emissions inventory at the leasing stage due to uncertainties" about how a lease will ultimately be developed, the agency used well numbers and emissions data from past development in the same area to estimate on-lease emissions. CO_119476.[18] For production and end-use emissions, BLM assumed that future wells would produce in amounts similar to current nearby wells and that all produced oil and gas would be combusted. CO_119476-77.[19] BLM accounted for the fact that well production declines over time by calculating both the maximum emissions that could be expected in a given year, as well as the average annual emissions. WY_485717-18.[20]

Next, again consistent with CEQ's 2023 Guidance, BLM "provided context" for the quantified emissions from each lease sale. 88 Fed. Reg. at 1,202. First, BLM compared annual lease sale emissions to (1) total annual federal oil and gas emissions in the State and in the U.S. as a whole; (2) total annual federal oil, gas, and coal emissions in the State and U.S.; (3) total annual State and U.S. emissions from all sectors; and (4) annual global emissions. WY_485719-20.[21] BLM further broke this down by comparing the emissions from the lease sale (assuming a 30-year life of each leased parcel) to both short-term and long-term federal oil and gas emissions in the State and U.S. WY_485720-21.[22] BLM used those numbers to calculate the percentage of federal emissions at the state and national levels attributable to the lease sale. CO_119479 (The

---

[17] *See also* CO_119477; NM_P_59080-81; MT_94930; NV_70352-53; NM_O_18553-54.
[18] *See also* NM_P_59079; MT_94929; NV_70352; NM_O_18553; WY_485716.
[19] *See also* NM_P_59079; MT_94930; NV_70352; NM_O_18553; WY_485716.
[20] *See also* CO_119478; NM_P_59080-81; MT_94931; NV_70353-54; NM_O_18554-55.
[21] *See also* CO_119475, 119479; NM_P_59078, 59082; MT_94928, 94932; NV_70351, 70354; NM_O_18552-53, 18555-56.
[22] *See also* CO_119479; NM_P_59082; MT_94932-33; NV_70355; NM_O_18556.

"life-of-lease emissions for the Proposed Action are between 1.4% to 6.3% of Federal fossil fuel authorization emissions in the State and between 0.2% to 0.4% of Federal fossil fuel authorization emissions in the Nation.").[23]

Second, BLM calculated the SC-GHG attributable to both the development and operation of wells on the leases, as well as end-use combustion of produced oil and gas.  CO_119481-82.[24] BLM used the current interim estimates provided by the Interagency Working Group to calculate the SC-GHG in four different scenarios.  For example, for the Colorado lease sale, BLM monetized the emissions as between $240,456,000 and $2,638,532,000 depending on the discount rate and scenario used.  CO_119480-82.

Third, BLM used EPA's equivalency calculator to express the potential annual emissions of each lease sale "on a scale relatable to everyday life."  WY_485719.[25]  For example, the projected annual GHG emissions from the Wyoming lease sale are equivalent to 400,926 gas-powered passenger vehicles driven for one year or the emissions that could be avoided by operating 384 wind turbines.  WY_485719.  And fourth, BLM calculated and disclosed the total reasonably foreseeable emissions from all foreseeable oil and gas development on federal lands in 2022.  CO_119482-83.[26]

However, BLM did not stop there.  Each EA incorporated by reference the Specialist Report.  WY_485724.[27]  The report is specifically intended to be incorporated by reference into

---

[23] See also WY_485721; NM_P_59082; MT_94933; NV_70355; NM_O_18556; WY_485721.
[24] See also NM_P_59083-84; MT_94934-37; NV_70355-57; NM_O_18556-58; WY_485721-24.
[25] See also CO_119478; NM_P_59081; MT_94932; NV_70353; NM_O_18555.
[26] See also NM_P_59085-86; MT_94937-38; NV_70357-59; NM_O_18558-60; WY_485724-25.
[27] See also CO_119482; NM_P_59077; MT_94927-28; NV_70350; NM_O_18551.  The EAs refer to the Specialist Report as the "Annual GHG Report" or "Annual Report."

20

NEPA analyses as "an evaluation of cumulative emissions from [federal] fossil fuel authorizations on a state and national level." HQ_1813.  It discusses climate science and trends at length, including anticipated impacts from climate change at global, national, and state levels. HQ_1822-25, 1877-1904.  It also estimates total emissions and emissions broken down by state from oil and gas development on federal leases, accounting for leases already under production (HQ_1845-50), reasonably foreseeable future wells (HQ_1851-54), and reasonably foreseeable future oil and gas leases (HQ_1854-58).  The Report compares those emissions to total global, U.S., and state emissions, HQ_1869-71, and also evaluates the emissions in the context of the Intergovernmental Panel on Climate Change's ("IPCC") carbon budget for meeting the goals of the Paris Agreement and the International Energy Agency's and Executive Order 14008's goal of achieving "net zero" GHG emissions by 2050, HQ_1872-75.  Based on modeling, the Report estimates that foreseeable emissions from federal fossil fuel development over the next 30 years would "raise average global surface temperatures by approximately 0.0158º C., or 1% of the lower carbon budget temperature target."  HQ_1876.[28]

      This analysis satisfies NEPA.  BLM did everything CEQ's 2023 Guidance recommends as "best practices" for analyzing GHG emissions under NEPA.  88 Fed. Reg. at 1,202.  It quantified the direct and indirect emissions from the lease sales and provided context for those emissions by (1) monetizing them using the SC-GHG; (2) discussing the effects of climate change at state, national, and global levels based on current climate science and literature; (3) comparing federal fossil fuel emissions to policy goals like the Paris Agreement, and (4) providing equivalencies to compare emissions to more familiar metrics, like cars driven in a year. *See id.* at 1,202-03.  Meeting CEQ's requirements alone is sufficient to demonstrate that

---

[28] *See also* CO_119480; NM_P_59082; MT_94933; NV_70355; NM_O_18556; WY_485721.

BLM took a hard look at cumulative impacts.  *See id.* at 1,197-98 (2023 Guidance is intended to

"facilitate compliance" with NEPA and "reduce litigation risk").

