**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **DAKOTA RESOURCE COUNCIL,** *et al.*, |
| Plaintiffs, |
| v. |
| **U.S. DEPARTMENT OF INTERIOR,** *et al.*, |
| Defendants. |

Case No. 22-cv-1853 (CRC)

## MEMORANDUM OPINION

The mounting climate crisis has spurred countless citizens, companies, and government actors to reassess their policies and practices concerning greenhouse gas ("GHG") emissions. The Bureau of Land Management ("BLM" or "the Bureau") is no exception.  Over the past few years, the Bureau has responded to calls to revamp its methods for analyzing the environmental impact of GHG emissions stemming from fossil-fuel development on federal land.  And in June 2022, it employed these new and improved tools when assessing the effects of six lease sales for oil and gas development that the Bureau authorized across the western United States.

Still dissatisfied, Dakota Resource Council and other conservation groups (collectively, "the Conservation Groups") filed suit.  They contend BLM's "deficient" environmental analysis violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq. Moreover, they assert that the Bureau's authorization of the six lease sales in the face of broad-scale climate degradation ran afoul of its substantive duties under the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 et seq.

The Court appreciates the Conservation Groups' concerns and the potentially existential threat that continued GHG emissions pose, yet it finds no legal error in the Bureau's

environmental analysis or its decision to approve the challenged lease sales.  Operating at the frontiers of science, BLM reasonably exhausted available tools to analyze the lease sales' environmental consequences:  It estimated the amount of GHG emissions from the lease sales; placed those projections in proper perspective; monetized the social cost of the emissions; described why it cannot predict the on-the-ground effects that this level of GHG emissions will have on the local ecosystem or global environment; and explained why, absent a government carbon budget or similar reference standard, it was not possible to determine whether the estimated emissions would have a "significant" impact on the environment.  While many observers may find that result unsatisfying, it was all that was required to comply with NEPA in this ever-evolving scientific and regulatory landscape.  And, on this record, there is no reason to conclude that the lease sales will cause "unnecessary and undue degradation" under the FLPMA. Id. § 1732(b).  The Court will, accordingly, deny the Conservation Groups' motion for summary judgment and grant the Bureau's and Intervenors' cross-motions.

## I.    Background

### A.  Legal Background

The Department of Interior ("Interior" or "the Department"), where BLM resides, manages oil and gas development on federal land pursuant to the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181–287, and the FLPMA.  The MLA directs the Secretary of the Interior to manage fossil-fuel development on federal land in a manner that "safeguard[s] . . . the public welfare."  Id. § 187.  It further provides that "[l]ease sales shall be held for each State where eligible lands are available [for oil and gas development] at least quarterly and more frequently if the Secretary of Interior determines such sales are necessary."  Id. § 226(b)(1)(A). Despite the mandatory language, however, the Secretary has discretion to decide where, when,

and under what terms and conditions oil and gas development should occur.  See id. § 226; 43 C.F.R. § 3101.1-2.

That discretion is guided and constrained by the FLPMA, which directs Interior to "manage the public lands under principles of multiple use and substantial yield."  43 U.S.C. § 1732(a).  "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  Id. § 1702(c).  The FLPMA lists "mineral exploration and production" as one of the "principal or major uses" of public lands.  Id. § 1702(l).  But development is not the only, or even the primary, use Interior must balance.  The FLPMA further instructs Interior to prevent "permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."  Id. § 1702(c).  To that end, the Department must "take any action necessary to prevent unnecessary or undue degradation of the lands" and "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."  Id. § 1732(b), (d)(2)(A).

Pursuant to these statutory requirements, BLM manages oil and gas development on federal lands through a three-stage process of planning, leasing, and drilling.  At the first stage, each BLM field office prepares a resource management plan ("RMP") for its assigned region. Id. § 1712(a); 43 C.F.R. §§ 1601.0-5(n), 1610.1.  The RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  Norton v. S. Utah Wilderness All., 542 U.S. 55, 59 (2004) (citation omitted).  This includes determining which

areas will be open to oil and gas leasing and what conditions will be placed on later development.  See 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n).

At the second stage, BLM may issue leases for the development of oil or gas on specific parcels within an area designated as open to leasing under the RMP.  43 U.S.C. § 1712(e); 43 C.F.R. § 3120.1-1.  In accordance with the MLA, lease sales occur quarterly via a competitive bidding process.  See 30 U.S.C. § 226(b)(1)(A).  The Bureau first receives public expressions of interest ("EOIs") and conducts an internal review to ensure that nominated parcels conform with the relevant RMPs.  43 C.F.R. §§ 3120.1-1, 3120.3-1.  It then posts online a list of the parcels under consideration for public scoping and, after soliciting comments, selects certain parcels as candidates for oil and gas leases.  Id. § 3120.4-2.  These leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold."  Id. § 3101.1-2.  But they do not directly authorize development or surface disturbance, see id. § 3162.3-1(c), as BLM may impose "stipulations as conditions of lease issuance" to "minimize adverse impacts to other resource values," id. §§ 3101.1-2, 3101.1-3.

At the third and final stage, a lessee seeking to extract oil and gas on an issued lease must file an Application for Permit to Drill ("APD").  Before approving the APD, the Bureau must confirm the application complies with the RMP, see id. § 1610.5-3, and may condition approval on the lessee's adoption of "reasonable measures" to mitigate the environmental impact, see id. § 3101.1-2.

At each step along the way, BLM must comply with the procedures set forth in NEPA. Known as our "basic national charter for the protection of the environment," 40 C.F.R. § 1500.1, NEPA implements a series of procedural requirements to ensure "agencies take a hard look at the

environmental consequences" before making "any irreversible and irretrievable commitment of resources."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348, 350 (1989) (citations omitted); see also 42 U.S.C. § 4332(2)(C)(v).  NEPA requires that agencies prepare a "detailed statement," known as an Environmental Impact Statement ("EIS"), for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If it is uncertain whether a proposed action will significantly affect the environment, and thus whether an EIS is required, an agency may prepare an Environmental Assessment ("EA").  See 40 C.F.R. § 1501.3–4.  An EA is a "concise public document" discussing the proposed action's environmental impacts, which informs the agency's decision on whether to prepare an EIS.  Id. § 1508.1(h).  If the agency concludes an EIS is not required, it issues a Finding of No Significant Impact ("FONSI") "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment."  Id. § 1508.1(l).  "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project."  Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (citations omitted).

By regulation, "[a]pproval of a resource management plan is considered a major Federal action significantly affecting the quality of the human environment" and requiring an EIS.  43 C.F.R. § 1601.0-6.  While the sale of oil and gas leases also represents an "irreversible and irretrievable commitment of resources" that triggers NEPA duties, Sierra Club v. Peterson, 717 F.2d 1409, 1414 (D.C. Cir. 1983), BLM must perform a full-blown EIS at this stage only if the sale is projected to have a "significant" environmental impact, 43 C.F.R. § 3162.3-1(c).  At the lease stage, then, BLM usually starts by preparing an EA.  If it determines based on the EA that the lease sale will significantly affect the environment, it prepares an EIS.  Otherwise, it issues a

FONSI along with a "Record of Decision" specifying which, if any, parcels it is offering for sale that quarter.

This case involves the second stage—the sale of oil and gas leases—and BLM's alleged failure to perform a proper environmental analysis before leasing six swaths of land across the western United States.

B.   Factual & Procedural Background

The origins of the current dispute date back to the early days of the Biden Administration. Shortly after taking office, President Biden issued Executive Order 14008 titled "Tackling the Climate Crisis at Home and Abroad." 86 Fed. Reg. 7,619 (Jan. 27, 2021). Section 208 of that Order directed Interior to "pause new oil and natural gas leases on public lands . . . pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands . . . including potential climate and other impacts." Id. at 7,624–25. The acting Solicitor of Interior heeded that Order several weeks later by issuing an opinion directing BLM to postpone the first quarter lease sales across several States to allow further NEPA review. HQ_4441–42. The following month, the Bureau announced it was "exercising its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021" due to an "ongoing review of the federal oil and gas program in assessing compliance with applicable laws and, as directed by Executive Order 14008, reviewing whether the current leasing process provides taxpayers with a fair return." Press Release, BLM, Statement on Second Quarter Oil and Gas Lease Sales (Apr. 21, 2021), https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales.

That momentary "pause" came to a sudden halt in June 2021 when a judge on the United States District Court for the Western District of Louisiana preliminarily enjoined BLM "from

implementing the [p]ause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008." Louisiana v. Biden, 543 F. Supp. 3d 388, 419 (W.D. La. 2021). In response, Interior ordered BLM to resume the leasing program, starting with the parcels it had deferred in the first and second quarters of 2021. HQ_60–62. The resumption in leasing was not just a return to business as usual, however: Interior promised that it would continue to "review the programs' noted shortcomings" by, among other things, completing a programmatic review of its leasing practices and assessing "what changes in the Department's programs may be necessary to meet the President's targets of cutting greenhouse gas emissions in half by 2030 and achieving net zero greenhouse gas emissions by 2050." HQ_61.

With the programmatic review underway, BLM forged ahead with its leasing program by posting parcel lists for potential lease sales within the jurisdictions of its Colorado, Montana-Dakotas, Nevada, New Mexico-Oklahoma, Wyoming, Utah, and Eastern States offices on its website in late August. See, e.g., CO_0001374–79; MT_0026869–70; NV_006200; WY400024. BLM received public scoping comments from interested parties the following month. See, e.g., CO_0034896; MT_0053878; NM_O_0018774; NM_P_0060083; NV_031869; WY425340–41. Based on the scoping comments, a "number of nominated parcels were deferred from further consideration." HQ_4001.

In October 2021, the Bureau released the BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends ("Specialist Report"). HQ_1806. The Specialist Report grew out of a confluence of "rapidly evolving" climate science, new policy directives, and a "significant amount of litigation in recent years regarding how agencies analyze GHG emissions from federal projects." BLM Br. at 5. Included in the latter category were a pair of cases from

this District—<u>WildEarth Guardians v. Zinke</u>, 368 F. Supp. 3d 41 (D.D.C. 2019) ("<u>WildEarth I</u>"),

and <u>WildEarth Guardians v. Bernhardt</u>, 502 F. Supp. 3d 237 (D.D.C. 2020) ("<u>WildEarth II</u>")—

which found the Bureau's analysis of the cumulative effects of GHGs lacking.  To address these

purported deficiencies, the Specialist Report began by documenting the current state of climate

science and estimating all "GHG emissions from coal, oil, and gas development that is occurring,

and is projected to occur, on the federal onshore mineral estate."  HQ_1808.  It also summarized

"emissions estimates from reasonably foreseeable federal fossil fuel development and production

over the next 12 months, as well as longer term assessments of potential federal fossil fuel GHG

emissions and the anticipated climate change impacts resulting from the cumulative global GHG

burden."  <u>Id.</u>  Although not intended to replace project-level analysis, the Specialist Report

(which will be updated annually) sought to serve as a "tool for evaluating the cumulative impacts

of GHG emissions from fossil fuel energy leasing and development authorizations on the federal

onshore mineral estate."  <u>Id.</u>

    The following month, November 2021, Interior issued its "Report on the Federal Oil and

Gas Leasing Program Prepared in Response to Executive Order 14008."  HQ_4016–33.  The

Report identified shortcomings in the leasing program and detailed several ways to improve the

bidding process to ensure a "fair return to taxpayers."  HQ_4018.  Notably, though, it did not

follow through on Interior's earlier promise to identify ways to amend the leasing programs "to

meet the President's targets of cutting greenhouse gas emissions in half by 2030 and achieving

net zero greenhouse gas emissions by 2050."  HQ_61.