BLM's actions also complied with recent judicial decisions.  Consistent with D.C. Circuit

precedent, BLM provided a qualitative discussion of climate change and its impacts, *see*

HQ_1877-1904, and compared the quantified emissions from the lease sales to state and national

emissions, *see, e.g.*, CO_119479; HQ_1870-71.  *See WildEarth*, 738 F.3d at 309.  In response to

recent district court decisions instructing BLM to consider the cumulative impact of GHG

emissions specifically from other BLM leases, it prepared an entire report analyzing emissions

across all past, present, and reasonably foreseeable federal fossil fuel development and broke that

information down on a state-by-state basis in each EA.  *See WildEarth*, 368 F. Supp. 3d at 77;

*WildEarth*, 502 F. Supp. 3d at 250; *see also, e.g.*, CO_119483.  And consistent with *350*

*Montana* and *Diné CARE*, BLM not only compared each lease sale's emissions to state and

national emissions, it also used the SC-GHG and a global carbon budget to contextualize those

emissions.

"[A]n agency has taken a 'hard look' at the environmental impacts of a proposed action if

'the statement contains sufficient discussion of the relevant issues and opposing viewpoints,'

and . . . the agency's decision is 'fully informed' and 'well-considered.'"  *Myersville Citizens for*

*a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015).  Faced with evolving

case law and guidance on how to evaluate the cumulative impacts of GHG emissions, BLM has

been adaptive and responsive and has met this standard.

### 3.   Plaintiffs' Attacks on BLM's Cumulative Impacts Analysis Are Not Supported by the Law

Plaintiffs attack BLM's methodologies and contend that the agency minimized the

impacts of the GHG emissions attributable to the lease sales.  However, their arguments rely on

out-of-Circuit case law and overlook BLM's explanations for why it chose certain approaches. BLM's "complex judgments" about "methodology and data analysis" within its "technical expertise" are owed "an extreme degree of deference," and should not be set aside based on Plaintiffs' flyspecking. *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007).

Plaintiffs argue that BLM's comparison of each lease sale's emissions to total state and national emissions "is designed to yield results that appear *de minimis*." Pls.' Mem. 21. This argument essentially contends that BLM's decision to provide *more* data and context for the lease sales' emissions, as recommended by CEQ's 2023 Guidance, is problematic purely because that data demonstrates that the lease sales' emissions are relatively small compared to total emissions at other scales. The argument fails for a number of reasons, foremost because the D.C. Circuit has specifically upheld an agency's cumulative impacts analysis based on the quantification of project emissions and comparison of those emissions to state and national total emissions. *WildEarth*, 738 F.3d at 309; *see also WildEarth*, 368 F. Supp. 3d at 79. In fact, BLM's analysis here goes far beyond that upheld by the D.C. Circuit, comparing the lease sale emissions not only to total state and national emissions, but also as a proportion of total federal oil and gas, and oil, gas, and coal emissions both within the state and the country. CO_119479.[29] Plaintiffs, in contrast, rely entirely on out-of-Circuit cases to contend that BLM's comparison is insufficient. Pls.' Mem. 21 (citing *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008), *Diné CARE*, 59 F.4th at 1042, and *350 Montana*, 50 F.4th at 1269-70).

Moreover, Plaintiffs' dismissal of the comparison of the lease sales' emissions to

---

[29] *See also* WY_485719; MT_94932; NV_70354; NM_P_59682; NM_O_18555-56.

emissions at other scales as saying "nothing about how the additional emissions will affect the environment" misunderstands the nature of climate change.  Pls.' Mem. 21.  Climate change impacts result from the totality of global GHG emissions.  BLM and the public would have little context for understanding the lease sale emissions or their contribution to climate change without comparing those emissions to emissions at broader scales.  *See WildEarth*, 8 F. Supp. 3d at 35 ("[E]valuating GHG emissions as a percentage of state-wide and nation-wide emissions, as BLM did here, is a permissible and adequate approach.").

    Even more fundamentally, however, Plaintiffs' argument completely ignores the multiple other approaches that BLM took to contextualize the lease sales' emissions.  Consistent with CEQ's 2023 Guidance, BLM provided accessible equivalencies for the lease sale emissions, comparing them to the equivalent number of gas-powered vehicles driven in one year, the emissions that could be avoided by operating a particular number of wind turbines, and the emissions that could be offset by the carbon sequestration provided by a particular acreage of forest.  CO_119478.[30]  As suggested by the Tenth Circuit in *Diné CARE*, BLM also used a carbon budget to assess the impact of all oil and gas leasing on federal lands, concluding that 30 years of emissions "would raise average global surface temperatures by approximately 0.0158 °C., or 1%" of the IPCC's lower carbon budget temperature target.  CO_119480.[31]  And, as recommended by CEQ's 2023 Guidance and discussed in *350 Montana*, BLM monetized each lease sale's expected emissions using the SC-GHG, disclosing figures in the millions and even billions of dollars depending on the discount rate used.  CO_119481-82.[32]  Plaintiffs themselves

---

[30] *See also* NM_P_59081; MT_ 94932; NV_70353; NM_O_18555, WY_485719.
[31] *See also* NM_P_59082; MT_94933; NV_70355; NM_O_18556; WY_485721.
[32] *See also* NM_P_59083-84; MT_94934-37; NV_70355-57; NM_O_18556-58; WY_485721-24.

argue that the SC-GHG estimates and contribution to the global carbon budget are "undeniably significant."  Pls.' Mem. 29; *see also id.* at 26-27.  Having reached that conclusion, they cannot turn around and claim that BLM is minimizing impacts.