    Around that same time, after reviewing the scoping comments, the relevant BLM State

Offices posted draft EAs for the lease sales online.  <u>See</u> BLM Br. at 7.  Each of the draft EAs

assessed the environmental impacts of various alternative lease sales, incorporating by reference

the Specialist Report's programmatic review of GHG emissions.  Id.  In each instance, the State
Office concluded that its preferred alternative would not significantly impact the environment
and, as a result, no EIS was needed.  The Offices accordingly posted, alongside the draft EAs,
unsigned FONSIs for public comment.  Id. at 6–7.

BLM planned to hold the lease sales in the first quarter of 2022 but hit another snag when
a different judge in the Western District of Louisiana enjoined its use of the Social Cost of
Greenhouse Gases ("SC-GHG").  Louisiana v. Biden, 585 F. Supp. 3d 840, 862–70 (W.D. La.
2022).  First developed in 2010 by the Interagency Working Group on the Social Cost of Carbon,
the SC-GHG is "a method of quantifying the impacts of GHGs that estimates the harm, in
dollars, caused by each incremental ton of carbon dioxide emitted into the atmosphere in a given
year."  350 Montana v. Haaland, 50 F.4th 1254, 1270 (9th Cir. 2022) (quotation marks omitted).
On inauguration day, President Biden issued Executive Order 13990 which declared that "[a]n
accurate social cost is essential for agencies to accurately determine the social benefits of
reducing greenhouse gas emissions" and established a working group to help agencies use the
tool in rulemaking and "other relevant agency actions," such as NEPA review.  86 Fed. Reg.
7,037, 7,040 (Jan. 25, 2021).  The Secretary of the Interior also promoted the SC-GHG as a
"useful measure to assess the climate impacts of GHG emission changes for Federal proposed
actions."  Secretary of the Interior Order No. 3399, 2021 WL 1584759, at *4 (Apr. 16, 2021).
Following these directives, BLM's draft EAs utilized the SC-GHG to calculate the costs of the
projected GHG emissions stemming from the proposed lease sales.  See, e.g., MT_0053824–27.
But after the Western District of Louisiana enjoined the Department's use of the SC-GHG, BLM
again paused all lease sales to consider the effect of the injunction—only to restart once more in

April 2022 after the Fifth Circuit stayed the injunction.  See Louisiana v. Biden, No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022).

That month, BLM issued the final EAs and FONSIs for the oil and gas lease sales within areas managed by its Colorado, Montana-Dakotas, Nevada, New Mexico-Oklahoma, Wyoming, and Utah offices.  HQ_4415.  The final sale notices offered "approximately 173 parcels on roughly 144,000 acres, an 80 percent reduction from the acreage originally nominated."  HQ_4417.  BLM touted that "[a]s a part of its environmental analysis, the agency disclosed GHG emissions and the social cost of GHG emissions, which provided important context for the agency's decision-making."  HQ_4416.  Yet, when explaining why the lease sales would not cause significant environmental impacts, the Bureau conceded that the SC-GHG calculations and the other tools it employed had their limits:  "Until such time as the Department develops further tools to analyze the relative emissions impact of its activities nationwide," it explained, "BLM can disclose GHG emissions and climate impacts, and provide context and analysis for those emissions and impacts" but "cannot render a determination of significance for a proposed action based on GHG emissions or climate impacts alone."  CO_0115633; NM_P_0059737; NV_0055140; WY481255.  Conservation groups criticized this conclusion during the ensuing protest stage, see CO_0119267; MT_0094488; NM_O_0000063; NM_P_0000063; NV_057215; WY485211, but their critiques were to no avail.  BLM finalized the six lease sales and issued Records of Decision for each sale on June 28 and 29, 2022.  See BLM Br. at 8.  The final totals of parcels and acreage offered for lease are as follows:

| BLM Office | Parcels (Acreage) Scoped | Parcels Not Made Available for Sale | Parcels (Acreage) Offered Day of Sale |
|---|---|---|---|
| Wyoming | 459 (568,196) | 337 | 122 (119,564) |
| Nevada | 10 (10,496.59) | 5 | 5 (2,560) |
| Colorado | 119 (141,675.22) | 113 | 6 (2,444) |
| Montana-Dakotas | 29 (6,849.16) | 6 | 23 (3,405.80) |

| Oklahoma | 1 (14.92) | 0 | 1 (14.92) |
| New Mexico | 5 (520.8) | 0 | 5 (520.8) |

Id. (citing relevant portions of the Administrative Record).

The Conservation Groups filed suit on June 28, 2022—the same day BLM finalized the Wyoming lease sale and the day before it issued the Records of Decision for the other sales—and then amended their complaint three months later.  Their Amended Complaint alleges that the Bureau violated NEPA and the FLPMA when issuing the FONSIs and moving forward with the six lease sales.  Specifically, the Conservation Groups contend that BLM: (1) failed to perform a hard-look review when analyzing the cumulative impact of GHG emissions; (2) wrongly adopted a piecemeal approach by reviewing the six lease sales in isolation rather than in unison; (3) erred in issuing a FONSI and refusing to prepare an EIS; and (4) violated its duty under the FLPMA to avoid "unnecessary or undue degradation" of the affected lands.

The States of Montana, North Dakota, Oklahoma, Utah, and Wyoming successfully intervened to defend the lease sales—as did the Western Energy Alliance, a trade association whose members purchased some of the leases at issue.  Pending before the Court now are cross-motions for summary judgment filed by the parties and the intervenors.  After considering the briefs and holding a hearing on the matter, the Court will now resolve these dueling motions.

## II.   Legal Standards

When evaluating cross motions for summary judgment under the APA, "the Rule 56 standard does not apply."  Alfa Int'l Seafood v. Ross, 264 F. Supp. 3d 23, 36 (D.D.C. 2017).  The court instead "sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  Id. (quoting Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Judicial review is limited to "deciding whether, as a matter of law, an agency action is supported

by the administrative record and is otherwise consistent with the APA standard of review." <u>Gulf Restoration Network v. Bernhardt</u>, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

"This standard applies when assessing an agency's compliance with NEPA." <u>WildEarth I</u>, 368 F. Supp. at 57–58. An EIS or EA "is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project." <u>Nat'l Comm. for the New River v. FERC</u>, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quotation marks omitted). "When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." <u>Id.</u> (quotation marks omitted). The Court's task "is not to 'flyspeck'" the agency's analysis "for 'any deficiency no matter how minor.'" <u>Sierra Club v. FERC</u>, 827 F.3d 36, 46 (D.C. Cir. 2016) (quoting <u>Theodore Roosevelt Conservation P'ship v. Salazar</u>, 661 F.3d 66, 75 (D.C. Cir. 2011) ("<u>TRCP</u>")). Rather, NEPA's "rule of reason" dictates that an agency's assessment is sufficient unless its "deficiencies are significant enough to undermine informed public comment and informed decisionmaking." <u>Sierra Club v. FERC</u>, 867

F.3d 1357, 1367 (D.C. Cir. 2017) (citing Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004)).

### III. Analysis

#### A. Standing

First things first: standing.  To establish Article III standing to sue, plaintiffs must demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  Because "standing is not dispensed in gross," plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 49 U.S. 413, 431 (2021).  As applied here, the Conservation Groups must establish standing as to each challenged lease sale because each sale was authorized in a separate BLM decision.  See Friends of Animals v. Bernhardt, 961 F.3d 1197, 1205 (D.C. Cir. 2020).  The Court finds that the Conservation Groups met their burden of establishing associational standing to challenge each of the sales, save for the Oklahoma one.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  The Court has "little difficulty concluding that the latter two elements of associational standing are met here and [will] focus on whether the members of [the Conservation Groups] would otherwise have standing to sue in their own right." WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013).

To establish standing to challenge a federal action, "plaintiffs must show 'concrete and particularized injury which has occurred or is imminent due to geographic proximity to the action challenged.'" WildEarth I, 368 F. Supp. 3d at 61 (emphasis omitted) (quoting City of Olmsted Falls v. FAA, 292 F.3d 261, 267 (D.C. Cir. 2002)).  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 183 (2000) (quotation marks omitted).  The Conservation Groups have done so by submitting affidavits from members detailing that they have extensively visited the areas surrounding the lease tracts; have concrete plans to visit these areas for recreational and professional purposes in the future; "have observed the effects of existing oil and gas development already occurring on public lands they recreate on, including around the challenged leases, including spills, dead animals, impacted habitat and air pollution"; and expect that the "challenged leases will degrade air quality in the areas . . . and result in harm to the landscapes, resources, and wildlife enjoyed and visited by [them], ultimately reducing their enjoyment of these areas and likelihood of returning in the future."  Pls' Br. at 17–18 (citing relevant portions of affidavits).  The affidavits further explain that these "injuries would be redressed by a favorable result in this suit because BLM would then be made to properly analyze the full impacts of lease development under NEPA" and, as a result, possibly change course.  Id. at 18.  For the regions covered, these sworn statements recounting the concrete impact on particular members suffice for standing purposes.  See Jewell, 738 F.3d at 304–07 (finding similar statements sufficient to challenge NEPA review of oil and gas leases).

14

But the Conservation Groups' standing extends only as far as the affidavits' reach.  And, as BLM noted in its brief and as the Conservation Groups concede, the affidavits did not identify any member who uses the area in or near the lease parcel in Oklahoma.  <u>See</u> BLM Br. at 11–12; Pls' Reply at 5 n.3 ("Federal Defendants challenge Conservation Groups' Standing with respect to the single parcel in the Oklahoma Lease Sale.  Conservation Groups do not contest that their standing declarations failed to address this sale.").  Accordingly, the Conservation Groups lack standing to challenge the Oklahoma lease sale.