Plaintiffs' attacks on BLM's specific methodologies are equally misplaced.  First, Plaintiffs cite EPA's comment recommending BLM "avoid expressing potential future project-level" emissions "as a percentage of national or state emissions."  Pls.' Mem. 21.  D.C. Circuit case law, however, upholds the comparison of project-level emissions to state and national emissions.  *See WildEarth*, 738 F.3d at 309.  But equally important, Plaintiffs omit the second half of the comment.  EPA suggested that if BLM "chooses to continue to present such comparisons," BLM should "put[] them into perspective by including the fact that oil, gas, and coal extraction from federal lands produces approximately one-fifth of all U.S. energy-related GHG emissions."  WY_480195, 481159.  BLM did exactly that.  The Specialist Report shows that emissions from fossil fuel development on federal lands constitute 14% of U.S. total GHG emissions, 17% of U.S. total energy production emissions, and 18.9% of U.S. fossil fuel combustion emissions.  HQ_1870; *see also, e.g.*, MT_95410 (responding to EPA's comment).

Second, Plaintiffs flyspeck BLM's treatment of midstream emissions, incorrectly suggesting that BLM "excluded" such emissions from its estimate of each lease sale's emissions.  Pls.' Mem. 21-22.  In the Specialist Report (and in the table of cumulative federal leasing emissions in each EA, *e.g.*, WY_485725), BLM calculated midstream emissions using emissions factors derived from a 2019 Department of Energy ("DOE") report.  HQ_1833 (methodology for natural gas); HQ_1830-31 (adopting same approach for oil); *see also, e.g.*, HQ_1845 (table breaking out extraction, processing, transport, and combustion emissions).  The calculations in the DOE report are based on national averages derived from actual production data for large oil

25

and gas basins in different geographic areas.  HQ_1833.  However, at the level of an individual

lease, operator decisions about how to develop the lease (*e.g.*, which equipment to use, how to

transport oil and gas off lease) make a major difference to accurate emissions estimates.  *See*

HQ_1842.  And at the leasing stage, "sources of emissions are highly speculative" because BLM

cannot know the exact nature of production (mineral types and volumes), what midstream

processes operators will use, or where midstream emissions will occur, given the inherent

differences in post-production refining for oil and gas.  *See, e.g.*, WY_485716.  For these

reasons, BLM made the reasonable methodological choice to assume for each individual lease

sale's emissions estimates that all produced oil and gas, *including* midstream emissions, would

be combusted and reported as $CO_2e$ (carbon dioxide equivalent, HQ_1824).  *See, e.g.*,

WY_485716 (explaining that BLM's Lease Sale Emissions Tool accounts for emissions from,

for example, "storage tank breathing and flashing," "truck loading," and "fugitives").  This is

precisely the sort of "complex judgment" about "methodology and data analysis" that is owed

"an extreme degree of deference."  *Powder River Basin Res. Council v. BLM*, 37 F. Supp. 3d 59,

78 (D.D.C. 2014) (quoting *Alaska Airlines, Inc. v. Transp. Sec. Admin.,* 588 F.3d 1116, 1120 (D.

C. Cir. 2009)) (deferring to BLM's methodological choice to avoid inaccuracies from

speculation).

　　　　Third, Plaintiffs contend that BLM failed to consider the cumulative effects of all six

lease sales together.  Pls' Mem. 35-36.  But every EA contains a table "show[ing] the cumulative

estimated GHG emissions from the development of the projected lease sale acres in 2022," when

combined with all other foreseeable oil and gas development on federal leases.  MT_94938.[33]  In

addition, the Specialist Report considers the cumulative impacts of GHG emissions from past,

---

[33] *See also* WY_485725; CO_119482; NV_70358; NM_P_59685; NM_O_18559.

present and reasonably foreseeable federal fossil fuel development.  Plaintiffs seem to think that
BLM should have separated out the total emissions of the six particular lease sales challenged
here, instead of combining them with other federal leasing emissions.  This argument finds no
support in the law as nothing in the 2020 Regulations requires an agency to consider the
cumulative impacts from a particular subset of GHG-emitting actions.  *See also infra* Section
II.C.4.  In addition, the argument overlooks BLM's explanation of its methodology.  BLM
necessarily employed a number of assumptions when estimating the emissions for each lease
sale—for example, assuming that every parcel would be fully developed, *see, e.g.*, NV_70499—
since "it is the [future] actual production of fossil fuel commodities on leased parcels that
generates GHG emissions and not the offering of acres or parcels for lease."  MT_94937.[34]
Analyzing the emissions from the six lease sales together magnifies the potential for inaccuracy
given these assumptions and the "dynamic nature of the lease sale process and independence of
each administrative unit for constructing its lease sales."  *Id.*  To avoid such "inflated,
unrealistic" emissions estimates, BLM instead evaluated the cumulative impacts of the leases,
when combined with all other foreseeable federal leases, using a different methodology
developed from the Specialist Report.  *Id.*  This methodology better accounts for production
trends and forecasts and therefore provides "the best available estimate of reasonably foreseeable
cumulative emissions related to any one lease sale or set of quarterly lease sales."  MT_94937-
38[35]; *see also* NM_P_59728, NV_70519.  What is more, BLM's methodology makes more sense
given the nature of climate change.  Because climate change results from cumulative GHG
emissions, the total emissions from all foreseeable BLM leasing is a more useful data point than

---

[34] *See also* WY_485724; CO_119482; NV_70357-58; NM_P_59685; NM_O_18558.
[35] *See also* WY_485725; CO_119482; NV_70358; NM_P_59685; NM_O_18559.

only the emissions from these six lease sales.  *See* NV_55135.

Finally, to the extent Plaintiffs contend that BLM should have traced the lease sales'
GHG emissions to specific climate change impacts, the agency explained that such a
determination is not currently possible.  WY_485714 ("The incremental contribution to global
GHGs from a single proposed land management action cannot be accurately translated into its
potential effect on global climate change or any localized effects in the area specific to the
action.").[36]  The D.C. Circuit has upheld this same explanation because "NEPA does not require
the impossible."  *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449
F.2d 1109, 1121 n.28 (D.C. Cir. 1971); *WildEarth*, 738 F.3d at 309 ("Because current science
does not allow for the specificity demanded by the Appellants, the BLM was not required to
identify specific effects on the climate[.]"); *see also WildEarth*, 8 F. Supp. 3d at 35 ("[T]he level
of specificity plaintiffs would prefer in BLM's analysis [of GHG impacts] is neither possible
based on current science, nor required by law.").[37]  Indeed, CEQ's new 2023 Guidance does not
require that level of analysis, instead instructing agencies to "remain aware of the evolving body
of scientific information as more refined estimates of the effects of climate change, both globally
and at a localized level, become available."  88 Fed. Reg. at 1,208.