    B.  <u>Cause of Action</u>

Establishing standing does not get the Conservation Groups a ticket to federal court.  To proceed further, they must satisfy still another threshold requirement for maintaining this suit: a cause of action.  On this score, the Conservation Groups look to the Administrative Procedure Act ("APA"), 60 Stat. 237, as amended, 5 U.S.C. § 500 <u>et seq.</u>  The State Intervenors counter that the APA is unavailable because the Conservation Groups did not exhaust administrative remedies as required.  <u>See</u> State Intervenors' Br. at 28–30.  But this exhaustion argument fails under <u>Darby v. Cisneros</u>, 509 U.S. 137 (1993), because Interior regulations do not clearly require an agency appeal in this context and because Interior does not automatically stay decisions pending such an appeal.  Alternatively, the State Intervenors suggest that the Conservation Groups cannot avail themselves of the APA because the lease sales were not "final agency action" under 5 U.S.C. § 704 at the time they first filed suit.  The Conservation Groups entirely failed to address this finality challenge in their reply, and the Court need not resolve this matter for present purposes because it finds that the APA claims fail regardless of whether the finality requirement is met.

To begin, the State Intervenors' exhaustion argument runs as follows:  The APA requires exhaustion of administrative remedies when expressly required by statute or an agency rule.  See Xia v. Tillerson, 865 F.3d 643, 658 (D.C. Cir. 2017).  Department of Interior regulations provide that a BLM State Office's decision "will become effective on the day after the expiration of the time during which a person adversely affected may file a notice of appeal unless a petition for a stay pending appeal is filed together with a timely notice of appeal."  43 C.F.R. § 4.21(a)(2).  If an appeal and a petition for stay are filed, a "decision, or that portion of a decision, for which a stay is not granted will become effective immediately after the Director or an Appeals Board denies or partially denies the petition for a stay, or fails to act on the petition within [45 days]."  Id. § 4.21(a)(3).  As a result, the State Intervenors contend, those challenging a State Office's decision must file an administrative appeal and seek a stay of the challenged decision pending appeal before proceeding to federal court.  See State Intervenors' Br. at 28–29.

This assertion runs headlong into Darby, however.  Interpreting the APA's exhaustion requirement, 5 U.S.C. § 704, Darby first recognized that Congress sought to avoid creating a "trap for unwary litigants" by mandating that "exhaustion requirement[s] [be] unambiguous so that aggrieved parties would know precisely what administrative steps [are] required before judicial review [is] available."  509 U.S. at 146–47.  Darby further determined that, because the "purpose of § [704] was to permit agencies to require an appeal to 'superior agency authority' before an examiner's initial decision became final," agencies can require parties to exhaust administrative remedies only "by providing that the initial decision would be 'inoperative' pending appeal."  Id. at 152.  Stitching these two threads together, the Supreme Court concluded that exhaustion is mandated only if (1) the agency (or the underlying statute) clearly requires an

administrative appeal before judicial review and (2) the initial decision is inoperative pending appeal.  Id.

Neither condition is satisfied here.  On the first prong, the relevant Interior regulation provides that "[a]ny party adversely affected by the decision of the State Director after State Director review, under § 3165.3(b) of this title, of a notice of violation or assessment or of an instruction, order, or decision *may* appeal that decision to the Interior Board of Land Appeals pursuant to the regulations set out in part 4 of this title."  43 C.F.R. § 3165.4(a) (emphasis added).  To state the obvious, "may" is not "must."  As other courts have held, this permissive language does not expressly require an administrative appeal before a party may seek judicial review—it merely provides an option.  See San Juan Citizens' All. v. Babbitt, 228 F. Supp. 2d 1224, 1233 (D. Colo. 2002); Mont. Wilderness Ass'n v. Fry, 310 F. Supp. 2d 1127, 1138–39 (D. Mont. 2004).  On the second prong, Interior regulations do not provide that a State Office's decision will automatically be inoperative pending an administrative appeal.  An aggrieved party can file a petition for a stay of the decision pending appeal, but the agency will grant such a request only if the party makes a compelling threshold showing to justify the stay.  See 43 C.F.R. § 4.21(b).  If it does not grant the stay, the State Office's decision goes into effect without further review.  Recognizing this reality, numerous courts throughout the country have held that an aggrieved party is not required to exhaust administrative remedies prior to seeking judicial review in this context.  See, e.g., Farrell-Cooper Mining Co. v. U.S. Dep't of Interior, 864 F.3d 1105, 1112–13 (10th Cir. 2017); Idaho Watersheds Project v. Hahn, 307 F.3d 815, 825 (9th Cir. 2002).  The Court concurs with this majority view.

But that does not end the inquiry.  Though often phrased in the language of "exhaustion," there is another way of understanding the State Intervenors' argument that has greater purchase:

The lease sales were not "final agency action" when the Conservation Groups filed suit. This contention rings in two notes.

One sounds similar. As the State Intervenors highlight, 43 C.F.R. § 4.21 specifies that "[n]o decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective" or the decision is made effective in some other way specified in the regulation, including expiration of the window to appeal or the denial of a request for a stay. 43 C.F.R. § 4.21(c). Because the Conservation Groups did not file an appeal or seek a stay, the State Intervenors argue, the Bureau's decisions became final after the 30-day deadline to appeal elapsed—which was almost a month after the Conservation Groups filed their initial complaint. Thus, from the State Intervenor's vantage, there was no final agency action to challenge when the plaintiffs initiated this action.

This contention again runs into Darby. While recognizing that exhaustion and finality are "conceptually distinct," the Supreme Court in Darby noted that those inquiries are nonetheless related. 509 U.S. at 144. Two conditions must be satisfied for agency action to be final. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). Whether an initial decision is "final agency action" for purposes of the APA therefore turns on the factors Darby identified for determining if a party must exhaust administrative remedies: whether the "initial" decision will go into effect automatically. Indeed, Darby explained that an agency "may avoid the *finality* of

an initial decision, first, by adopting a rule that an agency appeal be taken before judicial review is available, and, second, by providing that the initial decision would be 'inoperative' pending appeal.  Otherwise, the initial decision becomes *final* and the aggrieved party is entitled to judicial review."  509 U.S. at 152 (emphasis added).  Put differently, whether an initial decision is "final" for purposes of the APA merges with whether a party must exhaust administrative remedies.  That makes sense.  It would be bizarre to excuse an aggrieved party from having to pursue an appeal before the agency because the challenged decision will not automatically be stayed in the interim but to forbid that party from challenging the same decision in federal court because it is not yet final.  Reasoning along similar lines, the Tenth Circuit rejected a comparable finality defense in Farrell-Cooper Mining Co.  "In describing the general rule that an agency action is not final until the agency has completed its decision-making process," it wrote, "the Bennett opinion essentially presumed compliance with § 704 [as construed in Darby].  That is, the Court assumed that agencies would not require an intra-agency appeal without rendering the initial decision inoperative.  When that assumption fails, Darby instructs that the initial decision is final and subject to judicial review."  864 F.3d at 1114.  That holds true here.  Accord Friends of the Earth v. Haaland, 583 F. Supp. 3d 113, 131 (D.D.C. 2022), vacated and remanded on other grounds, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (holding the issuance of the Record of Decision in oil-lease case constitutes final agency action).

But there is an even more rudimentary challenge to finality lurking here, which rings truer.  The Conservation Groups filed this lawsuit on June 28, 2022.  That was the same day that the Bureau approved the Wyoming lease sale but the day *before* it issued the Record of Decision for the other sales.  See Pls' Br. at 14.  At the time the Conservation Groups filed suit, then, these five sales were still (just barely) in the works and not "final" under the APA.  The Conservation

Groups therefore jumped the gun in their rush to file suit.  To be sure, the plaintiffs amended

their complaint three months later in September, well after the lease sales were finalized.  But

courts in other jurisdictions have held that filing an amended complaint does not cure an APA

finality issue because, under Federal Rule of Civil Procedure 25(c)(1)(B), the amendment

"relates back to the date of the original pleading."  <u>Citizens for Appropriate Rural Roads v. Foxx</u>,

815 F.3d 1068, 1079 (7th Cir. 2016).  That suggests the Conservation Group's haste in filing

their suit one day early spoils their claims years later.  Though that outcome may seem unfair and

inefficient, the Conservation Groups do not offer any authority to the contrary because they

failed to respond to the State Intervenors' finality arguments in their briefing.

The Court need not enter this thorny thicket of finality issues, however, because, as

explained below, it finds all of the Conservation Groups' challenges fail on the merits regardless.

<u>See</u> <u>Trudeau v. Fed. Trade Comm'n</u>, 456 F.3d 178, 183–85 (D.C. Cir. 2006) (clarifying that the

APA's "final agency action" requirement is not jurisdictional).

C.  <u>Merits</u>

Turning to the merits, the Court finds that the Conservation Groups have not carried their

burden of showing that the Bureau violated NEPA or the FLPMA when analyzing the effects of

GHG emissions and approving the challenged lease sales.  First, the Bureau performed a hard-

look review of the cumulative effects of the six lease sales, employing the best available tools

and addressing the shortfalls in those methodologies.  Second, the Bureau adequately justified its

decision not to bundle the six lease sales into one comprehensive environmental review and,

regardless, any error in setting the scope of review was harmless.  Third, the Bureau did not err

when issuing a FONSI and not proceeding with an EIS.  And finally, the Court finds no support

for the Conservation Groups' contention that the lease sales will cause "unnecessary and undue degradation" under the FLPMA.

 1.   *Hard Look at Cumulative Impacts*

"NEPA's implementing regulations require an agency to evaluate 'cumulative impacts' along with the direct and indirect impacts of a proposed action."  TOMAC, Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852, 864 (D.C. Cir. 2006).  Cumulative impacts are "the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions. [They] can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.1(g)(3).  Building on this definition, the D.C. Circuit has held that "a meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable— that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate."  TOMAC, 433 F.3d at 864 (quotation marks omitted).  "In other words, the agency cannot treat the identified environmental concern in a vacuum."  Id. (quotation marks omitted).

That is especially true when it comes to analyzing GHG emissions because, as all sides agree, "[c]limate change is inherently cumulative."  BLM Br. at 14; see also Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct.").  Yet the parties diverge over how

the Bureau can satisfy its duty to analyze the cumulative effects of GHG emissions and whether it did enough here.

The legal landscape in this area has shifted in recent years.  In 2013, the D.C. Circuit held in WildEarth Guardians v. Jewell that the Bureau properly analyzed the cumulative impact of GHG emissions from a coal mine by quantifying the projected emissions and comparing them to overall state and national figures.  738 F.3d at 309.  Three years later, in 2016, the Council on Environmental Quality ("CEQ") issued additional guidance for considering GHG emissions in NEPA reviews.  81 Fed. Reg. 51,866 (Aug. 5, 2016) ("2016 Guidance").[1]  Consistent with Jewell, the 2016 Guidance instructed agencies to estimate GHG emissions as a "proxy for assessing potential climate change effects."  2016 Guidance at 4.  At the same time, it warned that "[a]gencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions."  Id. at 11.  Because climate change "results from the incremental addition of GHG emission from millions of individual sources," CEQ explained, "a statement that emissions from a proposed Federal action represent only a fraction of global emissions is essentially a statement about the nature of the climate change challenge."  Id. at 10–11.  The 2016 Guidance thus instructed agencies to employ other tools to capture the cumulative impacts that relatively small amounts of GHG emission can have on the environment.  Id. at 11.  Beyond that general directive, however, CEQ offered little insight into what form the analysis should take.[2]

---

[1]  Available at https://perma.cc/96VV-9KN9.