In sum, BLM has satisfied NEPA by contextualizing the lease sales' emissions in several
different ways consistent with CEQ's 2023 Guidance and D.C. Circuit case law, explaining its

---

[36] *See also* CO_119728-29.
[37] Plaintiffs cite a District of Montana case, *WildEarth Guardians v. BLM*, but that case relies on
the requirement that agencies provide a "catalogue of other past, present, and reasonably
foreseeable" federal and non-federal projects, which, as discussed above, is not feasible in the
context of climate change.  457 F. Supp. 3d 880, 892, 894 (D. Mont. 2020); *see supra* Section
II.B.1.  It is also readily distinguishable because there, the agency failed to consider emissions
from other BLM leases and did not use the many other tools that BLM used here such as SC-
GHG, a carbon budget, and GHG equivalencies.

methodologies, and explaining its limitations based on current science.  "[C]limate change poses unprecedented challenges of science and policy on a global scale, and this Court must be at its most deferential where the agency is operating at the frontiers of science."  *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 219 (D.D.C. 2011).

### C.      BLM's Decision Not to Prepare an EIS Was Reasonable

BLM's decision not to prepare an EIS should be upheld because its FONSIs complied with NEPA's "rule of reason."  BLM reasonably explained why it was unable to evaluate the significance of the lease sales' emissions, including why it could not use the specific tools Plaintiffs point to—namely, the SC-GHG and carbon budget—to make that determination.  That explanation comported with CEQ's regulations.  Moreover, BLM was not required by those regulations or otherwise to analyze the lease sales together in a single EIS.  Each lease sale constituted an independent agency action made by a separate BLM office pursuant to a separate decisionmaking process and, as such, BLM properly prepared separate EAs for each sale.

### 1.      The Applicable Regulations

When CEQ revised the NEPA regulations in 2020, it substantially revised the factors by which an agency determines whether an action is "likely to have significant effects and is therefore appropriate for an [EIS]."  40 C.F.R. § 1501.3(a)(3).  Plaintiffs rely on the prior version of the regulations which instructed an agency to consider an action's "context" and "intensity."  *See, e.g.*, Pls.' Mem. 24, 34 (citing 40 C.F.R. § 1508.27 (2019)).  The 2020 Regulations eliminated those terms and instead direct agencies to "analyze the potentially affected environment and degree of the effects of the action."  40 C.F.R. § 1501.3(a)(3).  Whereas the 1978 Regulations included ten specific factors relevant to the evaluation of "intensity," the 2020 Regulations identify only four factors relevant to an action's "degree of effects."  *Compare* 40

C.F.R. § 1508.27(b) (2019) *with* 40 C.F.R. § 1501.3(b)(2).  Because the 2020 Regulations were

in effect during BLM's decisionmaking process for the challenged lease sales, its decisions must

be evaluated against those requirements and the other provisions of the 2020 Regulations.  *See,*

*e.g.*, CO_119432 (citing definition of significance in 2020 Regulations); NM_P_59589 (same).

### 2.      BLM Was Not Required to Prepare an EIS for the Lease Sales

Plaintiffs contend that an EIS is necessary if there are "substantial questions" as to

whether a project may have a significant impact, but that is the test in the Ninth Circuit.  *See* Pls.'

Mem. 32 (quoting *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th

Cir. 1998)).  In the D.C. Circuit, a court assessing an agency's decision not to prepare an EIS

asks "whether the agency '(1) has accurately identified the relevant environmental concern, (2)

has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case

for its finding of no significant impact, and (4) has shown that even if there is an impact of true

significance, an EIS is unnecessary because changes or safeguards in the project sufficiently

reduce the impact to a minimum.'"  *Myersville*, 783 F.3d at 1322.  The "convincing case"

standard is no higher than the usual APA arbitrary and capricious standard of review.  *Sierra*

*Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011).  Therefore, the court's "role in

reviewing an agency's decision not to prepare an [EIS] is a 'limited' one, 'designed primarily to

ensure that no arguably significant consequences have been ignored.'"  *Del. Riverkeeper*

*Network v. FERC*, 45 F.4th 104, 113 (D.C. Cir. 2022).  Far from ignoring the GHG emissions

and climate change impacts of the lease sales, BLM's EAs and FONSIs demonstrate that the

agency met this standard by taking a hard look at potential impacts and fully and reasonably

explaining its reasons for foregoing an EIS.

For each of the challenged lease sales, BLM determined that the final selection of parcels

to be leased would not have a significant effect on the quality of the environment and therefore issued a FONSI.  CO_119431.[38]  In reaching this conclusion, BLM examined the "affected area" of the leases and applied the four factors relevant to the degree of effects from the current CEQ regulations.  CO_119432-36.[39]  For example, in the EA for the Colorado lease sale, BLM considered short- and long-term air quality effects and explained that modeling that accounts for the lease sales "predicts that overall air quality and related values will improve in the future around the region."  CO_119434.  BLM also considered the adverse effects of development, such as surface disturbance and noise, as well as beneficial effects, such as the production of fossil fuels to meet local, state, and national demand and royalty revenue for the federal and state governments.  CO_119435.  BLM explained that it did not expect impacts to public health and safety to be significant given federal, state, and local regulations and conditions on development imposed at the permitting stage.  *Id.*  Finally, BLM concluded that the lease sales did not violate any federal, state, local, or tribal law protecting the environment.  *Id.*

Plaintiffs do not contest any of those determinations.  Instead, they focus on BLM's conclusion for each lease sale that, "[a]s of the publication of this FONSI, there is no scientific data in the record, including scientific data submitted during the comment period for these lease sales, that would allow the BLM, in the absence of an agency carbon budget or similar standard, to evaluate the significance of the greenhouse gas emissions from this proposed lease sale."  CO_119434.[40]  While BLM "acknowledge[d] that all GHGs contribute incrementally to climate change," it explained that "[t]here are no established thresholds for NEPA analysis to

---

[38] *See also* MT_95443; NV_70309; NM_P_59587; NM_O_18513; WY_485956.