[2]  The Trump Administration withdrew the 2016 Guidance, see 82 Fed. Reg. 16,093, 16,094 (Mar. 28, 2017), but the Biden Administration reinstated it in January 2021, see 86 Fed. Reg. at 7,042.  Thus, the 2016 Guidance was in effect during the relevant period here.

Courts have struggled to supply an answer.  Following Jewell, courts in this District have continued to demand that, as part of their cumulative analysis, agencies quantify a project's GHG emissions "and compare those emissions to regional and national emissions."  WildEarth I, 368 F. Supp. at 77.  But the question of what more might be required remained.  In recent years, the Ninth and Tenth Circuits have held that a comparison of a project's GHG emissions to total state, national, and global emissions is insufficient if other tools exist to evaluate cumulative impact. See 350 Montana, 50 F.4th at 1271–72; Diné Citizens Against Ruining Our Env't v. Haaland, 59 F.4th 1016, 1042 (10th Cir. 2023) ("Diné CARE").  In doing so, these courts identified the SC-GHG and "carbon budgets," which are devices for allocating carbon emissions to ensure global temperatures will not surpass some specified limit, as possible tools agencies should consider. See 350 Montana, 50 F.4th at 1270–72 (SC-GHG); Diné CARE, 59 F.4th at 1042–44 (carbon budget).  Neither court, though, held that agencies must use either tool.  They instead rightly recognized that agencies have broad discretion when exercising their expertise to select methodologies and need only provide a reasoned explanation supporting their decisions to use (or not use) particular methodologies.  See 350 Montana, 50 F.4th at 1272; Diné CARE, 59 F.4th at 1043; accord WildEarth II, 502 F. Supp. at 254–55 (finding BLM was not required to assess GHG emissions against a carbon budget because the selection of appropriate methodologies is "within the expertise and discretion of the agency" but requiring BLM to "explain why using a carbon budget analysis would not contribute to informed decisionmaking").

Responding to these recent developments, the Bureau conducted a far more fulsome cumulative-impact analysis for the challenged lease sales than it had before, employing many of the tools that courts, conservationists, and CEQ had been promoting.

In each EA, the Bureau began by estimating the quantity of GHG emissions from the individual lease sale, denominated in metric tons or megatonnes (which is one million metric tons).  See, e.g., CO_0115341; WY485959.  It then compared the projected annual emissions for each lease sale to the total annual federal oil, gas, and coal emissions in that particular State as well as in the United States as a whole; overall annual emissions from the State and the United States from all sectors (public and private); and annual global emissions.  See, e.g., CO_0119475–76; WY485719–20.  Assuming a 30-year life for each leased parcel, BLM also compared both the short-term and long-term effects of the lease sale to the total federal oil and gas emissions in the State and the United States, calculating the percentage of each attributable to the sale.  See, e.g., CO_0119479  ("[The estimated] life-of-lease emissions for the Proposed Action are between 1.4% to 6.3% of Federal fossil fuel authorization emissions in the State and between 0.2% to 0.4% of Federal fossil fuel authorization emissions in the Nation.").  That is all Jewell required.

BLM did not stop there, however.  It then used the SC-GHG methodology, employing the Interagency Working Group's recommended cost estimates and discount ranges, to calculate the expected environmental harm for each lease sale.  The results of those projections are displayed below:

| BLM Office | MtCO$_2$e | SC-GHG |
|---|---|---|
| Colorado | 2.53 | $33,869,000 to $360,607,000 |
| Montana-Dakotas | 0.943 | $11,445,000 to $131,626,000 |
| New Mexico – OK Office | 0.173 | $2,350,000 to $25,031,000 |
| Nex Mexico – Pecos Office | 0.653 | $9,222,000 to $97,767,000 |
| Nevada | 0.13 | $1,616,000 to $8,541,000 |
| Wyoming | 30.667 | $357,602,000 to $4,116,251,000 |
| **Total** | **35.096** | **$416,104,000 to $4,739,823,000** |

Pls' Br. at 15 (citing relevant portions of the Administrative Record).  For perspective, BLM did the same for all foreseeable emissions from oil and gas development on federal land in 2022.

See, e.g., CO_0119482–83; WY485724–25.  It then contextualized the environmental costs using the EPA's "equivalency calculator" to express these projected emissions "on a scale relatable to everyday life."  See, e.g., WY485719.  In Wyoming, for instance, the average annual estimated emissions were equivalent to 400,926 gas-fueled passenger vehicles being driven for one year or the emissions that could be avoided by operating 384 wind turbines.  Id.

Each EA also incorporated by reference the Specialist Report—a detailed document evaluating the "cumulative emissions from [federal] fossil fuel authorizations on a state and national level."  HQ_1813.  As noted above, the Specialist Report opens with a panoramic snapshot of climate change and its anticipated impacts on the global and local levels.  HQ_1822–25, 1877–1904.  It then proceeds to estimate total emissions from all reasonably foreseeable development on federal land, breaking down those projections on a State-by-State basis and comparing them to total State, national, and global emissions.  HQ_1845–71.  For example, the Specialist Report shows that emissions from fossil-fuel development on federal lands constitutes 14% of total GHG emissions in the United States.  HQ_1870.  It also measures these projected GHG emissions against the yardstick of U.S. policy objectives and international agreements.  Most notably, it evaluates BLM's current activities against the Intergovernmental Panel on Climate Change's ("IPCC") global carbon budget aimed at meeting the Paris Agreement's target of "net zero" emissions by 2050—a goal the Biden Administration embraced in Executive Order 14008.  HQ_1872–75.  It estimates that foreseeable emissions from federal fossil-fuel development over the next 30 years would "raise average global surface temperatures by approximately 0.0158º C., or 1% of the [IPCC's] lower carbon budget temperature target."  HQ_1876; see also WY485721 (incorporating and discussing this finding).

This fulsome treatment satisfies BLM's obligation to analyze the cumulative impact of the lease sales.  Taken together, that analysis far exceeds the cumulative assessment that the D.C. Circuit approved in <u>Jewell</u>.  Indeed, BLM answered the calls to improve its cumulative-impact analysis by evaluating the lease sales within its fossil-fuel program using the methodologies and tools that various constituencies, including the Conservation Groups, have recommended.

Unsatisfied, the Conservation Groups assert that BLM must do even more to capture the cumulative effects of climate change.  Beyond estimating the amount of GHG emissions from the sales as a percentage of total emissions, they fault the Bureau for not "connect[ing] the dots" by projecting how emissions from these sales will actually impact local and global ecosystems on the ground.  <u>See</u> Pls' Br at 23.  The EAs explained, however, that "[t]he incremental contribution to global GHGs from a single proposed land management action cannot be accurately translated into its potential effect on global climate change or any localized effects in the area specific to the action."  WY485714.  Cognizant that "NEPA does not require the impossible," <u>Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n</u>, 449 F.2d 1109, 1121 n.28 (D.C. Cir. 1971), courts regularly have deferred to this sort of judgment made "within [an agency's] area of special expertise, at the frontiers of science," <u>Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.</u>, 462 U.S. 87, 103 (1983).  In <u>Jewell</u>, for instance, the D.C. Circuit resolved that "[b]ecause current science does not allow for the specificity demanded by the Appellants [on the specific global and local impacts resulting from additional emissions], the BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS."  738 F.3d at 309.  Fellow district courts have followed suit, finding that tracing a project's GHG emissions to on-the-ground effects "is neither possible based on current science, nor required by law."  <u>WildEarth Guardians v. BLM</u>, 8 F. Supp. 3d 17, 35 (D.D.C. 2014).

Because the Conservation Groups have not shown that advancements in climate science have rendered these decisions obsolete such that it is now possible to trace particular amounts of GHG emissions to specific environmental consequences, BLM's efforts to get at the cumulative impact via other routes was not arbitrary and capricious.

Retreating, the Conservation Groups insist they do "not ask BLM to do the impossible by tying the specific emissions of the challenged lease sales to specific on-the-ground impacts; they merely ask that BLM's analysis accurately portray what climate science is now capable of telling us—that certain effects have been and will be documented in the lease sale areas, that those effects occur and will continue to worsen as a result of increasing concentrations of GHGs in the atmosphere, that the challenged lease sales individually and in the context of BLM's oil and gas leasing program will contribute to the worsening of these on-the-ground impacts, and that it will be difficult to halt or ultimately reverse those impacts."  Pls' Reply at 21.  But the Bureau did just that in the Specialist Report.  The Specialist Report explains that climate change is, in large part, caused by GHG emissions; opines that climate change will worsen absent significant reductions to GHG emissions and have detrimental effects on local environments; acknowledges the federal fossil-fuel program's role in contributing to the climate crisis; and admits that, once the die is cast, climate change will be difficult to roll back.  See BLM Reply at 8–10 (citing relevant portions of the Specialist Report).  And, to the extent possible, BLM did attempt to project real-world consequences for the affected areas.  The Specialist Report discusses the impacts of climate change on a regional basis—describing, for example, past effects on the Colorado River and the western slope of the Colorado Basin and projecting future developments.  See HQ_1881–1902.  The charge that the Bureau ignored these real-world effects by burying its head in the sand is therefore unsupported by the record.

The Conservation Groups also fault the Bureau's effort to place the challenged lease sales in the proper context and its observation that they amount to 0.136% to 0.305% of total federal fossil-fuel authorization.  See Pls' Br. at 20–21.  "The problem with BLM's approach," they insist, "is that this comparison is designed to yield results that appear *de minimis*."  Id. at 21.  It is ironic to fault BLM for providing the exact analysis that the D.C. Circuit approved in Jewell, 738 F.3d at 309, and that another court within this District required in WildEarth I, 368 F. Supp. 3d at 77.  Because climate change is the result of the combined GHG emissions from all sources, it is entirely appropriate, even necessary, to analyze the lease sales within this broader picture.  Still, the 2016 CEQ Guidance recognized that overreliance on a comparative approach is dangerous given that climate change is the result of many small decisions adding up to major environmental harms.  See also Kern v. BLM, 284 F.3d 1062, 1078 (9th Cir. 2002) (describing the "tyranny of small decisions").  If BLM's review contained *only* this comparative analysis, then, the Court would be inclined to agree that it does not pass muster.  But the EAs and the Specialist Report did not stop with that crass comparison.  They instead offered a detailed overview of climate impacts; assessed the six leases as part of the overall fossil-fuel program; viewed the fossil-fuel program in the context of important policy objectives (such as satisfying the Paris Agreement); and provided a contextual view of the GHG emissions in the form of the SC-GHG estimates and accessible comparators.  That far exceeds what the D.C. Circuit has ever required, and it meets the exhortations of other circuits and the applicable CEQ 2016 Guidance to go further.