[39] *See also* NM_P_59588-97; MT_95446-48; NV_70310-14; NM_O_18514-18; WY_485960-62.

[40] *See also* NM_P_59594; MT_95447; NV_70312; NM_O_18515-16; WY_485960-61.

contextualize the quantifiable greenhouse gas emissions or social cost of an action in terms of the action's effect on the climate, incrementally or otherwise." *Id.*; *see also* NV_55140.  As the agency explained, "preparation of an EIS solely for the sake of analysis of the issue of climate change is not warranted as any disclosure in such an EIS would be the same as that prepared for this EA and would not better inform decision makers or the public."  NV_70312.

BLM's explanation is consistent with CEQ's regulations, which anticipate situations in which an agency lacks information necessary for evaluating impacts.  "If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known," an agency should acknowledge the missing information in its NEPA document, explain its "relevance" to "evaluating reasonably foreseeable significant adverse impacts on the human environment," summarize "existing credible scientific evidence," and provide an "evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  40 C.F.R. § 1502.21(c).

Here, BLM acknowledged that it lacked the necessary data or standard to assess the significance of GHG emissions and clearly explained why that data was "relevant." Notwithstanding those limitations, in the EAs and Specialist Report BLM thoroughly explained the science of climate change and evaluated the impacts of each lease sale's emissions—and total federal fossil fuel emissions—to the extent possible, using "methods generally accepted in the scientific community"—*i.e.*, a comparison to state and national emissions; the SC-GHG; a carbon budget; EPA's GHG equivalency calculator; and a qualitative discussion of anticipated climate change impacts based on current scientific literature.

In contrast, Plaintiffs rely on regulations that are no longer in effect, contending that

BLM should have prepared an EIS because the effects of the lease sales' GHG emissions are "highly uncertain or involve unique or unknown risks." Pls.' Mem. 33 (citing 40 C.F.R. § 1508.27(b)(5) (2019)). CEQ's new regulations eliminated this significance factor. *See* 40 C.F.R. § 1501.3(b).[41] Moreover, even if that factor remained relevant, this Court has held that "the risks of GHG emissions are not 'unique or unknown,'" such that they require an EIS. *WildEarth*, 368 F. Supp. 3d at 83. Any uncertainty results not from the *effects* of GHG emissions in contributing to climate change, which all parties agree upon (*see, e.g.*, MT_95381), but instead from the *means* of evaluating the significance under NEPA of a single project's emissions. *See* 368 F. Supp. 3d at 83 (where parties agree that oil and gas development "will produce GHG emissions" and "GHG emissions contribute to climate change," and agree on the risks of climate change, the effect of the emissions cannot be said to be highly uncertain, unique, or unknown).

Courts apply a "rule of reason" to an agency's NEPA analysis. *Myersville*, 783 F.3d at 1322. The purpose of the statute is "not to generate paperwork" but rather to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). BLM has met that standard here. BLM "identified the relevant environmental concern" (GHG emissions), took "a hard look at the problem" in its EAs and the Specialist Report, and made a "convincing case" for its FONSIs—namely, the insignificance of impacts to non-climate resources and the lack of a means by which to evaluate the significance of a particular quantity of emissions in the broader context of climate change. *See Myersville*, 783 F.3d at 1322. Put another way, BLM provided a "rational connection between the facts

---

[41] The Court need not consider the extent to which an agency should evaluate uncertainty in considering the significance factors set forth in the 2020 Regulations, because even if it remained a standalone factor, the BLM's approach is reasonable.

found and the choice made." *State Farm*, 463 U.S. at 52.

For this same reason, even if BLM were required to prepare an EIS for the lease sales based on its inability to assess significance, its failure to do so here is at best harmless error.  The D.C. Circuit applies the APA's "rule of prejudicial error" in the NEPA context "when the agency has undertaken the required analysis but 'failed to comply precisely with NEPA procedures.'"  *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (citation omitted).  Here, BLM offered multiple opportunities for public comment and took a hard look at the impacts of GHG emissions using the tools recommended by the 2023 Guidance and D.C. Circuit case law.  Requiring that BLM put the same information contained in its EAs in the form of an EIS and reach the same conclusion—an inability to assess significance for GHG emissions—would not serve the purpose of NEPA.  *See* 40 C.F.R. § 1500.3(d) ("It is [CEQ's] intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action.").

### 3.   BLM Explained Why It Could Not Use the SC-GHG or Carbon Budget to Evaluate the Significance of GHG Emissions

Plaintiffs argue that BLM could have used the SC-GHG or a carbon budget to evaluate the significance of the lease sales' GHG emissions.  Pls.' Mem. 26-30.  Their contention overlooks BLM's explanation that the agency lacks a threshold against which to evaluate the outcomes produced by those tools.  Because BLM considered and explained its reasons for not relying on either tool to assess significance, it has satisfied NEPA.

The SC-GHG provides an "estimate[] of the monetized damages associated with incremental increases in GHG emissions in a given year."  CO_119480.  The President has encouraged agencies to use the SC-GHG in their decisionmaking processes where appropriate.  86 Fed. Reg. at 7,040; *see also* 2023 Guidance, 88 Fed. Reg. at 1,198.  Here, BLM monetized the

emissions associated with each lease sale in its EAs using the SC-GHG.  CO_119480-82.[42]

Carbon budgets, meanwhile, "are an estimate of the amount of additional GHGs that could be emitted into the atmosphere over time to reach carbon neutrality while still limiting global temperatures to no more than 1.5° C or 2° C above pre-industrial levels."  HQ_1872. Organizations like the IPCC have developed carbon budgets, but as BLM explained in the Specialist Report, "[n]one of the global carbon budgets are a hard line that countries have committed to stay within as part of the Paris Agreement or otherwise," and "budgets have not yet been established on a national or subnational scale."  HQ_ 1873-74.  For that reason, BLM has determined that "the global budgets that limit warming to 1.5° C or 2.0° C are not useful for BLM decisionmaking as it is unclear what portion of the budget applies to emissions occurring in the United States."  HQ_1874; *see also* NV_55141.