Indeed, the Bureau maintains that this analysis fully complies with the interim guidance that CEQ issued in 2023, subsequent to the challenged sales.  The 2023 Guidance begins by instructing agencies to "quantify the reasonably foreseeable direct and indirect GHG emissions of their proposed actions."  88 Fed. Reg 1,196, 1,201 (Jan. 9, 2023).  It then recommends that

agencies furnish additional context by: (1) monetizing the emissions using the SC-GHG; (2)

"explain[ing] how the proposed action and alternatives would help meet or detract from

achieving relevant climate action goals and commitments," such as the Paris Agreement; (3)

summarizing "available scientific literature to help explain the real-world effects"; and (4)

"provid[ing] accessible comparisons or equivalents to help the public and decision makers

understand GHG emissions in more familiar terms."  Id. at 1,202–03.  BLM claims its analysis

checks each of these boxes.  See BLM Br. at 18–22.  But because the 2023 Guidance was issued

after the lease sales were finalized and is still undergoing notice-and-comment, the Court need

not grade BLM's performance on this steeper curve.  See 88 Fed. Reg. at 1,212 ("CEQ does not

expect agencies to apply this guidance to concluded NEPA reviews and actions for which a final

EIS or EA has been issued.").  Under applicable law, the Bureau's improved cumulative-impact

analysis met its mark.

 Finally, the Conservation Groups also challenge the Bureau's treatment of "midstream

emissions," such as pipeline and equipment leaks, which on average are "approximately 1.24%

of the production volume."  HQ_1833; see Pls' Br. at 21–22.  They remark that the Specialist

Report contains such estimations and that the absence of these figures in the EAs creates an

"apples-to-oranges comparison" that wrongly downplays the emissions from the six lease sales.

Pls' Br. at 21.  But the Bureau reasonably explained that, while the Specialist Report used

national averages to estimate total midstream emissions from all federal projects, such estimates

are too uncertain when it comes to individual leases because site-specific typology and operation

decisions greatly influence the volume of midstream emissions.  See, e.g., CO_0119476–77.

The Conservation Groups disagree with that determination, but this is the sort of "complex

judgment" about "methodology and data analysis" that is owed "an extreme degree of deference"

when assessing NEPA compliance.  <u>Powder River Basin Res. Council v. BLM</u>, 37 F. Supp. 3d

59, 78 (D.D.C. 2014) (quoting <u>Alaska Airlines, Inc. v. Transp. Sec. Admin.</u>, 588 F.3d 1116, 1120

(D.C. Cir. 2009)).  The Court therefore must decline the invitation to flyspeck the Bureau's

analysis by second-guessing its reasoned judgment to exclude midstream-emission estimates.

> ### 2.  *Scope of Review*

Approaching a similar set of issues from a different angle, the Conservation Groups also

contend that BLM wrongly analyzed the six lease sales in a piecemeal fashion by assessing each

sale individually rather than collectively in one environmental assessment.  Yet nothing in the

current regulations requires BLM to review these disconnected lease sales together.  And even if

the Court were to hold the Bureau to its promise to play by an outdated set of rules, it finds that

BLM did not act arbitrarily by failing to combine the lease sales into one environmental review

because it adequately explained that doing so would have been impracticable and uninformative.

Let's begin with the regulations on the books.  CEQ promulgates regulations to guide

federal agencies in implementing NEPA.  <u>See</u> <u>W. Org. of Res. Councils v. Zinke</u>, 892 F.3d 1234,

1237 (D.C. Cir. 2018).  It issued its first set of NEPA regulations in 1978, <u>see</u> 43 Fed. Reg.

55,978 (Nov. 29, 1978), and made minor substantive amendments in 1986, <u>see</u> 51 Fed. Reg.

15,618 (Apr. 25, 1986).  But in 2020, CEQ substantially revised those regulations.  <u>See</u> 85 Fed.

Reg. 43,304 (July 16, 2020).  Under the 2020 CEQ regulations, which were in effect when BLM

authorized the lease sales and remain in place today, agencies are directed to analyze "connected

actions" in the same environmental impact statement.  40 C.F.R. § 1501.9(e)(1).  "Actions are

connected if they: (i) [a]utomatically trigger other actions that may require environmental impact

statements; (ii) [c]annot or will not proceed unless other actions are taken previously or

simultaneously; or (iii) [a]re interdependent parts of a larger action and depend on the larger

action for their justification."  Id.  The challenged lease sales do not satisfy any of these criteria.

Each is a stand-alone project, undertaken by different BLM State Offices implementing their

own RMPs, which did not turn on the decisions of any other Office.  As a result, the Bureau

correctly maintains that it was not required to assess the six lease sales in one report under the

effective regulations.  See BLM Br. at 39–40.

Here's the wrinkle:  Each BLM State Office represented during the NEPA process that it

was "complying with the direction of Secretarial Order 3399 regarding application of the CEQ

regulations."  CO_0119755; NM_O_0018604; NM_P_0059727; MT_0095365; WY481312.

Secretarial Order 3399 opened by explaining that, in July 2020, CEQ "published in the Federal

Register its final rule to revise the NEPA regulations (2020 Rule), which went into effect on

September 14, 2020.  Consistent with EO 13990, CEQ has begun a review of the 2020 Rule to,

among other things, determine if the rule may adversely affect environmental justice

communities, climate change or environmental quality."  HQ_51 (citation omitted).  In the

interim, the Order instructed Interior not to "apply the 2020 Rule in a manner that would change

the application or level of NEPA that would have been applied to a proposed action before the

2020 Rule went into effect on September 14, 2020."  HQ_52.  By assuring stakeholders that it

was complying with Secretarial Order 3399, then, the Conservation Groups contend that BLM

promised to abide by the more stringent CEQ rules that existed prior to the 2020 amendments.

As a result, they argue, the Court must grade BLM's work under that stiffer rubric.  See Pls'

Reply at 6–13.

At first blush, the assertion that the Court should overlook the existing rules in favor of a

now-defunct set of regulations is rather odd.  Informal agency directives do not trump binding

regulations, even if revisions are underway (otherwise, the notice-and-comment process would

be a nullity).  That is especially true of Secretarial Order 3399, which disclaims any intent to supersede existing federal regulations when clarifying:  "To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control."  HQ_54.  Citing this caveat, other courts have recognized that Secretarial Order 3399 "does not necessarily require that the BLM use the old regulations."  Native Vill. of Nuiqsut v. BLM, 9 F.4th 1201, 1211 (9th Cir. 2021).  Nor does it vest outside actors with enforcement power, as the Order makes clear that it is "not intended to, and do[es] not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, or entities, its officer or employees, or any other person."  HQ_54.

Upon further inspection, though, the Conservation Groups' contention is not quite as strange as it first appears.  Though the disclaimer above could be construed as nullifying the earlier directive not to apply the 2020 CEQ amendments, such a self-defeating reading is neither necessary nor appropriate.  Cf. Quarles v. United States, 139 S. Ct. 1872, 1879 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute.").  Rather, Secretarial Order 3399 is better understood as instructing the Bureau to exceed the regulatory floor set by the laxer 2020 regulations by following the more taxing standards previously in place.  Because nothing prevents BLM from holding itself to a *higher* standard, any apparent conflict dissipates, and the rationale for judging BLM's performance under the regulations it had agreed to follow makes some sense.  The reasons an agency provides must support its decision.  See State Farm, 463 U.S. at 43.  Here, the Bureau promised that it had complied with Secretarial Order 3399, and that Order instructs BLM to follow the more stringent pre-2020 regulations.  The Conservation Groups (and the general public) were entitled to rely on that representation, so it seems

appropriate to evaluate the Bureau's analysis under those prior rules even if Secretarial Order

3399 has no independent legal effect.  Cf. Vecinos para el Bienestar de la Comunidad Costera v.

FERC, 6 F.4th 1321, 1330 (D.C. Cir. 2021) ("Although the executive order requiring agencies to

assess the environmental effects of their actions on environmental justice communities expressly

states that it does not create a private right to judicial review, a petitioner may challenge an

agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA."

(citation omitted)).  Therefore, for present purposes, the Court will hold the Bureau to its promise

and apply the prior regulations.  But see California v. EPA, 72 F.4th 308, 317–19 (D.C. Cir.

2023) (holding that the EPA's statement that it "complied with . . . executive orders" was

unreviewable because such orders "provide no right to judicial review" and concluding that

plaintiffs "cannot bootstrap private enforcement of executive orders into arbitrary and capricious

review").

      The pre-2020 CEQ regulations cast a wider net for requiring agencies to group actions

into a single environmental assessment.  In addition to "connected" actions, the prior regulations

also mandated that agencies "shall consider" grouping "cumulative" or "similar" actions into one

EA or EIS.  40 C.F.R. § 1508.25 (2019).  "Cumulative actions" include any actions "which when

viewed with other proposed actions have cumulative significant impacts and should therefore be

discussed in the same impact statement."  Id. § 1508.25(a)(2).  "Similar actions," meanwhile, are

those "which when viewed with other reasonably foreseeable or proposed agency actions, have

similarities that provide a basis for evaluating their environmental consequences together, such

as common timing or geography."  Id. § 1508.25(a)(3).

      The initial question, then, is whether the six lease sales here are "cumulative" or "similar"

actions.  They certainly constitute "similar" actions:  They are all oil and gas leases, approved

simultaneously, that will increase GHG emissions (and thereby contribute to climate change) in identical ways.  Whether they also qualify as "cumulative" actions is less evident.  To be sure, for the reasons described above, the oil and gas leases will have a "cumulative" impact in the colloquial sense by adding to overall GHG levels in the atmosphere.  But that is not how that term is used in 40 C.F.R. § 1508.25 (2019).  Instead, the regulation specified that actions are only cumulative actions if they will have "cumulative[] *significant* impacts."  Id. § 1508.25(a) (emphasis added).  Based on BLM's reasoning, which the Court takes up below, it is doubtful that the combined effects of all six lease sales rise to the level of "significant."  The Bureau concluded that each lease sale did not require an EIS because, based on the scientific tools available, "the agency cannot render a determination of significance for a proposed action based on GHG emissions or climate impacts alone."  See, e.g., WY481255.  It therefore issued a FONSI for each of the six lease sales—including the Wyoming sale, which was 13 times larger than all other lease sales combined.  See, e.g., WY485956.  That logic strongly indicates that, when combined, the six leases would still not have "significant impacts" (at least in BLM's expert view) and therefore do not constitute cumulative actions under § 1508.25.