Despite these constraints, in an effort to be responsive to "stakeholders and members of the public," BLM considered the total emissions from fossil fuel development on federal lands in the context of the IPCC's carbon budget.  HQ_1874-75; *see also* NM_P_59737.  BLM provided several caveats, including noting that its calculations "reflect only the emissions side of the equation"—meaning that they omit carbon sequestration and storage, for example—and therefore "may overestimate actual consumption of global carbon budgets resulting from BLM leases and authorizations."  HQ_1874.  BLM's MAGICC climate model "suggest[ed] that 30-plus years of projected federal emissions would raise average global surface temperatures by approximately 0.0158 °C., or 1% of the lower carbon budget temperature target."  HQ_1876.

Having provided these SC-GHG and carbon budget calculations in the EAs and Specialist

---

[42] *See also* NM_P_59083-84; MT_94934-37; NV_70355-57; NM_O_18556-58; WY_485721-24.

Report, however, BLM explained in its FONSIs and in responses to comments and protests that neither tool could currently be used to evaluate the significance of impacts associated with GHG emissions for purposes of NEPA.  As BLM explained, there is currently no "established threshold" or "standard" by which to determine when the social cost of an action's GHG emissions or its contribution to the carbon budget becomes "significant."  CO_119434.[43]  This is not a new problem.  In the NEPA context, agencies have for years struggled to assess the significance of SC-GHG calculations, explaining that "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016).  Notably, Executive Order 13990 and CEQ's 2023 Guidance do not resolve this issue.  *See* 88 Fed. Reg. at 1,200 ("This guidance does not establish any particular quantity of GHG emissions as 'significantly' affecting the quality of the human environment.").

Plaintiffs contend BLM's explanation is arbitrary and capricious.  But it is Plaintiffs who reject BLM's science-based explanations out of hand and have not put forward a standard for assessing significance that BLM could have, but failed, to use.  For example, Plaintiffs do not take on BLM's explanation that current carbon budgets are not designed for a "national or subnational scale," let alone for use evaluating "significance" under NEPA.  And while Plaintiffs flyspeck the individual EAs for failing to provide the total SC-GHG from all the lease sales conducted by separate BLM State Offices, they do not explain how that total—which Plaintiffs were able to easily calculate using BLM's disclosed data and "simple arithmetic," Pls.' Mem.

---

[43] *See also, e.g.*, CO_119739, NV_70312 ("[T]here is not a formal Federal policy establishing a national carbon budget or a final international consensus on which carbon budget the world should use for limiting global warming (1.5C or 2.0C) that the BLM can use to evaluate the significance of a proposed action.").

26—gets BLM any closer to evaluating significance.  Plaintiffs suggest that numbers of a certain size are "undeniably significant" but cite no law, policy, or science to support that conclusion. Pls.' Mem. 29; *see also id.* at 37 (assuming $5 billion in SC-GHG is significant).[44]  Even if BLM had calculated the total SC-GHG for all foreseeable leases nationwide, as Plaintiffs suggest—or for all emissions worldwide—that number would not confer significance or non-significance upon each lease sale's emissions.

Plaintiffs also contend that if BLM used a carbon budget in the Specialist Report, it could and should have used one in the EAs to evaluate the significance of the lease sales emissions.  To start, as BLM explained, carbon budgets are not developed for the purpose of comparing project-level emissions to an established budget.  *See* HQ_1873-74.  That scientific explanation is owed deference, particularly since Plaintiffs have not even attempted to rebut it.  *NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 763 (D.C. Cir. 2022).  But even putting that issue aside, Plaintiffs' argument conflates two different documents with two different purposes.  The Specialist Report is not a NEPA document; its purpose was to provide information, not to determine the significance of the impacts that it identifies.  *See* HQ_1813.  Indeed, BLM specifically explained in the Specialist Report that currently available global carbon budgets are "not useful for BLM decisionmaking" because there is no "consensus on how to allocate the global budget to each nation."  HQ_1873-74.  The EAs and FONSIs, in contrast, are NEPA documents intended to assist BLM in evaluating the significance of the lease sales' impacts.  And as BLM explained, "the Department [of the Interior] lacks an established carbon budget" that can be used to evaluate

---

[44] If, as Plaintiffs seem to suggest, any GHG emissions are inherently significant because of their contribution to climate change, an EIS would be required for nearly every federal action, which CEQ has in the past said would be inconsistent with NEPA's rule of reason.  2016 Guidance at 17.

the significance of GHG emissions for NEPA purposes.  CO_119394, 119434.

An agency's decision not to use a particular tool for assessing the significance of GHG emissions is not arbitrary and capricious when the agency explained its reasons for declining to do so.  *EarthReports*, 828 F.3d at 956 (upholding decision to not use the social cost of carbon to evaluate significance of GHG emissions); *Food & Water Watch v. FERC*, 28 F.4th 277, 290 (D.C. Cir. 2022) (upholding agency's conclusion in EA that it was "unable to determine the significance of the Project's contribution to climate change" given lack of "any workable alternative method").  For this reason, this case is different from *Diné CARE* and *350 Montana*. Not only did BLM utilize the tools proposed by those cases but it also "explain[ed] why [those tools were] deficient" for the particular purpose of evaluating the significance of emissions. *Diné CARE*, 59 F.4th at 1043.  While Plaintiffs may "take a different position" than BLM on the usefulness of SC-GHG and carbon budgets for evaluating significance, they have not even attempted to rebut BLM's explanation for why the tools are inadequate for this purpose, and so leave the Court "no reason to doubt the reasonableness of [BLM's] conclusion." *EarthReports*, 828 F.3d at 956; *see also Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (deferring to agency's explanation as to why the social cost of carbon is not useful for evaluating significance under NEPA).