And regardless, a finding that the lease sales are "cumulative" or "similar" actions is the beginning, not the end, of the inquiry.  Section 1508.25 did not require that agencies always analyze connected, cumulative, or similar actions together.  It instead directed that agencies shall "*consider*" these three types of actions when setting the scope of environmental review.  40 C.F.R. § 1508.25 (2019).  In other words, it preserved some play in the joints for agencies to exercise discretion.  This is especially evident for "similar" actions, where § 1508.25 provided that an agency "*may* wish to analyze such actions in the same impact statement" and only "*should* do so when," in the agency's view, "the best way to assess adequately the combined

impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement."  40 C.F.R. § 1508.25(a)(3) (2019) (emphasis added).

This discretion to decide how to handle multiple proposed projects with some overlap has deep roots reaching back to the Supreme Court's decision in Kleppe v. Sierra Club, which first recognized that, in some instances, NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time."  427 U.S. 390, 409 (1976).  Relevant here, Kleppe explained that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through a comprehensive consideration of pending proposals can the agency evaluate different courses of action."  Id. at 410.  While that mandatory-sounding language might suggest that the Bureau was obligated to consider all six leases in a single assessment, the Supreme Court clarified that this rule is not a straitjacket.  In finding the agency there had not violated its NEPA duties by "refusing to prepare one comprehensive statement on this entire region," the Supreme Court wrote:

> The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.  Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.  Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.

Id. at 412.  In other words, the decision to package a set of proposed projects into one single assessment turns not only on the nature of the actions under review but also the "feasibility" of considering those actions together.  Id.

Applying <u>Kleppe</u>, the D.C. Circuit has reiterated time and again that "determining need for programmatic environmental consideration is within the province of agency expertise" and agency determinations on this score should not be overturned unless the agency acted arbitrarily in setting the scope of review.  <u>Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n</u>, 677 F.2d 883, 889 (D.C. Cir. 1981).  In doing so, the Circuit has reaffirmed that agencies must consider "practical considerations of feasibility [that] might well necessitate restricting the scope of comprehensive statements."  <u>Id.</u> at 891.  "Even when an [environmental assessment] addresses one of a series of closely related proposals," the Circuit has explained, "the decision whether to prepare a programmatic impact statement is committed to the agency's discretion."  <u>Grunewald v. Jarvis</u>, 776 F.3d 893, 905 (D.C. Cir. 2015).  In effect, then, courts should overturn an agency's decision to separate its review of projects and require a combined environmental assessment only if the agency has impermissibly segmented a set of actions, "unreasonably constricting the scope of primordial environmental review," without identifying practical considerations that support such a piecemeal approach.  <u>Nat'l Wildlife Fed'n</u>, 677 F.2d at 889; <u>see also</u> <u>Nevada v. Dep't of Energy</u>, 457 F.3d 78, 92 (D.C. Cir. 2006) (holding that the decision to perform a programmatic review is "committed to the agency's discretion" and may depend on "practical considerations of feasibility"); <u>Sierra Club</u>, 827 F.3d at 50 (same).

That is not the case here.  Responding to requests that they consider all six lease sales together, the BLM State Offices explained that a consolidated review was infeasible because of the fluid and localized nature of the oil and gas lease decision-making process.  They concluded that "[t]he dynamic nature of the lease sale process, and independence of each administrative unit for constructing its lease sales, precludes an analysis of potential GHG emissions that could occur from other lease sales that might occur in the same quarter."  CO_0119482; MT_0053827;

NM_O_0018559; NV_054991; WY485724.  When the Conservation Groups protested, the

Bureau further spelled out its reasoning:

> BLM oil and gas lease sales are administered on a State Office by State Office basis
> for important statutory, policy, and administrative reasons, with the respective
> Director of each State Office acting as delegated authority over sales administered
> by that office.  It is therefore necessary to effective decision making that the NEPA
> analysis for a lease sale focus on the jurisdictional area of the administering State
> office.  BLM recognizes the national and global impact potential of greenhouse gas
> (GHG) emissions and the likewise broad scope of climate change impacts related
> to them, and has therefore prepared annual BLM Specialist Reports on Annual
> Greenhouse Gas Emissions and Climate Trends.  These reports account for current
> and projected future agency wide GHG emissions related to fossil fuel actions on
> Public Land, national and global GHG emission trends, and potential climate
> impacts related to these emissions.  The report is specifically referenced in and
> incorporated into each State Office lease sale NEPA analysis and provides the
> information necessary to properly assess agency wide, nationwide, and global
> reasonably foreseeable cumulative impacts of each State Office lease sale.

CO_0119379; NM_O_0000037.  It also noted that "[c]limate impacts are one of many factors

that are considered in the NEPA analysis to evaluate the significance of a proposed action and

the BLM's exercise of its discretion in deciding leasing actions."  CO_0119413.  In short, BLM

explained that each State Office makes leasing decisions according to its own RMPs through a

dynamic process of working with varied interest groups, in different regulatory landscapes, while

assessing an array of other environmental consequences—such as impacts to groundwater,

wildlife, or cultural resources—with localized impacts.  Under those conditions, BLM reasoned,

it would be impractical to group the lease sales into a comprehensive review.  The Conservation

Groups disagree with this account, arguing that a combined review of the six leases was feasible

because the lease sales across the different jurisdictions proceeded on identical timelines, were

finalized within the same 48-hour period, and had substantially similar analysis (suggesting that

some portions may have been drafted at BLM headquarters).  See Pls' Br. at 38.  But it is the

agency's, not the plaintiffs', assessment of feasibility that receives deference, and these critiques

do not refute BLM's assessment of the practicalities.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 301 F. Supp. 3d 50, 65 (D.D.C. 2018).

Moreover, while declining to conduct a programmatic review of the six leases, BLM did not hide the fact that the lease sales were part of an overall federal program with cumulative environmental impacts.  It confronted this issue head-on in the Specialist Report when providing a comprehensive overview of all foreseeable federal fossil-fuel development, including the six lease sales.  Further, each EA also contains a table "show[ing] the cumulative estimated GHG emissions from the development of the projected lease sale acres in 2022" when combined with all other foreseeable oil and gas development on federal land.  See, e.g., MT_0094938.  Because climate change results from cumulative GHG emissions, this more holistic analysis of all federal leases is, if anything, superior to a narrow programmatic review of six lease sales that happened to coincide.  The Court is thus assured that this is not a case in which the agency segmented its EAs in order to understate the full ramifications of its decisions.  See Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 514 (D.C. Cir. 2010) (explaining the purpose of cumulative analysis is "to prevent agencies from dividing one project into multiple individual actions each of which has an insignificant environmental impact, but which collectively have a substantial impact" (citation and quotation marks omitted)).

To be sure, the Bureau could have been clearer in explaining how its decision not to analyze the six lease sales together squared with its commitment to follow Secretarial Order 3399.  It did not explicitly cite the pre-2020 CEQ regulations when rejecting calls to perform a programmatic assessment and, on multiple occasions, commented that the lease sales were not "connected," without mentioning whether they were also "cumulative" or "similar."  See, e.g., WY486041 ("[T]he concurrent offering of leases across multiple states does not constitute a

connected action for purposes of NEPA analysis for several reasons.").  This may suggest BLM had its eyes "train[ed] on the governing regulations," not the regulations it had promised to follow.  Delaware Riverkeeper Network v. FERC, 753 F.3d 1304, 1315 (D.C. Cir. 2014) (faulting agency for not citing applicable regulations).  But an agency's decision need not be "a model of analytic precision," and a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quotation marks omitted).  Here, the Bureau reasonably explained that a programmatic review of all six lease sales was impracticable and of limited value in light of the Specialist Report.  Even under the pre-2020 CEQ regulations, then, the Bureau did not act arbitrarily by not reviewing the six lease sales together.

At a minimum, any error on this score was harmless.  "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule."  Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 659–60 (2007) (quoting PDK Labs., Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004)).  That rule "requires the party asserting error to demonstrate prejudice from the error."  First Am. Disc. Corp. v. CFTC, 222 F.3d 1008, 1015 (D.C. Cir. 2000).  The Conservation Groups have not shown that any shortcoming in the Bureau's explanation of its decision not to combine the lease sales into one environmental review prejudiced the proceedings, and the Court doubts that separating the assessments made a meaningful difference here.  First, even if it did not cite the relevant regulations, it is clear that BLM believed it was infeasible to review all six lease sales in a single assessment.  That practical determination warrants substantial deference.  Second, combining the lease sales into one assessment would not have altered the ultimate analysis.  It is a virtual certainty that, after adding up all emissions, the Bureau would have found that it could not determine whether the environmental impact would

be significant—just as it found for the six lease sales individually, including Wyoming, which dwarfs the sum total of all other lease sales combined.  Third, the Court doubts that the basic exercise in arithmetic of adding up the GHG emissions from the sales would have altered the Bureau's decision to authorize the lease sales because, as the Conservation Groups argue, BLM oversaw all the sales and was well-aware of their cumulative effects.  Fourth, the Bureau did not hide the ball on the cumulative impact of its decisions:  It squarely addressed this issue in the Specialist Report when tallying the "GHG emissions from coal, oil, and gas development that is occurring, and is projected to occur, on the federal onshore mineral estate" to paint a holistic picture of its fossil-fuel program.  HQ_1808.  The Court, accordingly, fails to see how grouping the lease sales that happened to coincide in the same quarter would have further illuminated the matter, informed the public, or influenced the Bureau's decision.

　　　　With that said, there is wisdom in the Conservation Groups' warnings about how the Department of Interior has structured its fossil-fuel program.  Climate change is inherently cumulative, yet the various State Offices approve leases independently, on a quarterly basis, according to their own RMPs.  That diffuse decision-making structure runs the risk of losing the forest for the trees—and losing the climate battle to the tyranny of small decisions.  The Court applauds the Bureau's efforts to address these structural concerns with its Specialist Report and, partially on that basis, finds no legal error with its analysis here.  But given the potentially catastrophic consequences of the climate crisis and the rapidly developing legal and scientific terrain, it may prove prudent for the Bureau to take the next step by preparing a programmatic EIS for the entire federal fossil-fuel program, as the Conservation Groups urge.  See Pls' Br. at 30.

### 3. FONSI

Beyond the analysis that BLM performed, the Conservation Groups also challenge the Bureau's decision to issue a FONSI because, in the Bureau's telling, there is no established, science-backed standard for determining the significance of a given amount of GHG emissions. An unbroken line of D.C. Circuit precedent supports the Bureau's reasoning on this score, however. And regardless, it is uncertain what purpose would be served by requiring the Bureau to plow ahead with an EIS when it already has exhausted all available tools for measuring the impact of the lease sales' emissions.