### 4.   BLM Had No Obligation to Consider the Lease Sales Collectively in a Single EIS

Plaintiffs improperly rely on CEQ's 1978 Regulations, which are no longer in effect, to argue that BLM should have considered the lease sales together in a single EIS.  *See* Pls.' Mem. 34-38.  Under the 1978 Regulations, agencies were to consider separate actions together in a single EIS if they were "connected actions" or "cumulative actions."  40 C.F.R. § 1508.25(a)(1)-(2) (2019).  Agencies also had discretion to analyze "similar actions" in the same EIS.  *Id.* §

1508.25(a)(3) (2019).  But the 2020 Regulations eliminated the concepts of "cumulative" and "similar" actions and instead require an agency to discuss actions in the same EIS only when they are "connected."  *Id.* § 1501.9(e)(1).  Because the 2020 Regulations eliminated "cumulative" and "similar" actions, BLM had no obligation to apply those concepts to the lease sales.  Moreover, because Plaintiffs do not contend that the lease sales are "connected actions," they have waived the argument.  Therefore, Plaintiffs provide no basis in the law, as it currently applies and as it applied at the time of BLM's decisionmaking processes, to require BLM to consider the six lease sales collectively in a single EIS.

Even if the Court were to consider the argument, it would find that the lease sales do not qualify as connected actions.  Under the 2020 Regulations, agency actions are "connected" and should be considered in the same EIS if they "automatically trigger other actions that may require [an EIS]," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1509.1(e)(1).[45]  The lease sales do not meet any of these requirements.  First, the sales do not automatically trigger any other actions.  While lessees may seek to develop the leases in the future, they must apply for, and BLM must approve, drilling permits before they can engage in any development or surface disturbance.  43 C.F.R. § 3162.3-1(c); *see also* MT_95419.  Second, the sales are not dependent on each other or any other actions such that one cannot proceed unless the others also proceed.  Each lease sale was authorized by an independent decision of the relevant BLM State Director after a state-specific decisionmaking process that resulted in a state-specific Decision Record based on that office's analysis of the specific parcels proposed for leasing in that State and State-specific factors, such as the

---

[45] These factors are the same as in the 1978 Regulations.  *See* 40 C.F.R. § 1508.25(a)(1) (2019).

applicable provisions of the relevant RMP, landscape, water resources, wildlife, local

communities, and State and local laws and regulations.[46]  WY_485991, 486041.[47]  Third, the

lease sales are not interdependent parts of a larger action that depend on the larger action for

their justification because there is no larger action here.  *Id.*  Each lease sale is a separate, stand-

alone agency action pursuant to BLM's leasing authority under the MLA and FLPMA.  *See*

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 67-71 (D.D.C.

2018) (holding separate agency decisions regarding the Dakota Access Pipeline did not qualify

as "connected" actions because, *inter alia*, the decisions were by separate offices, had

"independent utility," and involved "ecologically distinct" lands).

      Having identified no legal requirement that BLM consider the lease sales together,

Plaintiffs instead place their argument in the context of the "climate crisis," suggesting that the

cumulative and important nature of climate change necessitates that the agency consider the

lease sales in a single EIS.  Pls.' Mem. 35-37.  Plaintiffs' arguments seek to collapse the

distinction between when an agency is required to consider multiple actions in a single EIS and

the requirement that agencies consider cumulative effects.  But neither NEPA nor CEQ's 2020

Regulations require that an agency consider otherwise un-connected GHG-emitting actions in the

same EIS.  Nor do they require that an agency develop a "programmatic" EIS for certain types of

actions on the basis of climate change impacts.

      Plaintiffs' arguments also do not withstand scrutiny as a policy matter.  If projects that

---

[46] The fact that BLM Headquarters provided guidance on how the State Offices should analyze GHG emissions is inapposite.  *See* Pls.' Mem. 38.  Every State Office still had to reach an individual decision about which specific parcels, if any, to lease based not only on the lease sale's GHG emissions but also every other resource analyzed.

[47] *See, e.g.*, CO_119379, 119740; MT_95366; NV_70517; *see also, e.g.*, NV_70346, 70363, 70370, 70374, 70383 (considering local air quality, water resources, wildlife, etc.).

emit GHGs should be considered together in a single EIS because GHG emissions cumulatively impact climate change, then every federal agency would have to prepare an EIS for nearly all its actions, no matter how disparate.  There is no logical reason to require a single EIS for just these six lease sales on the basis that they all emit GHGs when many other federal projects emit some amount of GHGs and when the 2020 Regulations themselves instruct consideration of the cumulative effects of "reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.1(g)(3).

In sum, as explained *supra*, BLM complied with NEPA's requirement that it consider the cumulative effects of the lease sales' GHG emissions, including the cumulative emissions of all foreseeable oil and gas development on federal lands.  But that requirement is separate and distinct from any obligation to consider the lease sales together in a single EIS.  Because the lease sales are not connected actions, BLM was not required to consider them in a single EIS.

## III.   BLM Complied with FLPMA

BLM complied with the requirement in FLPMA to prevent "unnecessary or undue degradation" ("UUD") of the public lands.  43 U.S.C. § 1732(b).  This requirement prevents BLM from approving actions that would cause UUD in proportion to the activity being authorized.  *Theodore Roosevelt Conservation P'ship v. Salazar* (*TRCP*), 661 F.3d 66, 76 (D.C. Cir. 2011).  Plaintiffs offer a novel theory that BLM's oil and gas leasing, by its very nature, crosses the UUD threshold because it will contribute to climate change and associated environmental impacts.  This theory has no legal basis and should be rejected.

Under the UUD standard, BLM is prohibited from approving activities that would cause "the occurrence of 'something more than the usual effects anticipated' from appropriately mitigated development."  *Id.*  The terms "unnecessary" and "undue" have separate meanings.  *Id.*

"Unnecessary" means "that which is not necessary." *Id.* (quoting *Utah v. Andrus*, 486 F. Supp. 995, 1005 n.13 (D. Utah 1979)). "Undue" means "that which is excessive, improper, immoderate or unwarranted." *Utah*, 486 F. Supp. at 1005 n.13; *see also Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30, 43 (D.D.C. 2003) (finding that BLM must "prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive").[48] In the oil and gas context, the authorization of activities would violate the UUD standard if those activities were "conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology[.]" *Colo. Environmental Coalition*, 165 IBLA 221, 229 (2005).