Recall that agencies must prepare an EIS for any major federal actions "significantly affecting" the environment. 42 U.S.C. § 4332(C). To determine whether a proposed action will significantly affect the environment, agencies often prepare an EA. 40 C.F.R. § 1508.1(h). If, after preparing an EA, the agency finds the proposed action will not have a significant environmental impact, it issues a FONSI. Id. § 1508.1(l). A court's role in assessing the decision to issue a FONSI (and not prepare an EIS) is limited: It asks whether the agency "(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (alterations in original and citations omitted). "Although this analysis includes the phrase 'convincing case,' D.C. Circuit precedent clarifies that 'the scope of review is the usual one for reviewing administrative action—arbitrary, capricious, or an abuse of discretion.'" WildEarth II, 502 F. Supp. 3d at 257; see, e.g., Sierra Club, 661 F.3d at 1154. Still,

it is the agency's burden to justify the FONSI by explaining why there will not be a significant

impact.  See Grand Canyon Tr. v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002).

Here, after performing a robust analysis of the GHG emissions for each project, the

Bureau concluded:

> There are no established thresholds for NEPA analysis to contextualize the
> quantifiable greenhouse gas emissions or social cost of an action in terms of the
> action's effect on the climate, incrementally or otherwise.  The BLM acknowledges
> that all GHGs contribute incrementally to climate change and has displayed the
> greenhouse gas emissions and social cost of greenhouse gas in the EA in
> comparison to a variety of emissions sources and metrics.  As of the publication of
> this FONSI, there is no scientific data in the record, including scientific data
> submitted during the comment period for these lease sales, that would allow the
> BLM, in the absence of an agency carbon budget or similar standard, to evaluate
> the significance of the greenhouse gas emissions from this proposed lease sale.

See, e.g., CO_119434; see also, e.g., NV_070501 (noting that the SC-GHG is "not designed to

calculate effects to a particular area").  It then issued FONSIs for each lease sale in which it

resolved that each proposed project "would not have a significant effect on the quality of the

human environment."  See, e.g., CO_0119432.

To the Conservation Groups, this analysis doesn't cut it.  They first argue that the

Bureau's reasoning is self-refuting because, in their view, BLM "cannot, on the one hand, assert

that it is unable to make a determination as to the significance of climate change impacts, and on

the other, issue findings of no significant impact."  Pls' Br. at 33.  Apart from violating logic,

they insist that this rationale runs afoul of NEPA.  Their argument runs as follows:  NEPA places

the burden on an agency to show the proposed action "will *not* have a significant effect on the

human environment," 40 C.F.R. § 1508.1(l) (emphasis added), and requires that agencies prepare

an EIS when there are "substantial questions [as to] whether a project *may* have a significant

effect," Blue Mountains, 161 F.3d at 1212 (emphasis added).  Yet the Bureau did not provide a

"convincing statement" that the sales will not have a "significant effect."  It found instead the

environmental effects were uncertain based on current scientific tools.  And proposed actions with effects that are "highly uncertain or involve unique or unknown risks" usually should be analyzed in an EIS.  40 C.F.R. § 1508.27(b)(5) (2019).  Thus, the Bureau abdicated its NEPA responsibilities by concluding the effects were uncertain and calling it a day without exercising its best judgment in determining whether the estimated environmental effects from the sales were "significant."  See Pls' Reply at 38–42.  More was required.  Namely, the Bureau should have used the SC-GHG, a carbon budget, or some other device to determine significance at the EIS stage.

This argument has facial appeal.  Taken to an extreme, the Bureau's logic suggests that no agency has to perform an EIS based on *any* amount of GHG emissions so long as the government (or the overall scientific community) does not establish a threshold at which GHG emissions become significant.  That would appear to permit BLM to lease every last drop of oil in the country without ever making a significance determination or preparing a full-scale EIS.  With that said, this critique faces a series of hurdles that the Conservation Groups cannot clear.

*First*, the Conservation Groups contend that the effects of GHG emissions are "highly uncertain or involve unique or unknown risks" and should be assessed in an EIS under 40 C.F.R. § 1508.27(b)(5) (2019).  That regulation is no longer in effect, however, as CEQ repealed it in 2020.  The Conservation Groups are therefore once again forced to contend that the Bureau is bound by a defunct regulation—either because of its promise to abide by Secretarial Order 3399 or because the old rule merely reiterated NEPA's existing statutory requirements.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 985 F.3d 1032, 1043 (D.C. Cir. 2021) ("Congress created the EIS process to provide robust information in situations . . . where, following an environmental assessment, the scope of a project's impacts remains both uncertain

and controversial.").  But even if that rule still bound the Bureau, a fellow court in this District has held that "the risks of GHG emissions are not 'unique or unknown'" such that they must be analyzed in an EIS.  WildEarth I, 368 F. Supp. 3d at 83.

*Second*, and more importantly, the D.C. Circuit has uniformly upheld similar instances where an agency issued a FONSI after concluding that existing tools, including the SC-GHG, do not provide a sound method for assessing environmental impacts and determining significance. In EarthReports, Inc. v. FERC, the agency had prepared an EA and then issued a FONSI after concluding that the proposed project "would not constitute a major federal action significantly affecting the quality of the human environment."  828 F.3d 949, 951, 953–54 (D.C. Cir. 2016). FERC "acknowledged the availability of the 'social cost of carbon' tool" in issuing the FONSI, but declined to use that tool because: (1) "the lack of consensus on the appropriate discount rate leads to significant variation in output"; (2) "the tool does not measure the actual incremental impacts of a project on the environment"; and (3) "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes."  Id. at 956 (quotation marks omitted).  The D.C. Circuit upheld that decision.  In doing so, the Circuit noted there was "no reason to doubt the reasonableness of the Commission's conclusion" that "there [was] no standard methodology to determine how a project's incremental contribution to [GHG emissions] would result in physical effects on the environment."  Id.  In effect, then, the D.C. Circuit accepted exactly what the Conservation Groups insist was wrong with the Bureau's analysis here: issuing a FONSI because the available scientific tools, such as the SC-GHG, do not permit the agency to determine whether a particular amount of GHG emissions will have a significant impact.

EarthReports was not a one-off.  The D.C. Circuit recently doubled down on that decision in Food & Water Watch v. FERC, 28 F.4th 277 (D.C. Cir. 2022).  The plaintiffs there challenged FERC's issuance of a FONSI on the basis that it could not determine the "significance" of the emissions from a natural gas pipeline and compressor station.  Id. at 289.  In upholding FERC's decision, the Circuit refused to consider the plaintiff's contention that FERC should have employed the SC-GHG because the plaintiffs had failed to present that issue to the agency.  Id. at 290.  Yet more important than what the Circuit refused to consider was what the court did say in upholding FERC's decision to issue a FONSI.  Citing EarthReports, the Circuit concluded that the "bare assertion that [FERC] should have further assessed the significance of climate impacts . . . , unsupported by a validly raised criticism of the Commission's reasoning or any workable alternative method, affords no basis to overturn the Commission's finding."  Id.  In other words, when there are no accepted tools or thresholds to assess the significance of GHG emissions, the Circuit found no reason to fault the agency for explaining that fact in an EA and issuing a FONSI.  Accord Appalachian Voices v. FERC, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (upholding FERC's determination that the SC-GHG "is not an appropriate measure of project-level climate change impacts and their significance under NEPA").

That reasoning applies here.  The issues FERC identified in EarthReports and Food & Water Watch continue to ring true—especially the lack of established criteria for determining significance.  As BLM explained, despite recent developments involving the SC-GHG, there is still no developed standard for determining the significance of a given amount of emissions using this tool.  Responding to Executive Order 13990, a full suite of federal agencies joined forces in the Interagency Working Group on the Social Cost of Greenhouse Gases.  See NM_P_0059683–

84.[3]  The Working Group released a report in February 2021 offering technical guidance for how

agencies can use the SC-GHG.  See id.  But still, it offered no suggestions for how agencies can

determine the significance of a proposed action.  And in 2023, months after the lease sales here

were finalized, CEQ issued further guidance for applying the SC-GHG and suggested this tool

can be used to determine significance for NEPA purposes.  See 88 Fed. Reg. 1,196, 1,198 (Jan.

9, 2023) ("[r]ecommending that agencies provide additional context for GHG emissions,

including through the use of the best available [SC-GHG] estimates, to . . . help evaluate the

significance of an action's climate change effects").  But this new guidance—which, to repeat,

postdated the lease sales here—still did not establish any threshold or method to decide when

GHG emissions and their associated social costs become significant.  See id. at 1,200 ("This

guidance does not establish any particular quantity of GHG emissions as 'significantly' affecting

the quality of the human environment.").  Despite these developments, then, the Bureau found

itself in the same place as FERC in EarthReports and Food & Water Watch: having to translate a

range of social-cost estimates, which do not directly measure on-the-ground impacts, into a

significance determination.  The Bureau was permitted to reach the same conclusion that FERC

did in those cases, which the Circuit upheld, by resolving it could not make a significance

determination using the available tools.

    The Conservation Groups' struggle to distinguish cases.  In their reading, EarthReports

and its progeny addressed a separate question of whether the agency was required to use the SC-

GHG in the first place.  On that threshold matter, they accept that courts must defer to "the

expertise and discretion of the agency" in selecting which methodologies to use.  Sierra Club v.

U.S. Dep't of Transp., 753 F.2d 120, 128 (D.C. Cir. 1985).  But once an agency decides to use a

---

[3] Available at https://perma.cc/Q3WT-H8KY.

methodology, they contend, it cannot do so halfway; it must employ that methodology all the way through to determine whether the project will have a significant impact.  But agencies are not in for a penny, in for a pound when it comes to the SC-GHG.  If an agency can decide not to use the SC-GHG tool because there is "no established criteria identifying the monetized values that are to be considered significant for NEPA purposes," it would be passing strange if an agency that opts to provide a range of monetary figures for the estimated social costs is forbidden from reaching the same conclusion that there is no established criteria for determining whether the estimates add up to a significant environmental impact.  EarthReports, 828 F.3d at 956.  Such a rule would only lend credence to the saying "no good deed goes unpunished."  Worse still, it would create perverse incentives for the Bureau (and other agencies) to avoid using the SC-GHG entirely.  That cannot be right.[4]

    *Third*, it is doubtful what purpose would be served by requiring an agency to conduct an EIS under these circumstances.  As BLM explained, "preparation of an EIS solely for the sake of analysis of the issue of climate change is not warranted as any disclosure in such an EIS would be the same as that prepared for [the] EA[s] and would not better inform the decision makers or the public."  NV_070312.  When an agency has exhausted all available tools and finds there is no way to determine significance, forcing it to forge forward would be an exercise in futility that NEPA does not compel.  After all, NEPA's purpose is "not to generate paperwork" but to

─────────────────────

[4]  The Conservation Groups contend that the treatment of the carbon budget in WildEarth II supports their distinction between deciding not to use a tool at all and deciding that a tool cannot be used to determine significance.  See 502 F. Supp. 3d at 254–56.  The Court disagrees. There, the court faulted BLM for not explaining "why using a carbon budget analysis would not contribute to informed decisionmaking."  Id. at 255.  Here, by contrast, BLM did just that under the same logic that the Circuit endorsed in EarthReports.

"ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).

CEQ regulations reflect this reality.  "If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known," the regulations instruct agencies to acknowledge the missing information, explain its "relevance" to "evaluating reasonably foreseeable significant adverse impacts on the human environment," summarize "existing credible scientific evidence," and provide an "evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  40 C.F.R. § 1502.21(c).  That is precisely what the Bureau did here, and it was not required to copy and paste that analysis into the pages of an EIS.  Case law also supports that sensible conclusion.  In National Parks & Conservation Association v. Babbitt, for instance, the Ninth Circuit held that an "agency must *generally* prepare an EIS if the environmental effects of a proposed agency action are highly uncertain" but then clarified that "[p]reparation of an EIS is mandated" only "where uncertainty may be resolved by further collection of data."  241 F.3d 722, 731 (9th Cir. 2001) (emphasis added); see also Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt., 36 F.4th 850, 880 (9th Cir. 2022) ("An agency must prepare an EIS where uncertainty regarding the environmental effects of a proposed action may be resolved through further data collection.").  Where the uncertainty will *not* be resolved, by contrast, an EIS is not necessarily required—and declining to prepare an EIS is supported under the applicable "rule of reason" standard.  Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1322 (D.C. Cir. 2015).

The Conservation Groups maintain that requiring an EIS would be worthwhile because the Bureau should "be forced to develop a meaningful threshold for determining significance,"

and "[s]uch additional analysis is best done through the medium of an EIS."  Pls' Reply at 42.  In particular, they identify the carbon budget as one device that the Bureau could use to determine significance.  Id.  Though BLM used the Paris Agreement global carbon budget in the Specialist Report to compute that fossil-fuel development on federal land consumes approximately 1.47% of the remaining global budget, HQ_187, the Conservation Groups fault BLM for not using this same budget to assess the significance of the lease sales.  But, as the Bureau explained, it would be well-nigh impossible to scale down this global carbon budget to assess the significance of individual lease sales without any intermediary determination of the United States' share of the global carbon budget or the slice apportioned to the federal fossil-fuel program.  See, e.g., WY481349 ("Currently, there is not a formal Federal policy establishing a national carbon budget or a final international consensus on which carbon budget the world should use for limiting global warming (1.5C or 2.0C) that the BLM can use to evaluate the significance of a proposed action.").  Carbon "budgets have not yet been established on a national or subnational scale" and there is no "consensus on how to allocate the global budget to each nation," let alone between different departments within the federal government.  HQ_1873–74.  That reasonable basis for not using the carbon budget to determine significance would not change if the Court required the Bureau to perform an EIS.

"Agencies are not required to undertake new scientific and technical research to inform their analyses."  40 C.F.R. § 1502.23.  Nor are they required to spin new significance thresholds out of whole cloth, as the D.C. Circuit reiterated in Center for Biological Diversity v. FERC, 67 F.4th 1176 (D.C. Cir. 2023).  There, FERC produced an EIS in which it refused to use the SC-GHG to estimate the significance of the project's emissions because that tool does "not measure environmental impacts as such" and there is "no established criteria for translating these dollar

values into an assessment of environmental impacts." Id. at 1184.  Following "EarthReports and subsequent cases," the Circuit did not force FERC to set an ad hoc threshold at which emissions and social-cost projections suddenly become significant.  Id.  Instead, it accepted FERC's reasonable explanation that the "absence of an adequate methodology, combined with a lack of either state or federal emissions benchmarks, left FERC unable to assess the Project's causal effect (if any) on global climate change." Id.  The Court must follow suit here.

In doing so, the Court does not diminish the Conservation Groups' concerns.  Climate change poses a potentially catastrophic threat that all parties here appear to acknowledge, and the nation must address.  Labelling sizeable GHG emissions "insignificant" may therefore ring hollow to many citizens.  And dodging a significance determination altogether may strike many as little more than buck-passing—all the while global temperatures rise.  Nonetheless, the precedent in this Circuit and the absence of a clear indication of what an EIS would accomplish compels the Court to reject the Conservation Groups' challenge.

### 4. FLPMA: Unnecessary and Undue Degradation

Shifting gears from NEPA's procedural requirements, the Conservation Groups also claim that the Bureau failed to satisfy its substantive duty under the FLPMA to prevent "unnecessary and undue degradation" of public lands.  43 U.S.C. § 1732(b).  Under this standard, the Bureau cannot approve activities that would cause "the occurrence of 'something more than the usual effects anticipated' from appropriately mitigated development." TRCP, 661 F.3d at 76 (citation omitted).  Because the Conservation Groups point to no evidence in the record suggesting that the Bureau will not properly manage and mitigate any future development on the leased parcels, it has not proven that BLM violated the "unnecessary and undue degradation" standard.

Before getting there, the Court must address the State Intervenors' threshold assertion that the FLPMA claim is unripe.  <u>See</u> State Intervenors' Br. at 22–27.  Drawn from Article III's limits on judicial power as well as prudential considerations, the ripeness doctrine seeks to avoid "premature adjudication" of "abstract disagreements over administrative policies" and "to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  <u>Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 807–08 (2003).  In deciding whether an agency's decision is "ripe for judicial review," courts examine "both the fitness of the issues for judicial determinations and the hardship to the parties of withholding court consideration."  <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726, 733 (1998) (quotation marks omitted).  Following <u>Ohio Forestry</u>'s lead, the State Intervenors contend that the FLPMA claim is unripe.  There, the Supreme Court refused to consider the claim that the U.S. Forest Service's RMP permitted excessive logging because the plan did not "authorize the cutting of any trees" and the plaintiffs could pursue their challenge later once matters had come into greater focus with the benefit of particular logging proposals.  <u>Id.</u> at 729–30, 734–36.  By the same logic, State Intervenors reason, because the challenged lease sales do not authorize drilling, the Conservation Groups would not be prejudiced by deferring review until the APD stage when the Court can assess all mitigation measures and lease stipulations that the Bureau will impose.  <u>See</u> State Intervenors' Br. at 24–25.

This argument overlooks a critical distinction, however:  Unlike the resource plans at issue in <u>Ohio Forestry</u>, the oil and gas leases at issue here are an "irretrievable" and "irreversible" commitment of resources that will bind BLM going forward.  <u>Sierra Club</u>, 717 F.2d at 1412.  Deferring FLPMA review until a subsequent stage would therefore prejudice the Conservation Groups in some real sense, making their FLPMA claim ripe here and now.  Yet

this victory on ripeness is illusory because the exact same issues that the State Intervenors raise in their ripeness challenge—particularly the absence of a developed record on the mitigation measures that BLM will implement—doom the Conservation Group's claim on its merits.

The FLPMA directs BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The Department of Interior's Board of Land Appeals has interpreted "unnecessary and undue degradation" to require a showing that the "lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake the action pursuant to a valid existing right." Colo. Env't Coal., 165 I.B.L.A. 221, 229 (Apr. 8, 2005). Put differently, "unnecessary and undue" requires "something more than the usual effects anticipated" from appropriately mitigated development. Biodiversity Conservation Alliance, 174 I.B.L.A. 1, 5–6 (March 3, 2008). The D.C. Circuit has embraced this reasonable interpretation of "unnecessary and undue degradation" in TRCP, 661 F.3d at 76, so that definition binds the Court here.

So understood, the Conservation Groups have not carried their burden of proving the oil and gas leases here will cause "unnecessary and undue degradation." Nor does anything in the administrative record support this supposition. To the contrary, lessees are required to follow all applicable federal and state requirements, see, e.g., CO_0115305; MT_0083552; NV_070535, and BLM represented that, at the APD stage, it will take appropriate steps to ensure lessees follow best management practices to limit their environmental impact, see, e.g., CO_0115305; NV_070535–36; WY486040. On this record, there is no reason to believe that BLM will renege on these promises and permit excessive environmental harms beyond what is expected or needed when drilling for oil or natural gas.

The Conservation Groups' attempts to avoid this conclusion are unpersuasive.  Having conceded that BLM applied the correct "unnecessary and undue degradation" standard, see Pls' Reply at 51, the Conservation Groups nonetheless maintain that BLM cannot employ a "just trust us" approach by promising to mitigate the environmental effects with appropriate requirements and stipulations at the APD stage, see id. at 52.  Yet there is no reason to believe that BLM will go back on its word, and it appears entirely appropriate for the Bureau to wait until the APD stage to impose more specific lease requirements tailored to the projects and tracts at issue.  See Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. BLM, No. 18-cv-1643-JLK, 2022 WL 472992, at *24 (D. Colo. Feb. 9, 2022) (relying on BLM's commitment to further site-specific mitigation efforts at the APD stage).  More importantly, it is plaintiffs' duty to come forward with evidence demonstrating that BLM acted in an arbitrary and capricious manner by not properly mitigating the environmental impact of its leases.  Speculating, without support, that the Bureau *may* not abide by its promise and statutory obligations does not suffice.  Nor does the Conservation Groups charge that, given the dire nature of the current climate crisis, it is self-evident that GHG emissions are not being appropriately mitigated and, as a result, any further expansion of oil and gas drilling is per se "unnecessary and undue."  See Pls' Reply at 51.  Again, while the Conservation Groups' concerns may be valid, such considerations do not change the statutory requirement and invalidate all new authorizations of oil and gas leases under the FLPMA.

Accordingly, the Court concludes that BLM did not violate its duty under the FLPMA to avoid "unnecessary and undue degradation" when authorizing the challenged lease sales.  If the Conservation Groups believe BLM has not adequately managed the leases at the APD stage or has permitted drilling activities that cause excessive environmental damage beyond the norm,

they may (and no doubt will) raise these challenges at that stage when the record is more developed.[5]

## IV.   Conclusion

For these reasons, the Court will deny Plaintiffs' Motion for Summary Judgement and grant the Defendants' and the Intervenors' Cross Motions for Summary Judgment.  A separate Order will follow.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 22, 2024

---

[5]  In the companion case, Wilderness Society v. United States Department of Interior, No. 22-cv-1871, the Court found that BLM failed to adequately justify its decision to proceed with such a sizeable lease sale in Wyoming when it appeared to assert that its GHG analysis in the Wyoming EA had no influence on its decision to select the Modified Proposed Action.  See Mem. Op. & Order (ECF No. 45) at 52–59.  That holding has no bearing on the distinct NEPA and FLPMA challenges that the Conservation Groups present here, which focus instead on the type of environmental review that the agency performed across all six lease sales and whether its decision to proceed with the lease sales comport with the FLPMA's "unnecessary and undue degradation" standard.