The UUD mandate is intended to complement—not hinder—BLM's overarching mandate to manage public lands according to the "principles of multiple use and sustained yield." *TRCP*, 661 F.3d at 76 (citing 43 U.S.C. § 1732(a)). Under these principles, BLM "must balance multiple uses in its management of public lands," including uses that involve resource extraction and uses that relate to the scenic, scientific, and historic value of the land. *Id.* While BLM's multiple use and UUD obligations "are distinct, they are interrelated and highly correlated." *Id.* By following the principles of multiple use and sustained yield, BLM "will often, if not always, fulfill FLPMA's requirement that it prevent environmental degradation because the former principles already require [BLM] to balance potentially degrading uses—*e.g.*, mineral extraction, grazing, or timber harvesting—with conservation of the natural environment." *Id.*

---

[48] While it is true that the court in *Mineral Policy Center* rejected certain aspects of the Solicitor's opinion at issue there, Pls.' Mem. 42, that portion of the court's ruling has no bearing here. The court held that the terms "unnecessary" and "undue" should not be interpreted to have the same meaning, 292 F. Supp. 2d at 43, but BLM did not take that view here.

Here, BLM complied with the requirement to avoid UUD—and, more clearly, did not act arbitrarily or capriciously in that regard.  As BLM explained, it took appropriate steps to ensure that its leasing decisions would not result in unnecessary degradation or degradation that would be "excessive, improper, immoderate or unwarranted."  NV_70535.  To avoid unnecessary or undue methane emissions, lessees are required to follow applicable federal and state requirements and best management practices.  NV_70535-36.[49]  BLM also will require best management practices and other measures, as necessary, at the APD stage.  NV_70535.[50]  By requiring lessees to comply with applicable federal and state requirements and appropriate stipulations to protect the environment, BLM has ensured that any environmental degradation will be necessary and will not be excessive or disproportionate to any drilling activities that may eventually be authorized.  *See TRCP*, 661 F.3d at 76; *Mineral Policy Center*, 292 F. Supp. 2d at 43; *see also Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. BLM*, No. 18-CV-01643-JLK, 2022 WL 472992, at *24 (D. Colo. Feb. 9, 2022) (finding BLM complied with FLPMA when it identified laws, regulations, and stipulations that would prevent UUD from oil and gas development).

Plaintiffs argue, nevertheless, that BLM violated the requirement to avoid UUD based on potential climate impacts.  Although they point to no standard in FLPMA or the case law that BLM violated, they urge the Court to adopt a novel "climate degradation standard" and find that BLM failed to comply with it.  Pls.' Mem. 39.  Because oil and gas extraction results in GHG emissions and therefore climate change impacts, Plaintiffs argue, BLM's authorization of the lease sales violates FLPMA.  *Id.* at 41.  Plaintiffs are wrong for several reasons.

---

[49] *See also* CO_119396; NM_O_50-51; WY_485987-88.
[50] *See also* CO_119412, 119754; NM_O_49-50; WY_486046-47, 481266; MT_83953; NM_P_6005.

First, BLM relied on an appropriate definition of unnecessary or undue degradation. BLM defined "undue degradation" as environmental degradation that "is excessive, improper, immoderate, or unwarranted."  *See*, *e.g.*, CO_119412.  This same definition was relied upon in *Utah*, 486 F. Supp. at 1005 n.13.  And in a case involving oil and gas production, the D.C. Circuit cited *Utah* with approval.  *See TRCP*, 661 F.3d at 76.  Moreover, the D.C. Circuit interprets "undue" to mean "undue in proportion to," *id.*, which is consistent with the standard in *Utah*.  Thus, BLM relied on a legal standard that was implicitly endorsed by the D.C. Circuit.

Second, as the D.C. Circuit has explained, this standard must be viewed against FLPMA's principles of multiple use and sustained yield.  *Id.*  Mineral extraction is one of the multiple uses that is expressly permitted on public lands.  43 U.S.C. § 1702(c).  Because Plaintiffs make no effort to show that the lease sales' GHG emissions are either unnecessary or out of proportion to the emissions that would ordinarily occur in the context of oil and gas leasing, they cannot prevail on their UUD claim.

Third, it is not enough for Plaintiffs to speculate that BLM will not apply mitigation to address the sources of GHG emissions within its control.  With respect to methane emissions, lessees must comply with all applicable federal and state requirements and best management practices.  *See*, *e.g.*, CO_119396.  Similarly, lessees must comply with applicable federal and state requirements with respect to other GHG emissions and air quality.  *See*, *e.g.*, CO_115305-06 (Colorado lease stipulations); MT_83552 (Montana lease stipulations).  And BLM has the authority to require additional mitigation, best management practices, and other measures, as necessary, at the APD stage.  NV_70535; *see also* HQ_1905-10 (describing potential mitigation strategies); WY_486040 (stating that BLM will consider mitigation at the APD stage).  At that stage, BLM will be in a better position to address potential degradation based on the specific

development proposal before it. *See Bd. of Cnty. Comm'rs of Cnty. of San Miguel*, 2022 WL 472992, at *24 (noting BLM's commitment to further consider UUD at later site-specific stages).

In sum, BLM complied with FLPMA's requirement to prevent UUD while also allowing for multiple uses of public lands, including oil and gas development.

**CONCLUSION**

Because BLM's authorizations of the challenged lease sales complied with NEPA and FLPMA, the Court should deny Plaintiffs' claims and grant summary judgment in favor of Federal Defendants.

Respectfully submitted this 1st day of May, 2023,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Clare Boronow*
CLARE BORONOW, member of MD Bar
Senior Attorney, Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1362
Fax: (303) 844-1350
clare.boronow@usdoj.gov

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
Senior Attorney, Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Counsel for Federal Defendants*